Christopher Celentino (131688)
Christopher.Celentino@dinsmore.com
Yosina M. Lissebeck (201654)
Yosina.Lissebeck@dinsmore.com
Christopher B. Ghio (State Bar No. 259094)
christopher.ghio@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, California 92101
Tele: (619) 400-0500; Fax:  (619) 400-0501

Siqin Carol Wang (Ohio Bar 0097181)
Carol.wang@dinsmore.com
**DINSMORE & SHOHL LLP**
Dinsmore & Shohl LLP
191 West Nationwide Blvd, Suite 200
Columbus, OH 43215
T (614) 628-6940; F (614) 628-6890
(Admitted pro hac vice)

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP P.C., | Chapter 11 |
| Debtor. | Adv. Proc. No. 8:26-ap-01007-SC |
| Richard A. Marshack,<br>Trustee of the LPG Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>OHP-CDR, LP (f/k/a OHP-LPG, LP), a Delaware Limited Partnership; Old Hickory Fund I GP, LLC, a Delaware limited liability Company; Old Hickory Fund I GP, LP, a Delaware Limited Partnership; PurchaseCo80, LLC, a Delaware limited liability Company, Adam Blum, an individual, Daniel Young, an individual<br><br>Defendants. | **AMENDED COMPLAINT FOR:**<br><br>**(1) DECLARATORY JUDGMENT – INVALIDATION OF CONTRACTS ENTERED INTO FOR ILLEGAL PURPOSES;**<br><br>**(2) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br><br>**(3) CONVERSION;**<br><br>**(4) AIDING AND ABETTING CONVERSION**<br><br>**(5) DEEPENING INSOLVENCY; AND**<br><br>**(6) AIDING AND ABETTING DEEPENING INSOLVENCY**<br><br>Judge:      Hon. Scott C. Clarkson |

1

For his *Amended Complaint for (1) Declaratory Judgment – Invalidation of Contracts Entered into for Illegal Purposes;(2) Aiding and Abetting Breach of Fiduciary Duty;(3) Aiding and Abetting Conversion; (4) Conversion; ; (5) Deepening Insolvency; and  (6) Aiding and Abetting Deepening Insolvency*, plaintiff Richard A. Marshack, Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

### STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court"). Additionally, Sabia Financial, Inc. has consented to jurisdiction over this Court pursuant to its filing of the Proof of Claim (as defined herein).

2. Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3. Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

### THE PARTIES

5. Plaintiff, Richard A. Marshack, was the duly-appointed, qualified, and former Chapter 11 Trustee of Debtor's Estate, and is now the current duly-appointed, qualified, and acting Liquidating Trustee of the LPG Liquidation Trust.

6. The Litigation Practice Group P.C. ("LPG" or "Debtor") is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

**7.** Defendant, OHP-CDR, LP ("OHP-CDR"), formerly known as OHP-LPG, LP, is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in Austin, Texas.

**8.** Defendant, PurchaseCo80, LLC ("PurchaseCo80") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Austin, Texas. At all times relevant to this Complaint, OHP-CDR is a member and the Manager of PurchaseCo80.

**9.** Defendant, Old Hickory Fund I GP, LLC ("OHF"), the general partner of OHP-CDR, is, and at all material times was, a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Austin, Texas.

**10.** Defendant, Old Hickory Partners Fund I, LP ("Old Hickory"), is, and at all material times was, a limited partnership existing under the laws of the State of Delaware, with its principal place of business in Austin, Texas.

**11.** Defendant, Adam Blum ("Blum"), is an individual with a last known physical address of 3201 Bowman Ave, Austin, TX 78703-2255. At all times relevant to this Complaint, Blum served as Manager of OHF, Manager and General Partner of OHP-CDR, and owner and manager of Old Hickory, and exercised control over OHF, OHP-CDR, and Old Hickory.

**12.** Defendant, Daniel Young ("Young") (OHP-CDR, PurchaseCo80, Old Hickory, OHF, Blum, and Young are collectively, "OHP Defendants"), is an individual with a last known physical address of 2505 Watkins Way Austin, Texas 78746. At all times relevant to this Complaint, Young served as Chief Operation Officer ("COO") and General Counsel of Old Hickory.

### GENERAL ALLEGATIONS

**A.    The Bankruptcy Case**

**13.** On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

**14.** The Office of the United States Trustee ("UST") filed its Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b) [Bankr. Docket No. 21] and

creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert this Case to Chapter 7 or Appoint a Trustee [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its Order Directing United States Trustee to Appoint Chapter 11 Trustee [Bankr. Docket No. 58].

15.    Pursuant to the Acceptance of Appointment as Chapter 11 Trustee [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continued to serve in that capacity until confirmation of the Plan, described below. The Court approved the Trustee's appointment in its Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee [Docket No. 65].

16.    Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered on September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

17.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at \*5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); see also *Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at \*4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

///

4

**18.** All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee for the benefit of Debtor's Estate and its creditors.

**B. Protective Order**

**19.** On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion"). On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate Copy of the Projective Order is attached hereto and incorporated herein as **Exhibit A**.

**20.** By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C. LPG**

**21.** LPG operated a law firm for consumers across the country in 48 states who sought assistance in contesting or resolving debts they would identify.

**22.** LPG's organization chart prior to the filing of bankruptcy is attached hereto as **Exhibit B**.

**23.** The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

**24.** The monthly payments were meant to cover all legal services LPG provided to the consumers including debt review, review of documents to determine enforceability, pursuit of legal recourse, court appearances to halt lawsuits to obtain judgments, and rarely including bankruptcy advice.

**25.** In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

**26.** Tony Diab ("Diab"), who at all times relevant herein surreptitiously and without express knowledge of the actual control person, Daniel March ("March") controlled LPG and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form

///

5

of ACH Receivables (the "ACH Receivables" or "Accounts Receivables") out of LPG to third parties prior to the filing of bankruptcy.  Indeed, Diab has admitted that he used electronic signatures under his control to forge March's signature to documents.

27.     Pursuant to the same unlawful Ponzi scheme, Tony Diab caused funds in possession and control of LPG to be diverted to pay for extravagant and personal expenses, debtos  and other liabilities of Tony Diab with no intended or actual benefit to LPG (the "Scheme" or the "Ponzi Scheme").

28.     To obtain consumer clients, LPG contracted with marketing companies, known generally as marketing affiliates, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH receivables later collected by LPG from the consumers.

29.     The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

30.     In exchange, LPG agreed inter alia  to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

31.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals. Diab, working in concert with others, converted LPG funds from consumer payments and loan transactions to fund his personal extravagancies to the detriment and harm to LPG and its businesses; and in conjunction with others, converted those consumer funds to make payments to third parties who continued to finance the Ponzi enterprise being operated within LPG in conjunction with Diab.

32.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

33.     Diab used entities he controlled including, without limitation, Vulcan Consulting Group; Coast Processing; PrimeLogix, LLC; Marich Bein; PurchaseCo80 and/or Maverick Management, LLC to divert LPG consumer funds, loan proceeds, and ACH Receivables. Diab

would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection by March and others, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank accounts to Defendants consisted of Client Funds or loan proceeds designated to be received by Debtor or otherwise that Debtor held in its bank accounts and funneled to these entities by means of the ACH processing companies. Debtor regularly made deposits into these entities' bank accounts such that they received Client Funds and/or loan proceeds directly from Debtor in addition to future Accounts Receivable.

### D.    Affiliate Agreements with Market Affiliates

**34.**    Trustee is informed and believes that Debtor entered into affiliate agreement(s) with a few of the market affiliates (generally "Affiliate Agreements"). A true and accurate copy of an example of the Affiliate Agreement is attached hereto as **Exhibit C**.

**35.**    On information and belief, similar Affiliate Agreements would provide that market affiliate "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG."

**36.**    On information and belief, and based on similar agreements, market affiliates generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to LPG.

**37.**    On information and belief, and based on similar agreements, market affiliates went so far as to assist with the execution of an engagement letter with the consumer.

**38.**    On information and belief, and pursuant to similar agreements, LPG would agree to pay entities, similar to Defendants as follows:

> Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 65% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive [sic] for such cost and Affiliate shall not have to share such expense.

7

**39.** These types of Affiliate Agreements violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

**40.** Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc., 8 Cal. Rptr. 459* (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

**41.** Because the Affiliate Agreement(s) violate federal and state law, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under the Affiliate Agreements and/or the ARPA Agreements (as defined below) was unlawful.

**42.** Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### E. Diab's Ponzi Scheme Utilizing LPG

**43.** The Ponzi Scheme Presumption exists in Bankruptcy.

**44.** The Ponzi Scheme Presumption can be utilized to establish a debtor's – or in this case a surreptitious "controlling" agent's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi Scheme. Indeed, no other reasonable inference is possible. A Ponzi Scheme cannot work forever. The investor [and lender] pool is a limited resource and will eventually run dry. The perpetrator must know that the Scheme will eventually collapse as a result of the inability to attract new investors [or lenders]. The perpetrator nevertheless makes payments to present investors [and lenders], which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, cf. Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott* (*In re Independent Clearing House Co.*) (D. Utah 1987) 77 B.R. 843, 860.

**45.** "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi Scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his Scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id.* at

859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi Scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

46. Diab used LPG to operate a Ponzi Scheme that utilized the Defendants and several other entities as "investors" [and lenders] whether pursuant to unlawful fee-sharing agreements, account receivable purchase agreement, cash investments, diversion of funds, or diversion of "loan" proceeds to continue its unlawful business practices by using funds provided by current investors [and lenders] to attract new investors hoping for very high returns. Therefore, Diab was running a Ponzi Scheme using LPG and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).

**E.    OHP Defendants' Knowledge of Coast Processing/Scheme Insiders' Self-Dealing, Ponzi-Like Scheme, and Illegal Fee Sharing.**

47. B.A.T., Inc., doing business as Coast Processing ("Coast Processing"), is a Florida limited liability company with its principal place of business located at 7901 4th Street North, Suite 5765, St. Petersburg, Florida 33702.

48. Coast Processing is an affiliate of LPG was represented to be owned by Brian Reale ("Reale") and Mairo Azevedo ("Azevedo").

49. While LPG provided direct services to the customers, Coast Processing performed outsourced back-office and administrative functions, including customer service, communications, mail and paper processing, payment processing support, and file administration. At all times relevant to this Complaint, Coast Processing did not possess the required certification to practice law.

50. Upon information and belief, LPG and Coast Processing were in fact both controlled by Diab.

51. In furtherance of the Ponzi Scheme, Diab, Azevedo, and Reale sought to attract additional investors and capital while expanding the consumer base to sustain and grow the Scheme.

10

**52.** Through a mutual acquaintance, Mario Azevedo came into contact with Adam Blum and Kevin Yu of Old Hickory and introduced them to a purported high-return investment opportunity by working with Azevedo, Reale, and Diab.

**53.** Old Hickory claims to be a sophisticated investor managing a $125 million credit fund. It retained its own counsel and conducted due diligence for the relevant transactions. Through that diligence and related communications, Old Hickory learned that LPG was in financial distress and controlled by problematic individuals, conditions it sought to exploit to secure favorable terms and achieve high returns, to the detriment of LPG and its creditors.

**54.** In or about June 2020, Blum and Yu prepared a memorandum regarding the structure and investment mechanism of LPG and its affiliated entities based on the information provided by Brian Reale, Tony Diab, and Mario Azevedo ("LPG Memo"). A true and accurate copy of the LPG Memo is attached hereto as **Exhibit D**.

**55.** The LPG Memo demonstrates that the OHP Defendants were aware that revenues from LPG's customers are split between front-end marketing affiliates and the back-end entities (LPG and Coast Processing) in a 65% / 35% allocation, respectively.

**56.** OHP Defendants also learned through communications with Azevedo, Reale, and Diab that although LPG provided the legal services, contracted directly with consumers, and bore the ongoing obligation to provide services to generate future revenue, all profits from the legal services were allocated to and retained by market affiliates and Coast Processing.

**57.** According to Reale's email on September 17, 2020, "LPG is a break even entity, meaning that its cost of operation and attorney salaries are paid, but no profit is retained by the entity." A true and accurate copy of Reale's September 17 email is attached hereto as **Exhibit E**.

**58.** The LPG Memo further explained Coast Processing identified opportunities to factor front-end receivables by purchasing packages of monthly originations ("Packages") from front-ends and then selling the Packages to investors at a mark-up.

**59.** As described to OHP Defendants, the economic viability of the structure depended on the continual extraction and monetization of future consumer payments. This mechanism ///

prioritized investor pipelines and insider-affiliate payouts over LPG's duties and obligations to its clients.

60. Diab, Reale, and Azevedo further provided a document called "Coast Processing/Litigation Practice Group – Business Model Competitive Advantages and Market Map. ("Structure Document") which specifically state "Processing company contracts with affiliates to avoid fee-sharing restriction." "Coast offers purchase of 65% cash flows, creating a capital infusion able to be reinvested in further marketing growth by the affiliates." A true and accurate copy of the Structure Document is attached hereto as **Exhibit F**.

61. On or about July 1, 2020, Blum expressed to Azevedo his desire to partner in creating a dedicated purchasing entity to acquire front-end market affiliates' share of the cash streams generated by LPG.

62. Upon information and belief, the parties knew that the front-end marketing affiliates' Affiliate Agreements constituted unlawful fee-capping agreements; accordingly, LPG sought to avoid memorializing those capping arrangements in writing.

63. On July 28, 2022, Diab admitted in an email to Young and Yu that "we have had a small handful of affiliates sign the LPG agreement - maybe 4 or 5 total.  The vast majority were either existing affiliates on the Coast Processing side or did not insist on a written agreement.  We try to avoid written agreements if at all possible." A true and accurate copy of the July 28, 2022 email is attached hereto as **Exhibit G**.

64. Upon information and belief, OHP Defendants conducted background checks on Diab, Reale, and Azevedo, as part of its due-diligence process.

65. Upon information and belief, background checks conducted by OHP revealed to OHP that Diab, Reale, and Azevedo lacked the requisite licenses to practice law. Specifically, Blum and Yu knew that Diab had been disbarred in both California and Nevada.

66. Those background checks revealed that Diab, Reale, and Azevedo owned and controlled multiple front-end marketing affiliates. For example, Brian Reale owned ABR Enterprises, LLC, an entity created to purchase receivable packages, and Coast Processing established and controlled additional marketing affiliates used in LPG's business operations.

12

67.     OHP Defendants also learned through their due diligence that, on May 26, 2020, a class action lawsuit was filed against LPG, Leapforward Financial, an affiliate owned by Reale, Reale in his induvial capacity, BAT, Inc., and others. That action alleged multiple violations of the Telephone Consumer Protection Act ("TCPA"), based on the market affiliate's practice of initiating unsolicited automated calls to solicit consumers for LPG and affiliated services.

68.     In response to these findings, Reale stated that Leapforward Financial was an affiliate created by Coast Processing as part of an effort to vertically integrate marketing functions, and that Leapforward purchased leads from third-party marketing companies to sell LPG and Coast services.

69.     Reale further stated that such lawsuits based on TCPA violations were "not uncommon" and were considered an expected cost of doing business in the industry.

70.     OHP Defendants knew that Diab, Reale, and Azevedo were receiving LPG-derived customer payment streams through separate, insider-controlled entities, reflecting a pattern of self-dealings.

71.     On or about October 19, 2021, Tony Diab provided OHP with a list of controlled entities, including Real Marketing; Vulcan Consulting Group; Azevedo Solutions, Inc.; and Big Time Digital, while discussing the use of those entities as limited guarantors "to the extent of proceeds received from LPG." This further confirmed that the OHP Defendants knew that revenues derived from LPG were being funneled through multiple affiliated entities.

72.     Based on OHP Defendants' communications with Diab, Reale, and Azevedo, OHP acquired the actual knowledge that the same scheme insiders controlled both Coast Processing and LPG, that scheme insiders also ran and operated the marketing affiliates which would receive cash from the customers' monthly and future payments generated by LPG's debt-validation services. OHP Defendants also knew that (1) consumer payments were split 65% to front-end marketing affiliates and 35% to back-end entities, despite LPG contracting with consumers, providing all legal services to generate revenue; (2) marketing affiliates were responsible only for customer acquisition, and Coast Processing handled back-office administration, yet nearly all revenue flowed to the front-end affiliates and Coast Processing, (3) LPG itself was represented as a break-even

13

entity retaining no meaningful profit; and (4) that the "business" was built on a "restricted fee sharing model" and that payments came directly from money paid by consumers for legal services.

73.    OHP Defendants knew that front-end affiliates were incentivized to sell receivables at a discount because it allowed the front-end affiliates to grow rapidly while enabling them to increase volume and client base. OHP knew the business model's dependence on continual monetization of future consumer payments.

74.    OHP Defendants further knew that LPG's future consumer payments were not earned until the underlying services were performed because "the fees apply for the duration of the term for as long as any files are outstanding." [LPG Memo at p. 3.]

**F.    Establishment of PurchaseCo80 to Facilitate Illegal Fee Sharing and Expand the Ponzi Scheme**

75.    For the purpose of advancing and expanding high-margin returns regardless of the illegal and self-dealing conduct by Diab, Reale, and Azevedo, OHP Defendants and LPG discussed corporate structures for OHP's investment.

76.    The OHP Defendants and Diab, Reale, and Azevedo agreed to form an LLC for the purpose of purchasing packages from marketing affiliates and making monthly payments characterized as returns and distributions to OHP-CDR and the scheme insiders.

77.    OHP Defendants understood that marketing affiliate arrangements were created to avoid fee-splitting prohibitions, that Diab, Reale, and Azevedo owned multiple marketing affiliates, and that Diab was the actual controller of LPG-related entities and scheme insiders owned multiple affiliates.

78.    On or about August 1, 2022, Dan Young, the COO and General Counsel of Old Hickory established OHP-LPG, LP.

79.    On or about September 1, 2022, LPG, OHP-CDR, and Mario Azevedo executed a Limited Liability Company Agreement ("LLC Agreement") to form PurchaseCo80 LLC ("PurchaseCo80"). Specifically, Section 2.05 of the LLC Agreement states PurchaseCo80 was intended to acquire "cash flow streams representing interests in customer payments for debt

///

14

validation services." A true and accurate copy of the LLC Agreement filed with OHP's proof of claim is attached as **Exhibit H**.

80.     Section 3.02 of the LLC Agreement permitted OHP to advance up to $10,000,000.00 to PurchaseCo80 to fund operations ("OHP Funding Capital").

81.     It was the parties' understanding that the funds would go to purchasing packages and/or front-end affiliates' rights to receive the 65% monthly payments from monies paid by the LPG consumer client and required to be held in trust for the provision of legal services but instead were immediately and before any services were provided were actually diverted directly to OHP; affiliates could use those funds to obtain more customers and expand originations, hence create influx of new money and future payments, which payments were made pursuant to illegal fee sharing agreements and were funded by consumer monies that were nothing more than misappropriated client trust funds.

82.     Pursuant to the LLC Agreement, OHP Funding Capital did not fund LPG, but rather paid the front-end marketing affiliates to acquire their contractual rights to 65% of LPG customers' future payments.

83.     Whether LPG could actually perform services or achieve debt-validation outcomes for customers was not material to OHP's consideration; OHP focused on high returns from packages of customers' future income and proceeded.

84.     Section 6.01 required PurchaseCo80 to repay OHP Funding Capital first, followed by repayment of each member's Equity Investment, and then provided OHP the greater of (i) 88% of maximum OHP Funding Capital paid, and (ii) a 20% IRR.

85.     On September 1, 2020, the members of PurchaseCo80 entered into a letter agreement amending Section 6.01 of the LLC Agreement to provide that, one hundred percent (100%) of all available cash attributable to the Eligible Receivables is distributed to OHP. The letter Agreement is attached hereto as **Exhibit I.**

86.     Section 7.02 granted PurchaseCo80 a right of first offer to purchase cash flow streams from LPG on the same terms offered to LPG by the applicable LPG Receivable Affiliates.
///

15

**87.**    From July to September 2022, OHP executed numerous Accounts Receivable Purchase Agreements ("ARPAs") with market affiliates and assigned them to PurchaseCo80 through an Omnibus Assignment and Assumption Accounts Receivable Purchase Agreement ("Omnibus Assignment") on or about September 8, 2023. A true and accurate copy of the Omnibus Assignment without exhibits identifying client files ("Files") is attached as **Exhibit J**. Through those transactions, OHP effectively replaced the market affiliates in the unlawful fee-splitting Scheme.

**88.**    To secure repayment of OHP Funding Capital and obligations of PurchaseCo80 to OHP-CDR, Section 8.02 of the LLC Agreement granted OHP a lien on all business assets of LPG and any subsidiaries. On September 1, 2020, LPG executed an unlimited guaranty ("LPG Guaranty"), secured by all of its assets, guaranteeing the payment of PurchaseCo80's obligations under the LLC Agreement, including amounts (client receivables) owed to OHP in connection with the client files. [ OHP-CDR's proof of claim, Ex.C ]

**89.**    As of September 1, 2022, Debtor was encumbered by fourteen (14) unreleased UCC-1 financing statements, all of which remained effective as of the Petition Date.

**90.**    These UCC-1 statements either (a) asserted liens against substantially all of Debtor's assets, or (b) purported to assign or encumber significant portions of Debtor's future income and receivables.

**91.**    PurchaseCo80's structure required PurchaseCo80 to pay 100% of payments received from packages to OHP; LPG guaranteed the payment and pledged all of its assets even though the funding capital went directly to marketing affiliates and Coast Processing.

**92.**    OHP Defendants also required additional cash controls and account-control mechanisms to gain inappropriate advantages over other creditors.

**93.**    Upon information and belief, OHP-CDR and LPG executed a deposit account control agreement ("DACA") granting OHP-CDR secured interests in, and control over, LPG's bank accounts at JPMorgan Chase Bank. Thereafter, on November 18, 2022, OHP-CDR, LPG, and JPMorgan Chase Bank, N.A. executed a blocked account control agreement ("BACA") governing

///

16

two LPG accounts at JPMorgan, naming OHP as the secured party. A true and accurate copy of the BACA Agreement is attached hereto as **Exhibit K**.

94.     Upon effectiveness of the BACA, without LPG's consent, the bank must follow only OHP's written instructions regarding the rights to access, withdraw, or transfer funds from the accounts.

95.     Through these agreements, OHP-CDR obtained extensive control over LPG's deposit accounts, including accounts used to receive customer payments that were required to be held in trust until earned.

96.     Diab, Reale, and Azevedo, in order to obtain funds from OHP in furtherance of the Ponzi Scheme, allowed OHP to exert control over LPG assets and accounts used to receive customers' monthly trust payments, which should be secured and treated as trust funds until earned.

97.     Upon information and belief, PurchaseCo80 was intentionally formed to shield OHP Defendants from liability arising from illegal fee-capping and Ponzi-like conduct, despite OHP Defendants' knowledge that LPG and Coast Processing engaged in self-dealing and unlawful practices, including violations of the TCPA, illegal fee-capping, and Ponzi Scheme. The LLC Agreement and ancillary documents, including the LPG Guaranty, ARPAs and Omnibus Assignment, were entered into, at least in part, to facilitate and further those unlawful activities.

98.     After these transactions and the execution of the agreements, LPG made approximately $2 million in payments to PurchaseCo80 pursuant to the LLC Agreement.

**G.     OHP Defendants' Knowledge of LPG Diverting Its Assets and Clients' files**

99.     In furtherance of its Ponzi Scheme, LPG repackaged client files that had previously been sold to OHP-CDR and then resold or transferred those same files to other entities controlled by Diab, Reale, and Azevedo.

100.    Upon information and belief, hundreds of client files that OHP had purchased were resold by marketing affiliates and transferred among LPG and other affiliated entities.

101.    On or about December 6, 2022, OHP Defendants noticed significant reductions in file counts and was aware that LPG had moved files among insider-controlled entities.

///

17

**102.** Upon information and belief, Diab informed OHP Defendants that created a new law firm, Oakstone Law Group PC, to which LPG's work, assets, and client files would be transferred in order to evade LPG's obligations and shield assets from creditors.

**103.** Meanwhile, OHP Defendants also received notice of lawsuits brought by other investors against LPG based on defaulted contracts involving millions of dollars.

**104.** Between December 2022 and February 2023, OHP and LPG engaged in negotiations to restructure their arrangement, including discussions about transferring files and assets to the newly formed entity Oakstone, and including the request that Diab procure approximately $3 million in term life insurance to further secure OHP-CDR's investment.

**105.** Knowing that LPG was diverting funds, altering and transferring file ownership to avoid creditors, and facing significant debts and legal liabilities, OHP filed its UCC financing statement on January 25, 2023 in order to perfect the lien on LPG's assets granted by the LPG Guaranty. A true and accurate copy of the UCC-1 Financing Statement (File No. U230005834326), as reflected in OHP's proof of claim, is attached as **Exhibit L**. The lien was perfected within the statutory preference period.

**106.** Despite knowing that many of the files it purchased had been diverted or resold to third parties, OHP Defendants continued to support the arrangement so long as LPG replaced the client files, granted additional security interests, or allowed greater control over LPG's assets and customer payment accounts.

**107.** On February 10, 2023, an email from Adam Blum to a Partner at Old Hickory admitted that (1) OHP Defendants invested in LPG by buying receivables, not making a normal loan, because LPG was distressed and OHP Defendants wanted a bigger return; (2) they took advantage of sScheme insiders' poor and unstable management to obtain favorable terms; (3) LPG faced tremendous liability, so OHP took proactive measures with "trusted individuals from LPG" to transfer the receivables to a different law firm; and (4) because OHP-CDR and PurchaseCo80 owned the cash flow, not LPG, have the right to work with the consumer and move their files to a new firm. A true and accurate copy of Blum's February 10, 2023 email is attached hereto as **Exhibit M**.

18

**108.** On or about February 14, 2023, Young communicated with Diab to explore how OHP-CDR could keep profiting LPG customer files following LPG's reassignment, diversion, and resale of certain files originally purchased by OHP-CDR.

**109.** OHP Defendants demanded authorized user/signer-level access to systems and accounts and the ability to dictate banking/processing relationships.

**110.** In his February 14, 2023 email, Young stated that the "ideal provision would say OHP is entitled to the revenue … regardless of where they are serviced," but acknowledged that the "servicing company must take on the obligation; otherwise OHP has no obligor."

**111.** Young further requested the unilateral ability to dictate banking and processing relationships. In response, Diab stated, "Kind of aggressive … I am fine … provided we continue to agree not to share any information with anyone outside of OHP and me." A true and accurate copy of the Feb. 14 email is attached hereto as **Exhibit N**.

**112.** Upon information and belief, OHP Defendant colluded with Diab and scheme insiders to conceal the facts regarding the fraudulent transfers of LPG assets to other entities.

**113.** Knowing that LPG would transfer all of its assets to other entities, on or about February 28, 2023, OHP-CDR, pursuant to an agreement with Diab, removed LPG as manager of PurchaseCo80.

**H.    Bankruptcy Filing and State of the Estate**

**114.** On March 20, 2023, Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. [*See* Bankr. Docket No. 1.]

**115.** In its Statement of Financial Affairs, Debtor disclosed at least fifteen (15) active lawsuits pending against it at the time of filing.

**116.** As of the Petition Date, claims filed in the bankruptcy case totaled approximately $500 million.

**117.** On May 24, 2023, OHP-CDR filed Proof of Claim No. 44 asserting a claim against Debtor of no less than $16,938,954.00 consisting of approximately (1) $9,538,954 allegedly owed under a Guaranty, (2) $7 million in purported damages for alleged breaches of an LLC Agreement, plus additional interest, fees, and other unspecified amounts. [*See* Bankr. POC 44-1.]

**118.**   On September 11, 2023, OHP-CDR and PurchaseCo80 filed the Complaint to Determine Priority of Lien and Ownership Interest [Adv Proc No. 8:23-ap-01098-SC] ("First OHP Action"). [First OHP Action Docket No. 1.]

**119.**   On October 13, 2023, Trustee filed his Answer and Counterclaims alleging: (1) Declaratory Judgment and Accounting; (2) Avoidance, Recovery, and Preservation of Preferential Transfers Made Within Ninety (90) Days of the Petition Date; (3) Avoidance, Recovery, and Preservation of Preferential Transfers Made Within One (1) Year of the Petition Date; (4) Avoidance, Recovery, and Preservation of Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Post-Petition Transfers; and (6) Subordination of Proof of Claim. [First OHP Action Docket No. 7.]

**120.**   On February 21, 2024, the Court entered an Order requiring, among other things, the preservation of all documents related to this adversary proceeding pursuant to Rule 26(f), as well as early disclosure obligations ("February 21 Order"). [First OHP Action Docket No. 10, 12.]

**121.**   Pursuant to the Court's February 21 Order, OHP-CDR and PurchaseCo80 were required to produce exhibits in support of the Brief under Rule 26 by March 15, 2024, which shall include "all non-privileged communications between the Defendant and Debtor, or related parties, including but not limited to Tony Diab, or any employee, attorney, or agent Debtor, including but not limited to letters, emails, faxes, texts, or any other form of communication. If any party asserts a privilege over any communication, and those communications are not disclosed, that party must include a privilege log in their filing." [*Id.*]

**122.**   On March 13, 2024, counsel for OHP-CDR and PurchaseCo80, Razmig Izakelian, submitted a declaration in support of their Motion to Seal, in order to seal the documents that they intended to produce as exhibits. [Id. Docket No. 34-1.] The declaration stated that OHP-CDR and PurchaseCo80 expected to attach at least 500 exhibits to the brief required by the Court's February 21, 2024 order, and that a majority of these documents contain sensitive personal information. Therefore, they requested permission to file the documents under seal and provided the label of the exhibits. [*Id.*]

///

20

123.     On March 15, 2024, OHP-CDR filed its Brief Required by the Court's February 21, 2024 Order, along with the Exhibits 1- 524. [*Id.* Docket No. 37-46.] OHP-CDR represented, through sworn declaration and briefing, that it had produced all responsive communications and documents related to the adversary proceeding located through its searches. [*Id.* Docket No. 34-1, 37.]

**I.     Settlement between OHP-CDR and Trustee**

124.     Relying on OHP-CDR and PurchaseCo80's representations, arguments, and documents produced, the Trustee and OHP entered settlement discussions.

125.     On August 8, 2024, the Trustee, OHP-CDR, LP, and PurchaseCo80, LLC executed a Settlement Agreement resolving the claims in the First OHP Action.

126.     The Trustee filed a Motion seeking Court approval of the Settlement Agreement on August 8, 2024 ("Settlement Agreement"). [Bankr., Docket No. 1494.] The Motion was subsequently approved by the Court.

127.     Pursuant to the Settlement Agreement, the parties dismissed the First OHP Action and released each other from all <u>known</u> claims. Following execution of the Settlement Agreement, the Trustee made, and continues to make, payments to OHP-CDR/PurchaseCo80 in accordance with the payment terms set forth in the Settlement Agreement. [Settlement Agreement at pp. 2-4.]

128.     Unbeknownst to Trustee, the OHP Defendants withheld and concealed a substantial number of documents relevant to their claims, the alleged lien, and their dealings with Diab, Azevedo, Reale and related entities. Discovery conducted by Trustee following the Settlement revealed substantial, highly relevant new documents concerning OHP Defendants' complicity and involvement in, self-dealing with, and support of the Ponzi Scheme.

129.     The claims asserted in the present Complaint constitute previously unknown claims that were not released under the Settlement Agreement because they were not previously produced by OHP and were discovered only after review of newly produced evidence, including materials produced by Diab after execution of the Settlement.

130.     These newly discovered materials reveal previously undisclosed facts concerning OHP Defendants' knowledge, control, and participation in Ponzi Scheme and misconduct regarding

scheme insiders' conversion, diversion, and fraudulent transfer of the assets. These materials are new to the Trustee; however, upon information and belief, they have always been in OHP Defendants' possession and should have been produced pursuant to the Court's February 21 Order, but were not produced by OHP-CDR and/or PurchaseCo80 in the First OHP Action.

131.     None of the descriptions provided in the Izakelian Declaration match the documents recently discovered by the Trustee. Had these documents been filed under seal despite the misnamed labels, the Trustee would not have pursued settlement, as the newly discovered evidence indicates that OHP and its principals were instigators, participants, co-conspirators and supporters of the Ponzi Scheme.  Upon information and belief, even after the Court approved the settlement, OHP's representatives continued to seek unilateral settlement discussions with Diab outside the scope of the approved agreement. Specifically, on or about November 18, 2024, Dan Young, acting on behalf of OHP, sent an email to Tony Diab stating: "We are open to a discussion of a settlement amount, but we do not want to discuss any other topics."

132.     This shows OHP Defendants' continued effort to narrowly constrain disclosure and discussion, notwithstanding the pending litigation, preservation obligations, and the discovery of additional evidence bearing on OHP's conduct.

### F.    LPG's Prepetition Creditors

133.     Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

134.     When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim

No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

135. As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. *See* Paragraph 94 above regarding Debtor's continuing insolvency.

136. In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

137. Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit,

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

**138.**     As of the filing of this complaint, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of approximately $717,507,462.29.

<div align="center">

**FIRST CLAIM FOR RELIEF**

**Count I -Declaratory Judgment – Agreements Entered into for Illegal Purposes Are Void and Unenforceable**
**Against OHP-CDR and PurchaseCo80**

</div>

**139.**     Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**140.**     The Trustee alleges that LLC Agreement and Ancillary Agreements, including the LPG Guaranty, Affiliate Agreements, ARPAs, and Omnibus Assignment are void ab initio, illegal, and unenforceable as a matter of bankruptcy law, California contract law, and public policy.

**141.**     The agreements at issue were entered into for an illegal purpose, or that require performance in violation of law or public policy, are void and unenforceable. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the

fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

142. The agreements at issue were entered into to facilitate unlawful capping arrangement through which a non-law-firm creditor sought to control, cap, and extract the proceeds of the Debtor's legal services and unearned consumer client's future payments which were themselves trust funds. These agreements were entered into for the purpose of funding and expanding unlawful capping practices, despite California Rule of Professional Conduct's express prohibition against a lawyer or law firm sharing legal fees, directly or indirectly, with a non-lawyer or an entity not authorized to practice law.

143. Moreover, the agreements at issue were entered into for other unlawful purpose of, including: (a) the extraction and assignment of Debtor's unearned future legal fees and receivables; (b) facilitation of asset diversion to insider-controlled entities; (c) fund and expand market affiliates and expand customer base and to further the Ponzi Scheme; and (d) diversion to OHP of monies required to be lawfully held and earmarked client trust funds.

144. The agreements at issue sought to impose creditor control and revenue rights that violate public policy governing the independent practice of law, lawful fee ownership, and the protection of clients and creditors.

145. The agreements at issue executed by the Debtor lacked lawful and valid consideration, as any alleged consideration was inseparably tied to illegal or unenforceable obligations.

///

146.    Contracts formed through inequitable conduct, overreaching, or misuse of creditor control are unenforceable in equity.

147.    The agreements at issue were negotiated and executed while the Debtor was insolvent or in the zone of insolvency to with the intent to: (a) strip value from the Estate; (b) prefer OHP over other creditors; and (c) facilitate insider restructuring and asset diversion.

148.    As such, the Trustee seeks a declaration pursuant to California law,11 U.S.C. § 105, and/or FRBP 7001(i)  that the LLC Agreement and the Ancillary Agreements, including the LPG Guaranty, Affiliate Agreements, ARPAs, and Omnibus Assignment Agreement are void ab initio and unenforceable and do not create enforceable lien or payment rights, and OHP-CDR and/or PurchaseCo80 holds no enforceable claim based on the Agreements at issue.

149.    Absent such a declaration, the Trustee and the Estate will suffer ongoing and irreparable harm and damages.

150.    Despite the illegality of the Agreements at issue, OHP Defendants accepted and retained payments from LPG totaling approximately $2 million. OHP defendants' retention of those funds is inequitable and unjust because OHP had no lawful right to receive or retain them.

151.    Plaintiff is entitled to restitution of all amounts paid to OHP under and illegal agreements together with interest thereon.

### SECOND CLAIM FOR RELIEF

**Count II - Aiding and Abetting Breach of Fiduciary Duty**
**Against all Defendants**

152.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-138 as though set forth in full herein. This Claim is pled as an alternative basis for relief.

153.    At all relevant times, LPG's officers, directors, managers, and persons exercising control over LPG (de facto controllers and controlling persons) including Diab, owed fiduciary duties to LPG, including duties of loyalty, care, and good faith, and duties to avoid self-dealing, conflicts of interest, diversion of corporate assets, and conduct that impaired LPG's ability to operate and preserve enterprise value.

154.    The fiduciary breaches described herein constituted self-dealing, looting, and conduct adverse to LPG that harm LPG's interests and conferred no legitimate corporate benefit on LPG.

155.    Those fiduciaries breached their duties to LPG by engaging in self-dealing and misconduct, including causing LPG to monetize and divert customer-payment streams and future earnings for the benefit of insiders, insider-controlled entities, and favored counterparties; causing LPG to pledge, facilitating the transfer, withholding, and/or misappropriation of LPG client files and records; allowing investors to exercise excessive control over LPG's financial accounts; and continue these acts while LPG was insolvent or approaching insolvency, thereby deepening LPG's insolvency and destroying corporate value.

156.    OHP Defendants had actual knowledge of the foregoing fiduciary breaches, or were at minimum willfully blind to them. Defendants learned through diligence materials, communications, and transactions that (a) LPG's model relied on illegal capping practice and monetized unearned customer future payments as "receivables," (b) LPG and/or its insiders attempted to avoid written affiliate agreements where possible, (c) insiders controlled multiple entities on both sides of the payment and receivables flows, creating inherent conflicts and opportunities for insider self-dealing, (d) LPG was described as a "break-even entity" that retained no profit despite holding customer contracts and client accounts, signaling that value was being extracted away from LPG, (e) the economics depended on continuing extraction and monetization of clients' future payments, which are not earned by LPG until the services were provided; and (f) funds used to pay OHP were client trust funds to be held for the benefit of the consumer client, not OHP.

157.    OHP Defendants' knowledge is also evidenced by Defendants' insistence and LPG's agreement on extraordinary protections and controls inconsistent with ordinary commercial arrangements, including guarantees by all assets of LPG, deposit account control and blocked account control agreements over accounts receiving customer payments, and transaction-approval regimes.

///

27

**158.** OHP Defendants, through Blum's own admission, knowingly assisted LPG's insiders in breaching their fiduciary duties in exchange for high returns derived from the unlawful arrangement. Blum acknowledged that LPG was in distress caused by poor management and legacy liabilities, yet leveraged these conditions to secure "very advantageous purchase terms." Despite recognizing that the LPG's financial condition had not improved and continued to deteriorate, OHP chose to exercise a "hands-on role" and, colluded with scheme insiders, initiated the transfer of receivables to a different servicing platform and insider controlled entities. These actions diverted critical revenue streams and imposed additional costs on LPG, exacerbating its financial distress and impairing its ability to satisfy creditor and consumer claims.

**159.** At all material times, OHP Defendants had the intent to facilitate and conceal the Ponzi Scheme and assisting the fraudulent transfers of money by aiding and abetting the illegal capping scheme to keep the operations and the Ponzi Scheme going, in exchange for high margin returns from LPG.

**160.** OHP Defendants substantially assisted scheme insiders to continue diverting LPG property and assets to scheme insiders' entities, and concealing the transfers, and shield its assets from its creditor when it insolvent.

**161.** OHP Defendants substantially assisted and encouraged the fiduciary breaches by providing the funding and structure that enabled the continuation and expansion of the receivables "package" transactions tied to LPG client files and payment streams, including by allegedly funding up to approximately $10 million in transactions; purchasing purported receivables (which were stolen client funds) directly from marketing affiliates and assigning the rights into PurchaseCo80; requiring LPG to guarantee repayment and pledge substantially all LPG assets even though Defendants' capital flowed primarily to marketing affiliates and other third parties rather than LPG; and using account-control agreements and payment-approval requirements to capture gains through unfairly favorable terms.

**162.** Individual Defendants Blum, and Young knowingly assisted in structuring and administering transactions, approved and executed the necessary documents to facilitate the improper transfers, accepted funds on behalf of OHP-CDR and PurchaseCo80 with knowledge that

28

those funds originated from illegal capping practices, enabled Diab to conceal the funds, encouraged continuation of the misconduct, and used OHP-CDR, Old Hickory, and PurchaseCo80 to facilitate the transfers, and benefit from Diab's Ponzi Scheme and fraudulent transfers.

163. The injuries to the Debtor directly, proximately and reasonably foreseeably resulting from and caused by these fraudulent transfers and Ponzi Scheme include, without limitation, the improper transfer of substantial client files, hundreds of thousands of dollars in LPG assets and client payments, and the continued operation of the criminal enterprise.

164. LPG incurred an overwhelming amount of debt resulting from the Ponzi Scheme. The payments LPG made to OHP Defendants, and the Defendants' demands for further payments, caused LPG to seek out additional streams of income and investments, thereby perpetuating the fraud and deepening LPG's insolvency. Due to the involvement of the Defendants in the Ponzi Scheme, LPG continued to incur far greater debt than it could possibly repay.

165. OHP Defendants' assistance of breach of fiduciary duty prolonged the operation of LPG, deepening LPG's insolvency, and provided more opportunity for scheme insiders to divert and transfer LPG's assets and funds. OHP Defendants delayed LPG's filing for bankruptcy and caused direct injury to LPG by deepening its insolvency.

166. Because the instant claim for aiding and abetting breach of fiduciary duty claim alleges direct harm to the debtor, and is not a derivative state law creditor claim, pursuant to 11 U.S.C. § 541(a)(1)), the Trustee has standing to pursue this claim against the Defendants in this Adversary Proceeding. *See e.g., Huntsberger v. Umpqua Holdings Corp. (In re Berjac of Or.)*, 538 B.R. 67, 82 (D. Or. 2015)("Here, plaintiff argues that by aiding and abetting, acting in concert with, and/or conspiring with the Holcombs and others, the bank defendants caused debtor to incur indebtedness to new investors that it had no ability to pay. Consequently, because the Ninth Circuit recognizes that prolonging a debtor's life through bad debt constitutes a cognizable harm to debtor, and plaintiff alleges that the bank defendants caused debtor to incur indebtedness to new investors that it could not pay, thereby, prolonging debtor's life through bad debt, this Court finds that plaintiff has standing to bring its third claim.").

///

**167.** As a direct and proximate result of OHP Defendants' knowing participation and substantial assistance, LPG and its estate suffered damages in an amount to be proven at trial, including compensatory damages, consisting of funds LPG received from its customers, which were converted, dissipated, misappropriated, and fraudulently transferred, punitive damages, disgorgement and restitution of benefits received by Defendants, and other relief permitted by law.

### THIRD CLAIM FOR RELIEF

**Count III- Conversion**
**Against All Defendants**

**168.** Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs 1-138 as though set forth in full herein. This Claim is pled as an alternative basis for relief.

**169.** LPG, and now the bankruptcy estate, owned, possessed, and/or had the right to possess and control property including (a) LPG client files and records, (b) funds and proceeds derived from customers' monthly payments made in connection with LPG client relationships, and (c) the receivables and proceeds traceable to those customer payments and client accounts.

**170.** OHP Defendants knew that the converted property included unearned ACH receivables that were required to be preserved in a trust account, and that LPG lacked the authority to authorize their transfers or distributions.

**171.** OHP Defendants transacted with LPG's insiders, de facto controllers, and affiliated entities and wrongfully exercised dominion over LPG property in a manner inconsistent with LPG's rights, including by taking, withholding, transferring, and/or diversion of LPG client files and records tied to the receivables and payment streams monetized for OHP Defendants' benefit.

**172.** The conversion described above harmed LPG directly because the client files and payment proceeds were core assets necessary for LPG to lawfully perform services, administer client matters, maintain compliance obligations, and generate revenue; the taking, withholding, and diversion deprived LPG of the use and value of those assets and impaired LPG's business operations.

///

30

**173.** OHP Defendants had actual knowledge of the conversion. Defendants' knowledge is evidenced by, among other things, Defendants' understanding of the Coast Processing/LPG model and the fact that the receivables Defendants sought to monetize were inextricably tied to LPG client files, client records, and customer payment streams, and by contemporaneous notices and red flags concerning missing or taken files associated with OHP-related receivables and the transfer or reassignment of "files" to third parties.

**174.** OHP Defendants acknowledge is further supported by Blum's own admission that OHP Defendants took advantage of LPG's financial distress and poor management to achieve high returns for OHP Defendants.

**175.** Moreover, OHP intentionally withheld relevant documents and information in the First OHP Action, in violation of the Court's February 21 Order, while engaging in settlement negotiations with the Trustee to secure unfair settlement terms favoring OHP-CDR, to the detriment of the Estate and its creditors. These actions deprived the Estate of transparency and leverage in negotiations, resulting in diminished recovery for creditors and undermining the integrity of the judicial process.

**176.** As a direct and proximate result of OHP Defendants' conversion, LPG and the estate have suffered damages in an amount to be proven at trial, including the value of the converted property and proceeds, including any funds the OHP Defendants received from LPG as a result of such conversion, punitive damages, disgorgement and restitution of benefits received by OHP Defendants, prejudgment interest, and such other relief as is permitted by law.

**177.** Plaintiff seeks an injunctive relief pursuant to California law and/or FRBP 7001(g) allowing Trustee to refrain from making any payments pursuant to the terms of the Settlement Agreement because such payment will cause immediate and irreparable harm to the Estate and its creditors. If the settlement proceeds, the Estate will suffer unrecoverable loss of core assets and funds, impairing its ability to satisfy creditor claims and undermining equitable distribution.

///

///

///

31

## **FOURTH CLAIM FOR RELIEF**

### **Count IV- Aiding and Abetting Conversion**
### **Against All Defendants**

**178.** Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs 1-138 as though set forth in full herein. This Claim is pled as an alternative basis for relief.

**179.** LPG's insiders, de facto controllers, and affiliated entities wrongfully exercised dominion over LPG property in a manner inconsistent with LPG's rights, including by taking, withholding, transferring, and/or diversion of LPG client files and records tied to the receivables and payment streams monetized.

**180.** OHP Defendants had actual knowledge of the scheme insiders' misappropriation, diversion and retention of LPG's assets, and exercise dominion and control over the converted property inconsistent with LPG's rights.

**181.** OHP Defendants knowledge and support of the Scheme is further supported by Blum's own admission that OHP Defendants coordinated with scheme insiders to fraudulently divert and transfer LPG's assets when LPG is insolvent, and concealed the facts regarding those fraudulent transfers.

**182.** Despite this knowledge, OHP Defendants substantially assisted the conversion by providing the funding and transaction structure that treated LPG ACH Receivable (even though they have not been earned by LPG) and client files as monetizable commodities; purchasing purported receivables directly from marketing affiliates and assigning them into PurchaseCo80; insisting that LPG guarantee repayment and pledge all LPG assets (including assets tied to files and proceeds); and imposing and maintaining deposit account control and blocked account control agreements and other finance controls that enabled Defendants to capture, direct, and receive proceeds derived from LPG client files and customer payments.

**183.** OHP Defendants substantially assisted Diab in the tort of conversion as Diab exercised wrongful dominion of assets belonging to LPG by unlawfully transferring these assets, ///

32

and entities controlled and directed by scheme insiders, pursuant to the terms of the unlawful agreements entered into by OHP Defendants.

184. Defendants' acts and omissions were a substantial factor in enabling and perpetuating the conversion of LPG property and in causing injury to LPG and the Estate.

185. As a direct and proximate result of OHP Defendants' knowing participation and substantial assistance, LPG and the estate have suffered damages in an amount to be proven at trial, including the value of the converted property and proceeds, including funds LPG received from its customers, which were subsequently converted, dissipated, misappropriated, and fraudulently transferred, punitive damages, disgorgement and restitution of benefits received by OHP Defendants, prejudgment interest, and such other relief as is permitted by law.

## FIFTH CLAIM FOR RELIEF

### Count V- Deepening Insolvency
### Against All Defendants

186. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs 1-138 as though set forth in full herein. This Claim is pled as an alternative basis for relief.

187. "Deepening insolvency" refers to injury to a debtor's corporate property and enterprise value caused by the wrongful prolongation of an insolvent corporation's life and the fraudulent or wrongful expansion of corporate debt, resulting in dissipation of assets and increased liabilities. *See Mosier v. Stonefield Josephson, Inc.* 815 F.3d 1161, 1166-1167 (9th Cir. 2016); *see also Smith v. Arthur Andersen LLC*, 421 F.3d 989, 1002-04.

188. At all relevant times, LPG was insolvent or in the zone of insolvency, or became insolvent as a result of the conduct alleged herein, including the diversion and misappropriation of customer-payment streams, the stripping and/or impairment of client-file value, and the imposition of escalating obligations and guarantees.

189. OHP Defendants, through Blum's own admission, knowingly engaged in conduct that deepened LPG's insolvency. OHP Defendants pursued a deliberate strategy to protect their own position while knowingly exacerbating LPG's financial distress.

33

**190.** OHP Defendants knew, and/or were willfully blind to, facts demonstrating LPG's insolvency or impending insolvency and the non-ordinary, high-risk nature of the business mechanism, including that the economics depended on monetizing and extracting future customer payments and that LPG was described as a "break-even" entity while value was extracted by affiliates and other participants.

**191.** OHP Defendants knowingly engaged in wrongful conduct that prolonged LPG's life beyond insolvency and increased LPG's indebtedness and losses, including by entering into illegal Agreements, funding and expanding the "package" receivable transactions tied to LPG customer ACH Receivables, receiving excessive and unjustified payments from LPG, requiring LPG to guarantee repayment and pledge substantially all LPG assets, and structuring transactions so that distributions and collections were prioritized for Defendants' benefit.

**192.** OHP Defendants' demands for further payments caused LPG to seek out additional streams of income and investments, thereby perpetuating the fraud and deepening LPG's insolvency. Due to the involvement of the Defendants in the Ponzi Scheme, LPG continued to incur far greater debt than it could possibly repay.

**193.** Defendants further exacerbated LPG's insolvency by facilitating fraudulent transfers of LPG's assets and concealing those transfers to shield them from other creditors, thereby accelerating the depletion and dissipation of LPG's corporate property.

**194.** As a direct and proximate result of Defendants' conduct, LPG's insolvency was deepened and prolonged, LPG incurred additional liabilities and costs, LPG's corporate assets and enterprise value were diminished, and LPG's ability to reorganize or preserve value for creditors was materially impaired.

**195.** The Estate suffered damages in an amount to be proven at trial, including without limitation: increased indebtedness, loss of enterprise value, dissipation of assets, increased administrative and operating losses, and reduced recoveries for creditors.

**196.** Plaintiff seeks judgment against Defendants, jointly and severally, for all damages caused by the deepening of LPG's insolvency, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### Count VI- Aiding and Abetting Deepening Insolvency
### Against All Defendants

**197.**     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs 1-138 as though set forth in full herein. This Claim is pled as an alternative basis for relief.

**198.**     OHP Defendants knew LPG's insolvency and/or were willfully blind to the facts demonstrating LPG's insolvency or impending insolvency.

**199.**     OHP Defendants further knew that scheme insiders, including Diab, Reale, and Azevedo were transferring and diverting LPG's assets through illegal fee-sharing arrangement and by moving LPG's assets and client files to a new law firm established by Diab. OHP Defendants knowingly assisted scheme insiders in accomplishing these transfers and diversions in exchange for continued payments generated from LPG client accounts and favorable protection over other creditors.

**200.**     OHP Defendants' assistance of scheme insiders' operation of Ponzi Scheme and fee splitting operations deepened LPG's insolvency and provided more opportunity for scheme insiders to divert and transfer LPG's assets and funds. OHP Defendants delayed LPG's filing for bankruptcy and caused direct injury to LPG by deepening its insolvency.

**201.**     As a direct and proximate result of Defendants' assistance, LPG's insolvency was deepened and prolonged, LPG incurred additional liabilities and costs, LPG's corporate assets and enterprise value were diminished, and LPG's ability to reorganize or preserve value for creditors was materially impaired.

**202.**     LPG suffered damages in an amount to be proven at trial, including without limitation: increased indebtedness, loss of enterprise value, dissipation of assets, increased administrative and operating losses, and reduced recoveries for creditors.

**203.**     Plaintiff seeks judgment against Defendants, jointly and severally, for all damages caused by OHP Defendants' aiding and abetting the deepening of LPG's insolvency, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

35

**RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On the First Claim for Relief:**

1.    An order pursuant to California law, 11 U.S.C. § 105, and/or FRBP 7001(i) declaring that the LLC Agreement, the LPG Guaranty, Affiliate Agreements, ARPAs, and Omnibus Assignment Agreement are void ab initio and unenforceable and do not create enforceable lien or payment rights, and OHP-CDR and/or PurchaseCo80 holds no enforceable claim based on the Agreements at issue;

2.    An order for the restitution of all amounts paid to OHP pursuant to the invalid and unenforceable agreements at issue with interest thereon.

**On the Second Claim for Relief:**

3.    Judgment against OHP Defendants, jointly and severally, for all damages caused by the breach of fiduciary duty aided and abet by OHP Defendants in an amount to be proven at trial, including compensatory damages, including the funds LPG received from its customers, which were lost, dissipated, misappropriated, and fraudulently transferred, punitive damages, disgorgement and restitution of benefits received by Defendants together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

**On the Third Claim for Relief:**

4.    Judgment against Defendants, jointly and severally, for all damages and equitable relief arising from the conversion of LPG's assets and property by the OHP Defendants, including any funds the OHP Defendants received from LPG as a result of such conversion, in an amount to be proven at trial, punitive damages, together with costs, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

36

**5.** An injunction pursuant to California law and/or FRBP 7001(g) allowing Trustee to refrain from making any payments pursuant to the Settlement Agreement pending the resolution of this Action.

**On the Fourth Claim for Relief:**

**6.** Judgment against Defendants, jointly and severally, for all damages and equitable relief arising from the conversion aided and abetted by OHP Defendants, including funds LPG received from its customers, which were subsequently converted, dissipated, misappropriated, and fraudulently transferred by scheme insiders, in an amount to be proven at trial, punitive damages, together with costs, interest, and such other and further relief as the Court deems just and proper.

**On the Fifth Claim for Relief:**

**7.** Judgment against OHP Defendants, jointly and severally, for all damages caused by the deepening of LPG's insolvency, including the loss and dissipation of LPG's assets and property resulting from Defendants' misconduct, in an amount to be proven at trial, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

**On the Sixth Claim for Relief:**

**8.** Judgment against OHP Defendants, jointly and severally, for all damages caused by Defendants' aiding and abetting the deepening of LPG's insolvency, including the loss and dissipation of LPG's assets and property resulting from Defendants' misconduct, in an amount to be proven at trial, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

///

///

///

///

///

///

///

///

37

**On All Claims for Relief:**

9. Awarding costs of suit incurred here;

10. Awarding pre- and post-judgment interest; and

11. Granting any other and further relief as the Court deems just and proper.

Dated: February 12, 2026

Respectfully submitted,

DINSMORE & SHOHL LLP

By: _/s/ Christopher Celentino_

Christopher Celentino
Yosina M. Lissebeck
Christopher B. Ghio
Siqin Carol Wang
*Attorneys for Richard A. Marshack, Trustee of the LPG Liquidation Trust*

38

# EXHIBIT A

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:   619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax:  502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

<table>
<tr><td colspan="2" align="center">**FILED & ENTERED**<br><br>JUN 03 2024<br><br>**CLERK U.S. BANKRUPTCY COURT**<br>**Central District of California**<br>**BY mccall     DEPUTY CLERK**</td></tr>
</table>

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In Re | Case No: 23-bk-10571-SC |
| | Chapter 11 |
| The Litigation Practice Group P.C., | |
| Debtor(s), | **ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER** |
| | Date:     May 23, 2024 |
| | Time:     1:30 p.m. |
| | Judge:    Hon. Scott C. Clarkson |
| | Place:    Courtroom 5C (via Zoom)[1] |
| | 411 West Fourth Street |
| | Santa Ana, CA 92701 |

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1. The Motion is granted;

2. The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3. Govern the discovery conducted therein.

## PROTECTIVE ORDER

### 1. DEFINITIONS

1.1 "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2 This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3 "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4 "Receiving Party" means a Party that receives Confidential Information during the Action.

1.5 "Party" or "Parties" means person or entity subject to this Protective Order.

**2. SCOPE OF THIS PROTECTIVE ORDER**

2.1 Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3. DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1 This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2 Application to Non-Parties: Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit A</u>; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

3.3     <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4     <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.     CHALLENGES TO DESIGNATED INFORMATION**

4.1     In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

4

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

## 5. LIMITED ACCESS/USE OF PROTECTED INFORMATION

5.1 <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2 <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a) The Court, its personnel, and court reporters;

b) Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c) The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

///

5

d) Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e) Other witnesses or persons with the Designating Party's consent or by court order.

5.3 Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a) The Court, its personnel, and court reporters;

b) Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c) In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d) Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action, and so long as each such expert or consultant has signed attached Exhibit A; and

e) Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4 Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5 In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

<div align="center">6</div>

the Court's case-management or other pre-trial order, or by a motion *in limine*. Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

### 6.    CLAW-BACK REQUESTS

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

<div align="center">7</div>

**7. DURATION/CONTINUED RESTRICTIONS**

7.1  <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2  <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8. PRIVILEGED OR PROTECTED INFORMATION**

8.1  Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection"). If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2  If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

9

EXHIBIT "A"

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| In Re | Case No. 8:23-BK-10571-SC |
|---|---|
| | Chapter 11 |
| The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED ORDER** |
| Debtor(s), | |
| | Date:   May 23, 2024 |
| | Time:   1:30 p.m. |
| | Judge:  Hon. Scott C. Clarkson |
| | Place:  Courtroom 5C[1] - Via Zoom |
| | 411 W. Fourth Street |
| | Santa Ana, CA  92701 |

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

This is to certify that:

(a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

(b)    I have read the Stipulated Protective Order; and

(c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

# EXHIBIT B



# EXHIBIT C

**The Litigation Practice Group PC - Affiliate Agreement**

THIS AGREEMENT (the "Agreement") is made and effective as of the 15th day of June, 2022 by and between The Litigation Practice Group PC ("LPG") and **Hood Marketing Inc** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms. LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were



1

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1.        Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.        Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.        Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.        If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.        Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6.        Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 65% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file.  LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense.  LPG has exclusive discretion to grant or deny a requested refund or cancellation.  Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.        LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.        LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9.        This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement.  At that time, this Agreement will automatically renew until either party sends written notice of cancellation of this Agreement, which shall be effective

2



Exhibit "C"

Page 56

30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement.  If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.      If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default.  The notice of default must state with specificity the act of default alleged.

11.      Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.      The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00.  The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.  The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.      If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account.  Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account.  If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.

14.      Affiliate agrees not to use the name LPG or any law firm  in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.


DS

3

15.     Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.     This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.     In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**The Litigation Practice Group PC**

DocuSigned by:

*Daniel S March*

9D494DB1993341E...

**By: Daniel S. March, Managing Shareholder**

**Hood Marketing Inc**

DocuSigned by:

*Chris Hood*

957A13C49C404AC

By:  Chris Hood

Title:  CEO

4

# EXHIBIT D

From:        Mario Azevedo <Mario@Azevedo.com>
Sent:        Tue 6/23/2020 11:29 AM (GMT-08:00)
To:          'Adam Blum' <adamblum@aol.com>;Brian <brian@freedomea.com>
Cc:          'Kevin Yu' <kevin.yu93@gmail.com>
Bcc:
Subject:     RE: Coast Processing Investment Thread
Attachments: Old Hickory intro memo - Coast Processing - June 23, 2020 - edited by Brian and Mario.docx


Hi Guys,

Please see attached with changes from our side. Minor things here and there. Fixed a few numbers, and details surrounding that the customer contract is with the law firm...not Coast.

Let me know if you have any questions on anything we changed.
Definitely want to keep the ball moving forward!

Thanks,
Mario


-----Original Message-----
From: Adam Blum [mailto:adamblum@aol.com]
Sent: Monday, June 22, 2020 3:31 PM
To: 'Mario Azevedo'; brian@freedomea.com
Cc: 'Kevin Yu'
Subject: RE: Coast Processing Investment Thread

Guys, see attached for part of a memo we are drafting and 2 diagrams. Please give us any thoughts or feedback as we want to present the opportunity as accurately as possible, thanks!

Adam

-----Original Message-----
From: Mario Azevedo <Mario@Azevedo.com>
Sent: Friday, June 19, 2020 2:20 PM
To: 'Adam Blum' <adamblum@aol.com>; brian@freedomea.com
Cc: 'Kevin Yu' <kevin.yu93@gmail.com>
Subject: RE: Coast Processing Investment Thread

Yes, we have put a lot of thought into this.
Traditional processing companies are required to be licensed and bonded debt resolution companies in the states that they operate in.
Coast processing is not a traditional debt resolution processing company.
The program we run is with the law firm, where the customer contract is between the customer and the law firm.
Coast Processing provides outsourcing services to law firms. The law firm has a contract with Coast Processing for customer service.
It is a common practice for law firms to outsource their customer service, communications, paper processing, etc.
Coast Processing does not do the debt resolution, the law firm does and Coast just pushes the paper.

Exhibit "D"

Make sense?


-----Original Message-----
From: Adam Blum [mailto:adamblum@aol.com]
Sent: Friday, June 19, 2020 12:12 PM
To: 'Mario Azevedo'; brian@freedomea.com
Cc: 'Kevin Yu'
Subject: RE: Coast Processing Investment Thread

Mario,
The Coast Processing site is fairly vague and makes it look like the company does all kinds of back office functions without directly saying the company does this primarily for the purposes of debt resolution. Is there a regulatory or a PR reason that you guys want to keep a low profile? Just curious. I can understand why you'd want to have a low profile, so not concerned, just curious of you guys' thoughts.

Thanks,
Adam

-----Original Message-----
From: Mario Azevedo <Mario@Azevedo.com>
Sent: Friday, June 19, 2020 12:24 PM
To: 'Adam Blum' <adamblum@aol.com>; brian@freedomea.com
Cc: 'Kevin Yu' <kevin.yu93@gmail.com>
Subject: RE: Coast Processing Investment Thread

Hi Adam,

LPG and Coast does not do any marketing - as our affiliates are the ones who drive business.
Best we have is our two websites
https://coastprocessing.com/
http://litigationpracticegroup.com/

Let me know if you need anything else.

Thanks,
Mario


-----Original Message-----
From: Adam Blum [mailto:adamblum@aol.com]
Sent: Friday, June 19, 2020 8:45 AM
To: 'Mario Azevedo'; brian@freedomea.com
Cc: 'Kevin Yu'
Subject: RE: Coast Processing Investment Thread

Mario, do you have any promotional materials for Coast or for the law firm?

Adam

-----Original Message-----
From: Mario Azevedo <Mario@Azevedo.com>
Sent: Wednesday, June 17, 2020 11:42 AM
To: 'Adam Blum' <adamblum@aol.com>; brian@freedomea.com
Cc: 'Kevin Yu' <kevin.yu93@gmail.com>
Subject: RE: Coast Processing Investment Thread

Hi Guys,


Please see attachment with answers to your deal memo questions.

Let me know if you need us to elaborate on anything.


Thanks,

Mario



From: Adam Blum [mailto:adamblum@aol.com]
Sent: Wednesday, June 10, 2020 1:05 PM
To: 'Mario Azevedo'; brian@freedomea.com
Cc: 'Kevin Yu'
Subject: RE: Coast Processing Investment Thread


Thanks guys – we are writing up a short memo on the deal, and we may pick your brain on how we explain the deal and the industry. Can you send us some paragraphs or bullet points on the following? You've already told us some of this verbally, but would be good to get it in writing in one place. Need not be anything too detailed or formal.


1.    How you guys connected with Joseph Abate (who Ken knows)
2.    Each of your bios and history in the industry; how you know each other and how long you've worked in the industry and how long you've known each other and worked together
3.    How many portfolio buys you've done from front-end affiliates and for how long and rough estimate of total files and total dollars purchased and if current performance is meeting expectations [both portfolios you buy and keep, and portfolios you buy and then sell at a prebaked IRR]
4.    Summary overview of your processing business and your law firm – history, size, position in the industry, uniqueness, etc. – and how the processor and law firm operate with the front ends (and how you source and maintain relationships with front end affiliates to make these purchases), with individual customers, and with portfolio purchasers like us
5.    Industry size estimates – total volume; size of main players and who are they; number of front-ends

and volume per front-end; estimated market share today that you have access to (excluding future growth from settlements)

6.      Why are front-end affiliate willing to sell off their paper and leave a ton of returns on the table? Is there any other reason but that they want to free up working capital and not become a collection firm, so they can just focus on originations? What is the rough margins to them on the sale? I assume they're still making a lot of money off the deals they sell off to Coast for cash up front

7.      Other info you want to emphasize to our investor about this opportunity

Thanks,
Adam

From: Mario Azevedo <Mario@Azevedo.com <mailto:Mario@Azevedo.com> >
Sent: Wednesday, June 10, 2020 2:49 PM
To: 'Kevin Yu' <kevin.yu93@gmail.com <mailto:kevin.yu93@gmail.com> >
Cc: 'ADAM BLUM' <adamblum@aol.com <mailto:adamblum@aol.com> >; brian@freedomea.com <mailto:brian@freedomea.com>
Subject: RE: Coast Processing Investment Thread

Hi Kevin,

Your model is a bit more accurate than ours. The difference off is how we are calculating the management fee.

Yours puts the accurate management fee in based on how many months a particular deal pays for (the term).

Our is assuming a management fee of 31 months for all – more quick and dirty.

(9138*31)

Let me know if you want me to look at anything else.

Thanks,

Mario

From: Kevin Yu [mailto:kevin.yu93@gmail.com]
Sent: Wednesday, June 10, 2020 12:24 PM
To: Mario Azevedo
Cc: ADAM BLUM; brian@freedomea.com <mailto:brian@freedomea.com>
Subject: Re: Coast Processing Investment Thread

Hi Mario,

Modeled the cash flows out again and are close on expected totals. I believe we're off some small rounding differences but still arrived at the 25% returns. Do y'all mind taking a look and making sure we're all on the same page in all of our calculations?

Thanks.

Kevin Yu

kevin.yu93@gmail.com <mailto:kevin.yu92@gmail.com>

(512) 888-8897

On Tue, Jun 9, 2020 at 7:58 PM Mario Azevedo <Mario@azevedo.com <mailto:Mario@azevedo.com> > wrote:

Hi Guys,

Here is a new package we put together. This one is available now for purchase.

Purchase price on this one is $213,000. The conservative receivable after cancelations is $340,000 over 31 months.

For clarification, this package has already made the 1st payment.

We subtract that 1st payment out of the total receivables.

The historical cancelation rate of this affiliate is 27%, where 17% cancel before the 1st payment (annul).

So historical cancel on post 1st payment deals from this affiliate is 10%.

We took a conservative on this and modeled 23% - which is more than twice the historical.

Let us know if you guys want to purchase this package or have any questions on it.

Thanks,

Mario

From: Kevin Yu [mailto:kevin.yu93@gmail.com <mailto:kevin.yu93@gmail.com> ]
Sent: Friday, June 5, 2020 10:26 AM
To: ADAM BLUM
Cc: Mario Azevedo; brian@freedomea.com <mailto:brian@freedomea.com>
Subject: Re: Coast Processing Investment Thread

Hey all,

Drafted up a quick cash flow recalculation based on our understanding of the economics of these deals from the call and the purchase agreement. I've attached it for y'all's reference (<Sheet 1> tab) if y'all wanted to take a look before our call this afternoon, but was thinking it'd be useful to walk through this model to make sure we're all on the same page with how this all works. We've noted a few questions we had as well.

Thanks,

Kevin Yu

kevin.yu93@gmail.com <mailto:kevin.yu92@gmail.com>

(512) 888-8897

On Wed, Jun 3, 2020 at 10:10 PM ADAM BLUM <adamblum@aol.com <mailto:adamblum@aol.com> > wrote:

If you don't mind, send around a calendar invite and dial in number. Or I can do so tomorrow - thanks!

On Jun 3, 2020, at 10:06 PM, Mario Azevedo <mario@azevedo.com <mailto:mario@azevedo.com> > wrote:

perfect

From: Adam Blum [mailto:adamblum@aol.com <mailto:adamblum@aol.com> ]
Sent: Wednesday, June 3, 2020 7:30 PM
To: 'Mario Azevedo'; brian@freedomea.com <mailto:brian@freedomea.com>
Cc: 'Kevin Yu'
Subject: RE: Coast Processing Investment Thread

Sure thing- say 2pm CT / 12pm PT?

Adam

From: Mario Azevedo <Mario@Azevedo.com <mailto:Mario@Azevedo.com> >
Sent: Wednesday, June 3, 2020 9:28 PM
To: 'ADAM BLUM' <adamblum@aol.com <mailto:adamblum@aol.com> >; brian@freedomea.com <mailto:brian@freedomea.com>
Cc: 'Kevin Yu' <kevin.yu93@gmail.com <mailto:kevin.yu93@gmail.com> >
Subject: RE: Coast Processing Investment Thread

Friday after 12 I am good.

No need to include Joseph…but Brian, yes.

Thanks,

Mario

From: ADAM BLUM [mailto:adamblum@aol.com]
Sent: Wednesday, June 3, 2020 6:40 PM
To: Mario Azevedo
Cc: Kevin Yu
Subject: Re: Coast Processing Investment Thread

Mario,

How's Friday afternoon look to discuss and walk through these files with Kevin and me? No need to include all the other folks unless you want to do so.

Adam

On Jun 2, 2020, at 8:51 PM, Mario Azevedo <mario@azevedo.com <mailto:mario@azevedo.com> > wrote:

Hi Adam,

Hope you guys are doing well. I wanted to circle back around with you and get you some material to take a look at.

Attached is a sample purchase agreement we have been using for deal purchases.

Also a spreadsheet of a 100 deal current package.

With this package, the cost would be $255,000. The investor will get a return of $400,000 to $420,000 over 30 months. The annual return is around 26% and the initial investment is covered in 15 to

Exhibit "D"
Page 67

16 months. The average monthly distribution is around $16,000 to $18,000 a month.

Take a look and let us know when you would like to touch base again.

Thanks,

Mario Azevedo

415-828-4893

From: Adam Blum [mailto:adamblum@aol.com]
Sent: Thursday, May 28, 2020 5:01 PM
To: 'Joseph Abate'; brian@freedomea.com <mailto:brian@freedomea.com> ; 'Mario Azevedo'; 'Kevin Yu'
Subject: RE: Coast Processing Investment Thread

Thanks all, we look forward to learning more.

Adam

AdamBlum@aol.com <mailto:AdamBlum@aol.com>

(817) 683-9821

From: Joseph Abate <joseph@borderlightentertainment.com <mailto:joseph@borderlightentertainment.com> >
Sent: Thursday, May 28, 2020 6:58 PM
To: brian@freedomea.com <mailto:brian@freedomea.com> ; Mario Azevedo <mario@azevedo.com <mailto:mario@azevedo.com> >; Kevin Yu <kevin.yu93@gmail.com <mailto:kevin.yu93@gmail.com> >; ADAM BLUM <adamblum@aol.com <mailto:adamblum@aol.com> >
Subject: Coast Processing Investment Thread

Thank you all for taking the time to meet today. Connecting everyone here.

Best,


Joseph



--

Joseph V. Abate
Borderlight Entertainment, Inc.
2266 5th Avenue #561
New York, NY 10037
(917) 520-4123
Joseph@BorderlightEntertainment.com <mailto:Joseph@BorderlightEntertainment.com>

<100 Deals.xlsx>

<Sample Purchase Agreement.docx>

## CONFIDENTIAL MEMORANDUM

To:   Old Hickory Partners Investment Committee
From:  Adam Blum and Kevin Yu
Date:  June 22, 2020
Re:   Introduction – **Coast Processing**

**Intro**:  Old Hickory has an opportunity to create a joint venture with B.A.T. Inc. dba Coast Processing ("Coast Processing") (www.coastprocessing.com), an Orange County-based back office and administrative support services ~~outsourcing~~ firm in the debt resolution space; Coast Processing is known in the space as a "*back-end*."

Coast Processing, with its affiliated law firm, The Litigation Practice Group PC ("LPG") (www.litigationpracticegroup.com), partners with "*front-end*" affiliate companies.  Front-ends are origination engines with salesforces ~~who~~ that use direct mail, cold-calling, internet leads, etc., to enlist customers to resolve or invalidate their consumer debts – customers sign up with the ~~front~~back-end to pay a percentage of their debts on a monthly basis for as long as they're in the program in exchange for assistance in debt resolution, and the front-end then refers the customer to Coast Processing/LPG. LPG offers the customers a variety of legal services nationwide, most oriented to debtors in need of assistance in addressing their debts, including but not limited to debt validation, bankruptcy, and defense of collection lawsuits. The combination of services offered by LPG and Coast Processing gives it a competitive advantage in servicing leads generated by front-ends.  LPG provides continued advice and legal services for customers throughout the process, while Coast Processing processes the related mail, processes payments, addresses routine customer service issues~~legal summons~~, etc. and handles the back office.

> **Commented [M1]:** Customers sign contract with backend.  No contractual agreements with front-end.  Front end only enrolls the customer in the back end program. Does NOT sign up with front end and then get handed over. Only one transaction where customer signs up with back end via the front end sales rep who sells back end product.

> **Commented [M2]:** LPG handles the summons.  Coast does not handle the legal work.  Handles customer service, mail , back office, etc

The monthly cash receivables from each customer are allocated 65% / 35% to the front-end and back-end companies, respectively.  Coast Processing has identified an opportunity to factor the front-ends' receivables, purchasing packages of each month's originations ("Package") from front-ends that are willing to sell, then in turn selling the Packages to investors at a mark-up.  Each Package contains roughly 100 cash streams originated during the month and represents $300,000.00 - 400,000.00 of future allocated cash flows over the next ~30 months.  Coast Processing engages in this activity not only to make a profit on the cash stream, but also as a way to help its front-end affiliates generate ready cash to increase their investment in marketing and sales and accelerate their growth, thereby driving more business back to Coast Processing.

Coast Processing has presented us with opportunities to buy two pools in the last few weeks, each of which would've been in the $200,000-to-$300,000 purchase price range to buy cash streams on ~100 customer files.

**Why is there an Opportunity for Old Hickory?**:  Ken knows a gentleman named Joseph Abate through the nonprofit arts world, and Joseph emailed Ken about this opportunity on May 26, 2020. Joseph is a personal friend of Mario Azevedo, and they have known one another for a few years through the same social network.  Joseph and Mario have not previously done business together. Mario is one of the co-founders of Coast Processing.  OHP spoke to Mario and his business partner and co-founder, Brian Reale, several times over the last few weeks to learn about the opportunity and understand the business.

1

CONFIDENTIAL

Exhibit "D"
Page 70

The principals of Coast Processing are looking for a larger dollar and more strategic investor-partner to buy more Packages from front-ends and scale into new lines of business.  Currently, some Packages are self-purchased while the remainder are sold off to various investors and investor groups.  Specifically, the two principals, Mario and Brian, have been purchasing smaller, 40-file Packages monthly since late 2019.  Two other investor groups have been purchasing 100-file and 40-file Packages monthly since February 2019.  There have also been three one-off Packages of between 100 and 300 deals sold to two different investor groups.  After watching performance for a few months, both investors have returned with requests to purchase additional Packages.  The run-rate today is 300-to-500 sold files per month out of about 2,000 files processed.  We note that for a ~30-month asset, it is early, as the company has only been buying/brokering Packages since 2019, so there has not been a full cycle yet for any given cash stream, though the early batches of Packages will begin to hit break-even in the coming months.

Most of the front-end affiliates have come from long relationships developed by Coast Processing's principals over the course of several years providing marketing and software to these groups at other back-end operations.  The company has a few referral partners and outside reps and would like to expand these functions by using investor capital to entice more affiliates to come on board.  Coast Processing would also like to scale its purchasing to meet market demand, and it would be easier for the company to work with a single capital partner.  Prices and dollar amounts vary based on debt loads, terms and payments.  Price is typically around 8% of debt load.  There are currently approximately $700,000.00 in deals purchased each month by current investors.

Front-end affiliates are incentivized to sell-off their receivable books in order to focus time and working capital on their primary business of customer acquisition.  Acquisition costs for front-end affiliates can vary from $500 to $1,100 depending on the form of marketing they do.  Getting up-front payments for their deals allows them to spend more money on marketing and sales.  A lot of these affiliates do not have deep pockets to grow their businesses as quickly as they would like while their funds are tied up waiting for their residuals to come in.  Selling the deals ~~off~~ to Coast Processing with a haircut allows them to grow their business faster and allows Coast Processing to boost its own volumes.

**Industry Overview**:  Debt validation is the process of attempting to invalidate unsecured consumer debt by utilizing the Fair Debt Collection Practices Act ("FDCPA") and Fair Credit Reporting Act ("FCPA").  If a creditor has failed to comply with federal law, the debt is not only removed from a customer's credit report, but the debtor is estopped from any collection activity, including a lawsuit.

The resolution can go one of three ways in a debt validation scenario:  (1) immediate invalidation; (2) settlement; or (3) summons (lawsuit).  If the invalidation is successful, the customer owes Coast Processing a 25-to-35% service fee.  If the case results in a settlement, the customer pays the monthly amortized service fee until the settlement is reached, after which time the rest of the fee is wiped, and the customer begins to pay the settlement to the creditor. A case resulting in a summons will either have the summons dismissed (equivalent to being invalidated) or the debt eventually settled and would thus have economic outcomes similar to either of (1) or (2) above.

Coast Processing states that ~~10 to 12~~8 to 10% of individual files go to a summons.  Of those, ~~maybe approximately 27~~5% will end up in a settlement and 25% dismissed, so about ~~3~~ 6 to 7.5% of the total

**Commented [M3]:** Tony correct % to settlement

2

CONFIDENTIAL

amount oallf files end up with a debt settlement.  Usually, it takes 6-to-9 months before service of a summons, and any settlement would happens between at 12-to-18 months.  Up-until a settlement is reached, the customer iscontinues to pay still paying the monthly fees to Coast Processing/LPG.  And the fees apply for the duration of the term for as long as any files are outstanding, even if the customer has already had certain debts settled but others still outstanding.  Coast Processing/LPG have reported to us that only 2% of cancellations look for areceive a refund of past fees, and of those most are only partial refunds.

In practice, the setup is as follows:  A front-end affiliate owns and operates a system of lead generators consisting of consumers interested in the legal services offered by LPG through Coast Processing, its agent.  The front-end, acting with direction from Coast Processing/LPG, obtains the names of consumers and markets to them in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing Coast Processing's services, the front-end assists Coast Processing in having consumers execute an approved legal services agreement with LPG, at which point consumers will become clients of LPG, and LPG will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.

*Step-by-step*:
- A front-end company signs up a consumer for debt validation.  The front-end company then refers the consumer to Coast Processing/LPG [open question:  Do we know if Coast Processing has already agreed to purchase these Packages from the front-end when the front-end is signing the customers up, or is Coast Processing simply brokering the sale and taking a cut (i.e., if they can't find someone, no purchase of the Package by Coast from the front-end is obligated)?]

- The consumer agrees to a contract for debt resolution services with Coast Processing/LPG requiring monthly payments based on a percentage of the total debts owed.  This fee, over the life of the relationship (usually 24-to-36 months), amounts to about 25-to-35% of the total debt owed (average payment of $370 per month, serviced all the way through)

    o The fee is typically divided between the front-end for generating the lead (65%) and Coast Processing/LPG for the ongoing debt resolution work (35%) [*the stream of cash flows OHP would be investing in is the 65% portion, while Coast Processing and LPG own the remaining 35% of the cash flows*]

        ▪ In the case of this memo and this specific opportunity, Coast Processing/LPG also purchases the front-end's 65% share of the fee stream at a discount to allow the front-end to receive its payment up front in a lump sum; this stream is then sold off to investors like OHP.  The rough monthly payment to the investor amounts to ~$200 per file

        ▪ Coast Processing also collects a fixed maintenance fee of $91.38 per active file per month

        ▪ First-payment cancellations are in the 15-20% range, and early cancellations thereafter are in the 10% range [*OHP would invest in the cash stream after the first payment has been made thereon*]

**Commented [M4]:** Currently, the front-end does not know if this deal is being purchased by Coast or an investor, or if it will stay in possession of the front-end. Most front-ends keep 50% of their deals, and the ones that are sold are randomly selected from their enrolled clients. Most of the time only after a 1st payment is made.

**Commented [M5]:** Consumer contract is with LPG.

**Commented [M6]:** Which is a flat fee retainer for legal services

3

CONFIDENTIAL

- There is no collateral for the cash flows.  However, customers are generally locked in once enrolling, as the value proposition for them making minimum payments is large, given LPG's legal services and support through the process leads to successful outcomes for ~~them~~ customers and due to the large initial commitment and complexity of navigating the process required (discussed below).  Furthermore, the company is honest in terms of likelihood of the various scenarios, which leads to more realistic expectations, and offers other legal services designed to eliminate creditor calls, collection notices, and address various legal questions that arise in connection with defaulted credit accounts

- The legal phase of the process begins with a consumer stopping all payments to credit cards or other unsecured debts.  At that point, attorneys begin sending dispute letters to creditors, requesting a list of documents that give those creditors the legal right to collect on an account.  Under the FDCPA, a debt collector is legally required to provide specific documentation within a specific timeframe when requested to do so or the debt is rendered invalid as a matter of law (failure to comply with the FDCPA renders a debt voidable even if it was valid under applicable law *ab initio*).  In Coast Processing/LPG's experience, the majority of creditors typically either fail to produce the legally required documentation (often because they don't retain it within their files or never received the documentation from the original lender) or they fail to provide the required documentation within the required timeframe due to the administrative cost of doing so, making the debt from that creditor legally invalid

<div style="float:right; border:1px solid #999; padding:4px;">**Formatted:** Font: Italic</div>

- The LPG attorneys follow the FDCPA protocol to request proof of the clients' outstanding debts from each of the client's creditors on behalf of the clients, and when a creditor fails to do so, the attorneys . ~~Once a creditor fails to produce legally required documentation within the legally required timeframe, the debt is no longer a valid debt, and the attorneys~~ proceed to dispute the account with the three national credit bureaus (Transunion / Equifax / Experian) and request that the bureaus remove all derogatory marks associated with the account.  This completely removes the debt from the client's credit history

- Once an account is invalidated, the balance is no longer owed, the negative file is removed from the credit report, and the client's credit score improves

- It typically takes 12-to-24 months to process all debts for an individual client.  During this time, a Coast Processing representative speaks with and updates each client every 30 days for the first four months, and every 90 days thereafter.  On average, the debt validation process will result in the majority of clients' debt being invalidated, which is a very favorable result for the clients

4

CONFIDENTIAL



**Process Flow**
1. A front-end affiliate identifies a consumer for debt resolution services.
2. The front-end company then refers the consumer to LPG. The consumer agrees to a contract for legal services with LPG.
2a. LPG outsources all paperwork, mail, and other back office services to Coast Processing.
3. Consumer stops payments on debt, LPG then sends dispute letters to creditors requesting debt validation.
3a. If debt is validated, LPG assists consumer in any settlement negotiations. LPG stops collecting, and consumer pays off settlement.
4. Once the debt is deemed no longer valid, the LPG disputes the account with the three national credit bureaus (Transunion, Equifax, and Experian).
5. Consumer's debts are cleared and credit score is restored.

**Cash Flow**
1. Consumer agrees to pay 25%-35% of total debt as amortized over ~30 months. Monthly cash flows average $370 per customer.
2. Cash flow is allocated 65% / 35% to the front-end affiliate and back end (LPG/Coast) respectively.
2a. Coast Processing additionally collects a monthly admin fee of $91.38 per file

Exhibit "D"
Page 74

Debt validation may sound too good to be true, but it is a lesser-known method for consumers to manage their outstanding debts as compared to other more advertised and marketed methods, including debt consolidation, debt settlement and bankruptcy.  This results in most consumers being unaware that debt validation is an option.  It also is a more complicated undertaking and longer process than each of these better-known alternative methods, resulting in some consumers not wanting to make the commitment to see it through. The process is not a simple process for consumers in that it ~~involves~~ begins with consumers stopping payments to creditors, thereby impairing their credit score during the pendency of the program in exchange for drastically improving it as the process unfolds.  Furthermore, the process is by far more effective with attorneys representing clients, as they can ensure that the correct process is followed and that the credit bureaus receive the correct supporting documentation to allow for removal of the invalidated debt, thereby making it unlikely that most consumers would undertake this on their own.  In summary, this process is not one that most consumers would want to pursue on their own, is lengthy, and ~~it~~ requires that the consumers hire attorneys to represent them in most cases, making debt validation a very effective but not complex process that definitely is not "too good to be true" when viewed as a whole.

**What's in it for the Consumer?**:  Using debt validation, the average file can get debts owed reduced by 50-to-80%, so the monthly payments by the customer are more than justified as compared to being buried for many years into the future under credit card debt at compounding levels of high interest and fees, coupled with the consequences of going through life with a terrible credit score.

**Why Don't Credit Card Companies Put a Stop to Debt Validation?**:  Credit card companies, understanding the value in compounding interest at very high rates with lots of fees, are incentivized to approve people that should not be approved for their cards, because the benefits of those who end up on interest-only payments and with large debt outweigh the money lost due to debt settlements, especially when mitigated by tax write-offs and sales to debt collection agencies.  Consumers engaging in debt resolution services have likely had their debt sold to debt collection agencies already.  These agencies are generally not provided with the legal documentation by the credit card companies or by the banks to support the existence of the debt.  Many challenges are met with immediate forfeiture of the claim as it's no longer worth it to pursue, especially because the debt was already long ago written off ~~and/~~or sold.  The credit card industry is massive, and the portion we are addressing here is infinitesimally miniscule in the larger picture.  In addition, the laws used during the invalidation process have been around for more than 40 years in one form or another, and would be difficult to eliminate even through aggressive lobbying.

**Company Overview and Team**:  The Coast Processing/LPG principals created a marketplace to sell front-end deals (through their wide referral network of front-end affiliates) and then transitioned to buying these deals on the back-end in order to free up the front-ends' capital and boost volumes.

As mentioned above, among the services offered by Coast Processing/LPG are the following:
- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense from collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre- and post-litigation;

6

CONFIDENTIAL

- Protection from harassing collection practices, including but not limited to the initiation of actions under the Telephone Consumer Protection Act and FDCPA;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting; and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country
- Bankruptcy filing for those consumers who are unable to pay validation or settlement fees

Coast Processing reviews all client files prior to the execution of the client's legal services agreement with LPG and maintains oversight through its administrative services over all file placements.

Traditional processing companies are required to be licensed and bonded debt resolution companies in the states that they operate in, but Coast Processing is not a traditional debt resolution processing company. Its program is through LPG, where the customer contract is between the customer and the law firm. Coast Processing provides outsourcing services to law firms, so LPG has a contract with Coast Processing for customer service. It is a common practice for law firms to outsource their customer service, communications, paper processing, etc. Unlike others in the space, Coast Processing does not do the debt resolution. LPG does, and Coast Processing just pushes the paper.

Coast Processing/LPG is a relatively new player to the industry, but with a twist. Most comparable back-ends do not pay for the deals up front. This gives Coast Processing a competitive advantage by attracting front-ends who do not have a 6-to-9 month runway of capital to grow their business. Also, most of the back-end companies are not law firms. They are registered debt settlement companies in each state in which they work and have higher regulations and regulatory costs than Coast Processing/LPG does as a nationwide law firm. Most back ends only offer one service, either settlement or validation. Coast Processing/LPG is unique in that the company is not a one-trick pony pushing a customer into one service offered. Coast Processing/LPG has a comprehensive program that does what is right for the customer and offers a variety of legal services that no other back-end company can offer. As detailed previously, the company first attempts invalidation – utilizing a failure to comply with legal obligations as a means of removing a debt from a costumer's credit report – which is the cheapest way out of debt for a customer. For those files that cannot be validated, LPG then settles with the creditors rather than kicking the customer out of the program and over to a settlement company. Finally, if a customer is unable to make settlement or validation fee payments, Coast Processing/LPG can handle a bankruptcy filing for them in-house. This structure allows the company to service more customers and be a comprehensive debt solution for the customer.

Mario Azevedo has 15 years' experience running a software, marketing, and lead generation business in the debt and mortgage industries. For seven years Mario ran his own front-end operation in debt settlement, debt management and debt validation. Mario has worked with many back-end operations throughout his career in the debt industry, helping them with structure, marketing, compliance and growth. Mario shut down his front-end affiliate to in December 2019 to focus exclusively on Coast Processing/LPG. Brian Reale has over 20 years' experience owning and running financial services front-end sales floors and three years running a back end debt validation company. Brian and Mario have worked together on various businesses since 2007. Mario and Brian are two of three co-founders and partners of both Coast Processing and LPG. We have spoken to both of them several times over the last few weeks. Mario and Brian determined there was more opportunity creating a company to service the leads from front-ends than to being a front-end itself, and out of this came the Coast Processing/LPG program.

7

CONFIDENTIAL

**Favorable Macro Environment for the Company**:  The market share opportunity is in the billions of dollars. Coast Processing/LPG is currently a very small player enrolling about $40 million a month (2,000 files) compared to bigger players in the debt industry doing $200-to-$400 million a month.  The company would like to grow to 10,000 files per month over the next year, which would still only be a tiny segment of the settlement industry.  There is over $1 trillion of credit card debt with a good portion of this, over $100 million, delinquent each month and in need of the services the company offers.

Key players in the space include Mccarthylawyer.com, lexingtonlaw.com, Freedom Debt Relief and Rescue One.  Coast Processing/LPG currently works with ~15 different front-ends.

**Expected Performance of a Sample Portfolio**:  Below is a sample portfolio shared with us by Mario and Brian that OHP could purchase.

*Key Info*:
- 100 files originated by Coast Processing/LPG's front-end partners between March 2020 and June 2020 from consumers in several different states, all with the first payment made on them
- Average expected term of 30.82 months, max single file duration of 36 months
- $2,274,207.77 of debt enrolled (average balance per file of $22,742.08); total implied payments per month of $36,499.99 (average monthly payment per file of $364.99)
- Total expected payments of $1,113,045.91 ($1,149,545.30 total payments (-) first payments already made of $ 36,499.39)
- Amount of remaining payments due to front-end affiliate of $440,201.84 [(65% (x) $1,113,045.91) (-) 31 months (x) $91.38 monthly maintenance fee (x) 100 files)]
- Assumed cancellation rate:  23% (assumption provided by the company; conservatively foots to narrative that early cancellations thereafter are in the 10% range)
- Purchase price of the Package as offered by Coast Processing:  $213,000.00

8

CONFIDENTIAL

## Investment Opportunity



1. Each month, Coast Processing packages the cash flows due to the front-end affiliates (65% of total) and offers to purchase them with an up front payment.
2. Coast Processing identifies an investor (OHP, e.g.), and sells the cash flows at a markup.
3. Investor collects cash flows, less the $91.38 per month per file administrative charge.

9

CONFIDENTIAL

# EXHIBIT E

From:    Brian </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
         (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E8A2CFE6F2244A8996580A718AE91C25-BRIAN-
         FREED>
Sent:    Thu 9/17/2020 12:12 PM (GMT-08:00)
To:      kevin.yu@oldhickorypartners.com
Cc:
Bcc:
Subject: Fw: Fw: Coast Purchase Agreement - further details


DRAFT RESPONSE:

1.   Who do the consumers pay initially?
All payments are made to The Litigation Practice Group PC, but the payments are processed by Coast
Processing.  In other words, CP collects the payments on behalf of LPG, the contracting entity, and then
allocates those payments to various operating costs, including the cost of marketing.
2.   For individual consumers (expressed as a percentage of each file):
         a.   How much of the consumer's payment does LPG receive?
         -LPG is a break even entity, meaning that its cost of operation and attorney salaries are
         paid, but no profit is retained by the entity.
         b.   How much of the consumer's payment does BAT receive?
         BAT receives the remainder, meaning that all amounts beyond LPG's operating cost is
         retained by BAT.  From that, BAT pays all of its operating costs, which includes
         marketing, and retains the remainder as profit.
         c.   How much of the consumer's payment does the front-end affiliate receive (assuming
         the right to receive this portion is not bought out)?
         Front-end affiliates receive payments based upon individual contracts executed between
         such entity and Coast Processing.  In other words, it varies.  The amount the affiliate
         would receive for a batch of files is what we transfer to the entity that buys such batch.
         In other words, you take the place of the affiliate for the batch of files you purchase, and
         obtain the payment they would receive for their marketing.
3.   How much of the consumer's payment will Old Hickory acquire (i.e., right to receive)?
-Old Hickory would receive the payment that would otherwise have gone to the marketing affiliate.
         a.   From whom will Old Hickory acquire the right to receive the consumer's payment?
         -From Coast Processing.  The contract is between BAT Inc. dba Coast Processing and
         Old Hickory, and any recourse would be against Coast Processing only.
         b.   How many clients will generally be bundled for sale to Old Hickory? Are all of those
         clients "recruited" by the same front-end affiliate?
         -The batch you purchase would come from one marketing affiliate, but the number of
         files purchased is up to you.  We can make files available each month, and will send a
         profile of the batch along with the contract at the time of execution so that you can see
         the outstanding receivable (number of files, payment per file, months remaining per file).
4.   What is the relationship between BAT and the front-end affiliate? Is the relationship fully contained
in the same agreement as the purchaser relationship?
-BAT Inc. dba Coast Processing has a separate written agreement with each marketing affiliate.  That
agreement is a complete statement of the relationship between the affiliate and Coast Processing.  No
other agreement exists.
5.   As the transaction is contemplated by BAT, how will the capital flow? (i.e., you have a $100
payment from a consumer, step-by-step where does that $100 go?)

-The consumer processes a $100 payment by ACH.  That money is received by Coast Processing, at which point Coast Processing distributes the marketing affiliate's fee to Old Hickory.  The remainder is retained by Coast Processing and used to pay its operating cost, with the remainder retained as profit. Old Hickory's payments are made without regard to any other consideration, meaning there is no universe in which a payment due to Old Hickory would be retained by Coast Processing.

On Tue, Sep 15, 2020 at 9:05 PM Brian <brian@freedomea.com> wrote:

---

**From:** Kevin Yu <kevin.yu93@gmail.com>
**Sent:** Tuesday, September 15, 2020 7:17 PM
**To:** Brian <brian@freedomea.com>
**Cc:** Adam Blum <AdamBlum@aol.com>; Allen, Ben <ballen@winstead.com>
**Subject:** Coast Purchase Agreement - further details

Hi Brian,

As I mentioned on the phone, here are the questions our lawyers had. We've covered some of these previously, but they preferred to hear it straight from the horse's mouth. Let's go ahead and plan for a call Thursday at 11am PST as a backstop, but if y'all can get this turned around beforehand we'd be happy to take a look.

1.  Who do the consumers pay initially?
2.  For individual consumers (expressed as a percentage of each file):
    a.   How much of the consumer's payment does LPG receive?
    b.   How much of the consumer's payment does BAT receive?
    c.   How much of the consumer's payment does the front-end affiliate receive (assuming the right to receive this portion is not bought out)?
3.  How much of the consumer's payment will Old Hickory acquire (i.e., right to receive)?
    a.   From whom will Old Hickory acquire the right to receive the consumer's payment?
    b.   How many clients will generally be bundled for sale to Old Hickory? Are all of those clients "recruited" by the same front-end affiliate?
4.  What is the relationship between BAT and the front-end affiliate? Is the relationship fully contained in the same agreement as the purchaser relationship?
5.  As the transaction is contemplated by BAT, how will the capital flow? (i.e., you have a $100 payment from a consumer, step-by-step where does that $100 go?)
Thanks,

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

--
Coast Processing
27129 Calle Arroyo
Suite 1821
San Juan Capistrano, CA 92675
949.229.6262, ext. 1013
tony@coastprocessing.com

# EXHIBIT F

| Business Model Characteristics | Coast Processing ("Coast") / Litigation Practice Group ("LPG") | Other national debt settlement/validation processors e.g., Freedom Debt, McCarthy Law | Other |
|---|---|---|---|
| Structure | Law firm + processing company<br><br>- Processing company contracts with affiliates to avoid fee-sharing restrictions<br>-<br>- Law firm contracts directly with customer<br><br>- National – in 48 states<br><br>- Few-to-no large national competitors offering a comprehensive debt solution product | Typically just a processing company<br><br>- Usually only operate in green states (can do debt settlement without licensed attorney, see chart below)<br>- Usually focused on one solution: settlement, validation, or bankruptcy, etc.<br>- Has to source out any legal related issues to a law firm – increases cancellation rate<br>- McCarthy Law (www.mccarthylawyer.com) is exception; only other large network of lawyers that provides mainly settlement services; no bankruptcy or validation | Law firm or individual lawyer with debt settlement focus<br><br>- Usually in the 22 red states where attorney is required (see chart below)<br>- Ranges from individual lawyer to law firms that service a single state<br>- Generally, don't do debt validation |

Case 8:26-ap-01007-SC    Doc 11    Filed 02/12/26    Entered 02/12/26 17:11:32    Desc Main Document    Page 84 of 217

Exhibit "F" Page 84

CONFIDENTIAL

Case 8:26-ap-01007-SC   Doc 11   Filed 02/12/26   Entered 02/12/26 17:11:32   Desc
Main Document   Page 85 of 217

| | | | |
|---|---|---|---|
| **Customer Acquisition** | Marketing company generates leads for affiliates who sell LPG's program<br>- Overall CAC is lower because higher closing ratio due to better product.<br><br>*Marketing:*<br>- Leads cost $40 - $120 per lead, scaling cheap to expensive based on source: social media/online generated, call center, and direct mail<br><br>*Affiliates:*<br>- Total cost to client is 35% of debt enrolled; fee is allocated over ~30 months and charged as a monthly payment, can charge higher as there are no limiting regulations<br>- 65%/35% split for front end and back end, respectively | Similar structure to Coast<br><br>*Marketing:*<br>- Lead cost the same, but higher acquisition cost due to lower conversion rates because of the higher customer fee and only one program option rather than a complete solution<br><br>*Affiliates:*<br>- Total cost to client is about 75% of total debt, where ~50% is set aside for eventual settlement and ~25% is fee<br>- Fee split about 5-10% for front end, 15-20% for backend | Similar structure to Coast<br><br>*Marketing:*<br>- Not done on a massive scale due to limited capacity, typically referrals<br><br>*Affiliates:*<br>- Far fewer affiliates in space<br>- Requires affiliates to create/maintain individual relationships with several lawyers/firms rather than work with a single (or few) backends |
| **Affiliate Relationship Deal Buying** | - Coast offers purchase of 65% cash flows, creating a capital infusion able to be reinvested in further marketing growth by the affiliate<br>- Coast identifies affiliates producing subpar customers and works to improve their identification and sales process by conducting management and sales trainings and coaching the affiliate through identifying good leads and creating reasonable expectations | - Upfront payments sometimes offered, but with clawback provisions<br>- Upfront payment lower than Coast | - Does not likely exist |

CONFIDENTIAL

## Coast Processing / Litigation Practice Group – Business Model Competitive Advantages and Market Map - August 2020

| | | | |
|---|---|---|---|
| **Customer Service** | - Provides comprehensive debt solution tailored to each customer<br>- Attempts to first invalidate debt, then settle or file for bankruptcy to maximize savings<br>- Coast will work with customers that cannot pay to file for bankruptcy as a customer service gesture<br>- Coast helps to ensure creditors/collectors follow federal and state regulations | - Customer essentially forced to choose program type up front<br>- If enrolled in a validation program and a summons is received, could be unenrolled from program and told to find a lawyer | - Some firms provide similar services to LPG<br>- Some smaller firms or individuals may specialize in various areas but lack general expertise across the board |
| **Regulatory Environment** | Regulated by State Bar – governing professional responsibility<br>- Marketing rules – cannot guarantee results; must disclose the fact that you are an attorney; generally cannot mislead client<br>- Punishment is (1st time) censure letter + fine, (2nd) license suspension + fine, (3rd) disbarment<br>- General professional responsibility rules include keeping the client informed, being available to the client, showing up in court<br>- Much lower bar of regulation compared to credit industry<br>- Not subject to regulations targeted at the debt settlement industry<br>- No current regulatory body for debt validation | - Regulated by various state and federal debt settlement laws that govern the types of debt settlement services allowable (cannot work in red states), payment structures (money must be kept in escrow), and limits on chargeable fees<br>- Max charge is 25% of total debt<br>- Money kept in escrow cannot be deployed | - Regulated by State Bar – Similar to Coast/LPG |

3

CONFIDENTIAL

**Coast Processing / Litigation Practice Group – Business Model Competitive Advantages and Market Map - August 2020**

| | | | |
|---|---|---|---|
| **Financial Metrics** | Debt enrolled dependent on the affiliate (some have more targeted marketing, high dollar debt)<br><br>On average:<br>- $27k total debt enrolled per customer<br>- ~30 months in the program<br>- $380 monthly payment<br>- 33% Cancellation rate, 17% before first payment | - Often have minimum debt requirements of $7.5k-10k<br>- Higher monthly payments, ~75% of total debt enrolled<br>- Similar program length<br>- 15-20% higher cancellation rates because cannot meet all needs | - Attorneys paid on retainer and high hourly rates<br>- More expensive, no economies of scale<br>- Not all-inclusive, will charge extra for a lawsuit |
| **Future Growth** | - Continue to invest in front-end affiliates to drive sales growth<br>- Create wholesale reps to increase ability to identify and partner with front-end affiliates<br>- | - Affiliates similar to Coast model, but with higher cancel rates, lower price for deal buying model, less attractive<br>- Saturated market with many competitors and affiliates jumping from one to the next | - Capacity limited by how many clients an attorney can service.<br>- No use of outsourced processing companies<br>- Not done as a scale model |

| Green States (non-attorney) | | | | Red States (attorney required) | | |
|---|---|---|---|---|---|---|
| Alabama | Illinois | Nebraska | Rhode Island | Connecticut | Minnesota | Utah |
| Alaska | Indiana | New Hampshire | South Dakota | Georgia | Mississippi | Vermont |
| Arizona | Louisiana | New Mexico | Texas | Hawaii | Nevada | Virginia |
| Arkansas | Maryland | New York | West Virginia | Idaho | New Jersey | Washington |
| California | Massachusetts | North Dakota | Wisconsin | Iowa | North Carolina | Washington DC |
| Colorado | Michigan | Oklahoma | | Kansas | Ohio | Wyoming |
| Delaware | Missouri | Oregon | | Kentucky | South Carolina | |
| Florida | Montana | Pennsylvania | | Maine | Tennessee | |

X Bruce Reele

4

CONFIDENTIAL

# EXHIBIT G

From:    Dan Young <dan.young@oldhickorypartners.com>
Sent:    Thu 7/28/2022 8:57 AM (GMT-08:00)
To:    Tony Diab <tony@coastprocessing.com>
Cc:    Kevin Yu <kevin.yu@oldhickorypartners.com>
Bcc:
Subject: RE: Front End Agreements


Ok, thanks.

Thanks.

Dan Young, CLU, ChFC

*COO and General Counsel | Old Hickory Partners*
*dan.young@oldhickorypartners.com*

This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Old Hickory Partners Management, LP  and its subsidiaries. This email may also contain information that is confidential, legally privileged and/or otherwise protected from disclosure by contract or law. Any unauthorized use, copying, disclosure, or distribution of this email and/or its attachments is prohibited. If you are not the intended recipient, please let us know by replying to this email and then destroying all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be a solicitation for investment or an offer to sell securities. Such an offer may only be made to qualified investors by means of delivery of a confidential private placement memorandum.  This email is not legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.  Per IRS Circular 230 Disclosure, any tax advice contained herein is not intended or written to be used and cannot be used by you or any other persons for the purpose of avoiding any penalties that may be imposed by the IRS.

---

**From:** Tony Diab <tony@coastprocessing.com>
**Sent:** Thursday, July 28, 2022 11:56 AM
**To:** Dan Young <dan.young@oldhickorypartners.com>
**Cc:** Kevin Yu <kevin.yu@oldhickorypartners.com>
**Subject:** Re: Front End Agreements

Hi Dan -

We have had a small handful of affiliates sign the LPG agreement - maybe 4 or 5 total.  The vast majority were either existing affiliates on the Coast Processing side or did not insist on a written agreement.  We try to avoid written agreements if at all possible.

Thanks!

On Thu, Jul 28, 2022 at 6:27 AM Dan Young <dan.young@oldhickorypartners.com> wrote:

> Thanks Tony.  Which affiliates have signed an agreement and how many do you have that have not signed anything?
>
> Thanks.
>
> Dan Young, CLU, ChFC
>
> *COO and General Counsel | Old Hickory Partners*

*dan.young@oldhickorypartners.com*

This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Old Hickory Partners Management, LP  and its subsidiaries. This email may also contain information that is confidential, legally privileged and/or otherwise protected from disclosure by contract or law. Any unauthorized use, copying, disclosure, or distribution of this email and/or its attachments is prohibited. If you are not the intended recipient, please let us know by replying to this email and then destroying all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be a solicitation for investment or an offer to sell securities. Such an offer may only be made to qualified investors by means of delivery of a confidential private placement memorandum.  This email is not legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.  Per IRS Circular 230 Disclosure, any tax advice contained herein is not intended or written to be used and cannot be used by you or any other persons for the purpose of avoiding any penalties that may be imposed by the IRS.

**From:** Tony Diab <tony@coastprocessing.com>
**Sent:** Thursday, July 28, 2022 12:40 AM
**To:** Dan Young <dan.young@oldhickorypartners.com>
**Cc:** Kevin Yu <kevin.yu@oldhickorypartners.com>
**Subject:** Re: Front End Agreements

Hi Dan -

Our current affiliate agreement is attached.

Thanks!

On Wed, Jul 27, 2022 at 9:44 AM Dan Young <dan.young@oldhickorypartners.com> wrote:

> Tony,
>
> Good morning.  I hope you are well.
>
> Could you send along those agreements we discussed.  We appreciate it.
>
> Thanks.
>
> Dan Young, CLU, ChFC
>
> *COO and General Counsel | Old Hickory Partners*
> *dan.young@oldhickorypartners.com*
>
> This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Old Hickory Partners Management, LP  and its subsidiaries. This email may also contain information that is confidential, legally privileged and/or otherwise protected from disclosure by contract or law. Any unauthorized use, copying, disclosure, or distribution of this email and/or its attachments is prohibited. If you are not the intended recipient, please let us know by replying to this email and then destroying all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be a solicitation for investment or an offer to sell securities. Such an offer may only be made to qualified investors by means of delivery of a confidential private placement memorandum.  This email is not legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.  Per IRS Circular 230 Disclosure, any tax advice contained herein is not intended or written to be used and cannot be used by you or any other persons for the purpose of avoiding any penalties that may be imposed by the IRS.

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

# EXHIBIT H

**Fill in this information to identify the case:**

Debtor 1    The Litigation Practice Group P.C.

Debtor 2 
(Spouse, if filing)

United States Bankruptcy Court for the:    Central District of California

Case number    8:23-bk-10571

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

OHP-CDR, LP

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Jeremy Andersen, Razmig Izakelian
Name

865 S. Figueroa Street, 10th Floor
Number    Street

Los Angeles    CA    90017
City    State    ZIP Code

Contact phone (213) 443-3000

Contact email jeremyandersen@quinnemanuel.com

**Where should payments to the creditor be sent?** (if different)

Name

Number    Street

City    State    ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

Exhibit "H"
Page 93

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

❏ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$___At least $16,938,954.00___. **Does this amount include interest or other charges?**

❏ No

❏ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached.

**9. Is all or part of the claim secured?**

❏ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

❏ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

❏ Motor vehicle

☑ Other. Describe: All personal property

**Basis for perfection:** See attached

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ See attached

**Amount of the claim that is secured:** $ See attached

**Amount of the claim that is unsecured:** $ See attached (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ See attached

**Annual Interest Rate** (when case was filed)_____%See attached

❏ Fixed

❏ Variable

**10. Is this claim based on a lease?**

☑ No

❏ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

❏ Yes. Identify the property: _____

Official Form 410         **Proof of Claim**

Exhibit "H"
Page 94   page 2

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | Amount entitled to priority |
|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

❑ Yes. *Check one:*

❑ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

❑ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

❑ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

❑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

❑ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

❑ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
❑ I am the creditor's attorney or authorized agent.
❑ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
❑ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   05 / 24 / 2023
                   MM / DD / YYYY

_Signature_

**Print the name of the person who is completing and signing this claim:**

| | | |
|---|---|---|
| Name | Adam / First name | Middle name / Blum / Last name |
| Title | Manager | |
| Company | OHP- CDR, LP | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. Razmig Izakelian | |
| | c/o Quinn Emanuel, Attn: Jeremy Andersen, | |
| Address | 865 S. Figueroa St. | |
| | Number   Street | |
| | Los Angeles   CA   90017 | |
| | City   State   ZIP Code | |
| Contact phone | 213-443-3000 | Email   jeremyandersen@quinnemanuel.com |

Exhibit "H"
Page 95

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re | Chapter 11 |
| **LITIGATION PRACTICE GROUP P.C.** | Case No. 8:23-bk-10571-SC |
| Debtor. | |

### ATTACHMENT TO PROOF OF CLAIM FILED BY OHP-CDR, LP

1.      On March 20, 2023 (the "Petition Date"), Litigation Practice Group P.C. (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").  On May 8, 2023, the Bankruptcy Court entered its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* and appointed Richard A. Marshack as the chapter 11 trustee in the above-captioned case (the "Chapter 11 Trustee").

2.      The proof of claim and this attachment thereto (together, the "Proof of Claim") is filed by OHP-CDR, LP, formerly known as OHP-LPG, LP ("OHP-CDR").

3.      On the basis of the facts and claims set forth below, OHP-CDR asserts a claim of at least $16,538,954 against the Debtor including: (i) $9,538,954 in connection with the Guaranty (as defined below); (ii) damages caused by the Debtor's breaches of the LLC Agreement in an amount of at least $7 million (as defined below); and (iii) additional amounts that may be owing in connection with the foregoing, including interest and fees relating thereto.

4.      In filing this Proof of Claim, OHP-CDR reserves all its rights, claims, privileges, and defenses against the Debtor, including all its rights to assert setoff, counterclaims, recoupment, or defenses arising from any and all or its transactions or dealings with the Debtor.

## CLAIM

**I.       The Parties**

5.       OHP-CDR, formerly named OHP-LPG, LP, is a limited partnership organized under the laws of the State of Delaware, with its headquarters in Austin, Texas.

6.       The Debtor is a corporation organized under the laws of the State of California, with its headquarters in Tustin, California.

**II.      The Debtor's Business**

7.       The Debtor is a debt validation law firm that provides debtor's rights services in the form of debt validation, consultation, and litigation defense.  The legal services it offers include: (i) removal of invalid debts through correspondence with credit bureaus; (ii) validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with credit bureaus; (iii) defense of collection actions; and (iv) negotiation of settlements of consumer debts.

8.       One of the ways that the Debtor generated clients was by utilizing the services of marketing companies called "Affiliates."  These Affiliates were companies that owned and operated systems of generating leads consisting of consumers interested in the legal services offered by the Debtor.  The Affiliates were retained by the Debtor to provide marketing and customer service functions, and would receive, as payment, a percentage of the fees generated by the Debtor for each file referred to the Debtor by the Affiliate.

**III.     The LLC Agreement**

9.       On September 1, 2022, OHP-CDR (then named OHP-LPG, LP), the Debtor, and Mario Azevedo ("Azevedo") entered into the *Limited Liability Company Agreement of PurchaseCo80, LLC*, as amended from time to time (the "LLC Agreement" and "PurchaseCo").

2

A true and correct copy of the LLC Agreement is attached hereto as **Exhibit A**.  The purpose of PurchaseCo was to, among other things, acquire cash flow streams representing interests in customer payments for debt validation services.  The LLC Agreement was subsequently amended, replacing Azevedo with Azevedo Solutions Group ("ASG").  OHP-CDR, the Debtor, and ASG are referred to as the "Members."

10.     Pursuant to the LLC Agreement, each of OHP-CDR, the Debtor, and ASG made "Initial Capital Contributions" to PurchaseCo.  In addition to Initial Capital Contribution, OHP-CDR made an "Equity Investment" of $22,000 and had the option of providing "OHP Funding Capital" of up to $10,000,000.00.  OHP-CDR provided the full amount of OHP Funding Capital of $10,000,000 pursuant to the procedures set forth in section 3.02 of the LLC Agreement.

11.     The funding provided to PurchaseCo, including the OHP Funding Capital, was to be used by PurchaseCo to purchase from the Debtor and/or the Affiliates cash flow streams representing an interest in customer payments for debt validation services (the "Eligible Receivables").  The LLC Agreement required the Debtor to operate in a manner consistent with its historical practices, and to collect the Eligible Receivables and remit them to PurchaseCo.

12.     Pursuant to section 6.01 of the LLC Agreement, any available cash, after allowance for PurchaseCo's obligations then due and payable along with reasonable reserves, was required to be distributed to the Members pursuant to a specified waterfall ("Waterfall").  The Waterfall required that any available cash: (i) first be distributed to OHP-CDR until OHP-CDR received a return of all of the OHP Funding Capital paid into PurchaseCo; (ii) second to OHP-CDR until OHP-CDR received a return of its Equity Investment; (iii) third to the Debtor and ASG until they received a return of their Equity Investments; (iv) fourth to OHP-CDR until OHP-CDR received distributions equal to the greater of 88% of the OHP Funding Capital paid into PurchaseCo and a

20% IRR on the total OHP Funding Capital paid into Purchase Co; (v) fifth to the Debtor and ASG

in an amount equal to 13.5% of what was paid to OHP-CDR under subsection (iv) above; (vi) sixth

to the Members to the extent they had contributed additional capital contributions; and (vii) last,

pro rata to the Members in accordance with their membership interests.

13.     PurchaseCo was managed by a Manager, and the Debtor was appointed as the initial

Manager.  The LLC Agreement also contained numerous operational covenants, which are set

forth in section 7.02.  Those covenants required, among other things, the Debtor and ASG to grant

PurchaseCo a right of first offer to purchase any cash flow stream representing an interest in

customer payments for debt validation services, and the Debtor, as Manager, to maintain a

minimum cash balance.  Specifically, the operational covenants include:

> Presentment of Cash Flows; Right of First Offer.  During the Term, LPG and
> Azevedo grant to the Company a right of first offer to purchase any cash flow
> stream representing an interest in customer payments for debt validation services.
> On no less than a monthly basis, LPG shall present OHP with a written list of cash
> flows for consideration to be Eligible Receivables, which shall be presented to OHP
> without price markups and on the same terms as originally presented to LPG by the
> applicable LPG Receivable Affiliate. OHP shall have five (5) days after receipt of
> such list to accept or decline such cash flows as Eligible Receivables. Should OHP
> fail to respond prior to the expiration of such five (5)-day period, the applicable
> cash flows shall be deemed approved by OHP and the Company in all respects.
> Should OHP decline any presented cash flow stream, it may be sold to third-parties
> for a period of thirty (30) days on identical economic terms as were presented to
> OHP. After the thirty (30)-day period or upon any change in economic terms of the
> offering, the Company's and OHP's rights under this Section 7.02(a) shall be
> renewed as to such cash flow. For so long as any of LPG or Azevedo hold any
> Membership Interest, directly or indirectly, LPG and Azevedo shall not (and shall
> cause each of the LPG Limited Guarantors to not) enter into side letters or
> agreements with any LPG Receivable Affiliates or among each other which would
> result in price markups to the Company or additional payments to LPG as a result
> of any cash flow being acquired by the Company, or which would violate the
> Company's and OHP's rights in this Section 7.02(a) or elsewhere in this
> Agreement. Any commissions or similar payments received by LPG or Azevedo as
> a result of the Company's purchase of Eligible Receivables shall be promptly paid
> to the Company not as Additional Capital Contributions and without any
> corresponding increase in the Percentage Interest of such party.

LLC Agreement § 7.02(a).

> <u>Maintenance of Minimum Cash Balance and Available Cash</u>. At all times, the Manager shall cause the Available Cash to be no less than the Minimum Cash Balance. All Available Cash shall be kept in depository accounts to which OHP has direct access and joint control.

LLC Agreement § 7.02(b).

> <u>Deposit Account Control Agreements; Phone Conference</u>. Until the later of (i) LPG no longer being Manager, and (ii) LPG no longer holding, directly or indirectly, any Membership Interest, LPG shall grant and provide OHP access to all of LPG's depository accounts (the "LPG Accounts"), within fourteen (14) days of the Effective Date, through deposit account control agreements or similar instruments at the discretion of OHP. Such agreements or instruments shall include, without limitation, the right of OHP to take sole custody and control over the funds therein and to approve expenditures outside of the ordinary course of business. In addition to granting OHP access to the LPG Accounts, within seven (7) days of the Effective Date, LPG and OHP shall attend a phone conference for the purposes of discussing regulatory issues attended and facilitated by Tony Diab.

LLC Agreement § 7.02(e).

> <u>Purchase of Eligible Receivables; Collections and Management</u>. (i) The Manager shall cause the Company to acquire Eligible Receivables first with Available Cash in excess of the Minimum Cash Balance, second with OHP Funding Capital, and third with Additional Capital Contributions. (ii) Within seven (7) days of the Effective Date, OHP shall attach certain agreements to be assigned to the Company as Exhibit K (the "Assigned Eligible Receivables"). Upon attachment of the Assigned Eligible Receivables, OHP's rights in the Assigned Eligible Receivables will be assigned to the Company pursuant to an assignment agreement and deemed as approved Eligible Receivables acquired with OHP Funding Capital in the amount listed on Exhibit L. (iii) The Manager shall operate the Company at all times in compliance with all Applicable Law and shall promptly, within forty-eight (48) hours, notify OHP of the Manager's or the Company's receipt or becoming aware of any notices of defaults, claims, investigations, or actions of any kind against the Company, LPG (whether in its capacity as Manager or otherwise), any of the LPG Limited Guarantors, or any of the LPG Receivable Affiliates. (iv) From the Effective Date and thereafter, LPG shall continue operate in a manner consistent with its historical practices, including, without limitation, in its solicitation, relationships, and purchases with LPG Receivable Affiliates. (v) From the Effective Date and thereafter, LPG will operate its collections and management practices with LPG Receivable Affiliates consistent with the terms detailed in the ACB Holdings Agreement, listed on Exhibit H.

LLC Agreement § 7.02(f).

<u>Major Decisions</u>. The Company shall not, and shall not enter into any commitment to (and the Manager shall not authorize the Company to), do any of the following without the affirmative written consent of OHP: … (ii) make any material change to the nature of the business conducted by the Company or enter into any business other than the Business; … (iv) approve the Budget for any Fiscal Year or any amendment, modification or supplement thereto or authorize or incur expenses by an amount in excess of ten percent (10%) of the corresponding amounts set forth in the then-current Budget; … (v) authorize any distribution other than as required by ARTICLE VI or Section 13.03(c); (vi) establish any reserve for expenses, indebtedness, obligations, or anticipated capital expenditures under Section 6.01(a); (vii) other than the OHP Funding Capital, Equity Investments, and as set forth in Section 8.03, incur any Indebtedness, pledge or grant liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person; (viii) make any loan, advance, capital contribution or other investment in or to any Person other than to the extent approved or authorized in the Budget then in effect; (ix) make any single capital expenditure not set forth in the Budget in excess of five thousand dollars ($5,000.00); (x) enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange or other acquisition (including by merger, consolidation, acquisition of stock or acquisition of assets) of any assets and/or equity interests of any Person, other than in the ordinary course of business; (xi) enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange or other disposition (including by merger, consolidation, sale of stock or sale of assets) of any assets other than in the ordinary course of business; (xii) approve any merger, consolidation, or combination with or into any other Person ….

LLC Agreement § 7.02(h).

14. Additionally, the LLC Agreement at section 11.03 included a "non-compete" clause, stating that so long as the Debtor and ASG held membership interests in PurchaseCo and for two years thereafter, the Debtor, Tony Diab ("Diab"), and ASG shall not engage in any business competitive with PurchaseCo's business.

15. As set forth in section 8.03 of the LLC Agreement, to secure repayment of the OHP Funding Capital, LPG granted OHP-CDR a first priority security interest in all of its personal property, including, among other things, all accounts, contract rights, rights to payment of money, commercial tort claims, deposit accounts, and all other financial assets. On January 25, 2023,

6

OHP-CDR (then OHP-LPG, LP) recorded a UCC-1 Financing Statement with the California Secretary of State.  A true and correct copy of the UCC-1 Financing Statement is attached hereto as **Exhibit B**.

**IV.     The Guaranty**

16.     In connection with the LLC Agreement, the Debtor entered into a guaranty ("Guaranty") with OHP-CDR.  A true and correct copy of the Guaranty is attached hereto as **Exhibit C**.

17.     Pursuant to sections 3, 4, 5, and 9 of the Guaranty, the Debtor unconditionally and irrevocably guaranteed to pay, when due, the OHP Funding Capital as a primary obligor.

**V.     Breaches of the LLC Agreement and Guaranty**

18.     The Debtor almost immediately defaulted under the terms of the LLC Agreement, in the following ways:

a.     It failed, as manager of PurchaseCo, to remit payments from Eligible Receivables to PurchaseCo, in violation of section 7.02(a) of the LLC Agreement;

b.     It failed to abide by PurchaseCo's right of first offer to purchase the Eligible Receivables purchased by the Debtor, in violation of section 7.02(a) of the LLC Agreement;

c.     It incurred third-party debt, equity, and merchant cash advance obligations beginning on September 23, 2022, in violation of section 7.02(h) of the LLC Agreement;

d.     It paid commissions from Eligible Receivables to Affiliates and other parties rather than PurchaseCo, in violation of section 7.02(h) of the LLC Agreement;

e.     It paid Tony Diab for personal matters rather than for the payment of Eligible Receivables for PurchaseCo, in violation of section 7.02(h) of the LLC Agreement; and

f.     It failed to grant and provide OHP-CDR access to all of the Debtor's

7

depository accounts, in violation of section 7.02(e) of the LLC Agreement.

19.     On December 1, 2022, OHP-CDR sent the Debtor a *Notice of Default and Reservation of Rights* (the "December 1, 2022 Notice of Default"), outlining these defaults and giving the Debtor, in accordance with the terms of the LLC Agreement, seven days to cure the defaults.  The December 1, 2022 Notice of Default stated that, to the best of OHP-CDR's knowledge, the Debtor had failed to remit Eligible Receivables to PurchaseCo in an amount totaling $3,293,732.81 as of that date.

20.     The Debtor failed to timely to cure the defaults, and OHP-CDR sent multiple subsequent notices of default and reservations of rights, including on January 27, 2023, February 17, 2023, and March 6, 2023, outlining the same defaults as set forth in the December 1, 2022 Notice of Default.  As set forth in the March 6, 2023 *Notice of Default and Reservation of Rights* ("March 6, 2023 Notice of Default"), as of that date, to the best of OHP-CDR's knowledge, the Debtor had failed to remit over $7 million of Eligible Receivables to PurchaseCo.  Additionally, on February 28, 2023, OHP-CDR removed LPG as Manager of PurchaseCo, and appointed itself as the Manager of PurchaseCo.

## VI.     OHP-CDR's Claims

### a.  OHP Funding Capital

21.     The Debtor has breached the Guaranty by failing to pay the OHP Funding Capital.

22.     Under the Guaranty, the Debtor unconditionally and irrevocably guaranteed to pay, among other things, the OHP Funding Capital as a primary obligor.

23.     As set forth above, the Debtor has failed to comply with several of the operational covenants set forth in section 7.02 of the LLC Agreement which despite numerous notices of default beginning on December 1, 2022, have not  been cured.  Pursuant to section 9.01(b) of the

LLC Agreement, the failure to cure the defaults constitutes an Event of Default, and OHP has the right to accelerate the repayment of any unpaid OHP Funding Capital.  Therefore, under the Guaranty, the Debtor is obligated to pay OHP-CDR the outstanding OHP Funding Capital of $9,538,954.

### b. Violations of the Operational Covenants

24.    The Debtor has breached both the Guaranty and the LLC Agreement by failing to comply with the operational covenants set forth in section 7.02 of the LLC Agreement.

25.    Pursuant to the Guaranty, the Debtor unconditionally and irrevocably guaranteed to pay, among other things, the "Guaranteed Performance Obligations," which is defined to include "all of the obligations of [PurchaseCo] and each Guarantor [including the Debtor] under the LLC Agreement … other than the obligation to pay money."  Additionally, as set forth above, pursuant to section 7.02 of the LLC Agreement, the Debtor, as manager of PurchaseCo, had numerous obligations.

26.    As set forth in the December 1, 2022 Notice of Default and subsequent notices, the Debtor breached several of the operational covenants set forth in section 7.02 of the LLC Agreement.  OHP-CDR is entitled to damages caused by those breaches, including, without limitation, payment of all monies associated with cash flow streams that should have been offered to OHP-CDR, Eligible Receivables that have not been paid to OHP-CDR which as of March 6, 2023 totaled at least $7 million, and attorney's fees as set forth in the LLC Agreement.

## RESERVATION OF RIGHTS

27.     This Proof of Claim is filed to protect OHP-CDR from any asserted forfeiture of claims.  OHP-CDR reserves its right to amend and/or supplement this Proof of Claim for any purposes and to the extent permitted by applicable law.

28.     The Proof of Claim does not encompass claims or rights that OHP-CDR may have that arise after the Petition Date that are entitled to an administrative priority.  OHP-CDR expressly reserves its right to file and assert at the appropriate time any claims and rights that are entitled to an administrative priority.

29.     OHP-CDR, on its own behalf and on behalf of its officers, directors, members, and managers, hereby reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims or defenses that may be asserted by the Debtor or Chapter 11 Trustee, including, without limitation, any rights of setoff and/or recoupment.  OHP-CDR, on its own behalf and on behalf of its officers, directors, members, and managers, hereby further reserves all of its rights as against the Debtor and/or Chapter 11 Trustee in this chapter 11 proceeding.  OHP-CDR, on its own behalf and on behalf of its officers, directors, members, and managers, does not waive, and hereby expressly reserves, any right of action that it has or may have against the Debtor and/or Chapter 11 Trustee, or any other person or persons, including the Debtor's officers, directors, members, managers, and non-debtor affiliates.

30.     OHP-CDR, on its own behalf and on behalf of its officers, directors, members, and managers, hereby further reserves all rights accruing to it, and the filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver, release, or limitation of its rights against any person, entity, or property (including, without limitation, the Debtor, the Debtor's officers, directors, members, or managers, the Debtor's non-debtor affiliates, the Chapter 11 Trustee, or

<div align="center">10</div>

any other person or entity that is or may become a debtor in a case pending in this Court); (ii) a consent by OHP-CDR or any of its officers, directors, members, and managers to the jurisdiction or venue of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving OHP-CDR or its officers, directors, members, and managers; (iii) a waiver, release, or limitation of the right of OHP-CDR and/or its officers, directors, members, and managers to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether or not such jury trial right is pursuant to statute or the U.S. Constitution; (iv) a consent by OHP-CDR or any of its officers, directors, members, and managers to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of the right of OHP-CDR or any of its officers, directors, members, and managers to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a U.S. District Court Judge; (vi) consent to this Court hearing or deciding any matter or proceeding, to the extent this Court lacks the constitutional authority to do so, under *Stern v. Marshall* or otherwise; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving OHP-CDR; (viii) an election of remedies; or (ix) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

31. Any payments made with respect to the claims referenced herein should be sent to the following address:

> OHP-CDR, LP
> c/o Jeremy Andersen, Razmig Izakelian
> Quinn Emanuel Urquhart & Sullivan, LLP
> 865 S. Figueroa Street, 10th Floor
> Los Angeles, CA 90017
> Phone: 213-443-3000
> Email: jeremyandersen@quinnemanuel.com
> razmigizakelian@quinnemanuel.com

32. All notices and communications concerning the Proof of Claim should be sent to the following addresses:

> OHP-CDR, LP
> c/o Jeremy Andersen, Razmig Izakelian
> Quinn Emanuel Urquhart & Sullivan, LLP
> 865 S. Figueroa Street, 10th Floor
> Los Angeles, CA 90017
> Phone: 213-443-3000
> Email: jeremyandersen@quinnemanuel.com
> razmigizakelian@quinnemanuel.com

33. To the extent that OHP-CDR has or may have a right to subrogation, indemnification, reimbursement, or other similar claim, whether arising under 11 U.S.C. § 509, common law, equity, any written or oral agreement, or otherwise, OHP-CDR expressly preserves such rights.

12

Exhibit "H"
Page 107

# EXHIBIT A

LIMITED LIABILITY COMPANY AGREEMENT

among

PURCHASECO80, LLC

and

THE MEMBERS NAMED HEREIN

dated as of

September 1, 2022

TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................................... 1

    Section 1.01    Definitions ........................................................................... 1

    Section 1.02    Interpretation...................................................................... 10

ARTICLE II ORGANIZATION................................................................................................. 11

    Section 2.01    Formation............................................................................ 11

    Section 2.02    Name .................................................................................. 11

    Section 2.03    Principal Office................................................................... 11

    Section 2.04    Registered Office; Registered Agent ................................. 11

    Section 2.05    Purpose; Powers................................................................. 11

    Section 2.06    Term.................................................................................... 12

    Section 2.07    No State-Law Partnership .................................................. 12

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ................................ 12

    Section 3.01    Initial Capital Contributions; Updates to Membership Interests ......................... 12

    Section 3.02    Equity Investments and OHP Funding Capital.................... 12

    Section 3.03    Additional Capital Contributions....................................... 13

    Section 3.04    Maintenance of Capital Accounts...................................... 14

    Section 3.05    Succession Upon Transfer ................................................. 14

    Section 3.06    Negative Capital Accounts ................................................ 14

    Section 3.07    No Withdrawals from Capital Accounts............................. 14

    Section 3.08    Loans from Members.......................................................... 15

    Section 3.09    Modifications...................................................................... 15

ARTICLE IV MEMBERS......................................................................................................... 15

    Section 4.01    Admission of New Members .............................................. 15

    Section 4.02    No Personal Liability.......................................................... 15

    Section 4.03    No Withdrawal.................................................................... 15

    Section 4.04    No Interest in Company Property ....................................... 15

    Section 4.05    Certification of Membership Interests ............................... 16

i

ARTICLE V ALLOCATIONS ..................................................................................... 16

    Section 5.01    Allocation of Net Income and Net Loss ........................................ 16

    Section 5.02    Regulatory and Special Allocations ............................................. 16

    Section 5.03    Tax Allocations ............................................................................ 17

    Section 5.04    Allocations in Respect of Transferred Membership Interests ............................ 18

ARTICLE VI DISTRIBUTIONS AND PAYMENTS ...................................................... 18

    Section 6.01    General ......................................................................................... 18

    Section 6.02    Tax Distributions ......................................................................... 19

    Section 6.03    Tax Withholding; Withholding Advances ................................... 20

    Section 6.04    Payments of Excess Funding Base .............................................. 21

    Section 6.05    Distributions in Kind ................................................................... 21

ARTICLE VII MANAGEMENT AND COVENANTS REGARDING THE OPERATION
        OF THE COMPANY .................................................................................. 21

    Section 7.01    Management by Manager; No Authority of Members ................... 21

    Section 7.02    Operational Covenants; Certain Rights of OHP .......................... 21

    Section 7.03    Removal; Resignation; Vacancies ............................................... 24

    Section 7.04    Compensation; No Employment .................................................. 25

    Section 7.05    No Personal Liability ................................................................... 25

    Section 7.06    Budget ......................................................................................... 25

    Section 7.07    Other Activities; Business Opportunities .................................... 25

ARTICLE VIII EXCULPATION AND INDEMNIFICATION; SECURITY INTEREST ...................... 25

    Section 8.01    Exculpation of Covered Persons .................................................. 25

    Section 8.02    Indemnification ............................................................................ 26

    Section 8.03    Guarantees and Granting of Security Interest for OHP Funding Capital ............. 27

    Section 8.04    Survival ....................................................................................... 28

ARTICLE IX EVENTS OF DEFAULT ......................................................................... 28

    Section 9.01    Rights Upon Event of Default ..................................................... 28

    Section 9.02    Power of Attorney ........................................................................ 28

    Section 9.03    Remedies Not Exclusive .............................................................. 29

ii

ARTICLE X TRANSFER ................................................................................................. 29

    Section 10.01    Restrictions on Transfer .................................................................. 29

    Section 10.02    Permitted Transfers ........................................................................ 30

    Section 10.03    Drag-Along Rights .......................................................................... 30

ARTICLE XI OTHER COVENANTS AND AGREEMENTS OF THE MEMBERS ............................. 31

    Section 11.01    Change of Control Notice ................................................................ 31

    Section 11.02    Related-Party Agreements ................................................................ 31

    Section 11.03    Non-Compete .................................................................................. 31

ARTICLE XII ACCOUNTING; TAX MATTERS ...................................................................... 31

    Section 12.01    Company Financial Statements ........................................................ 31

    Section 12.02    LPG Financial Statements ................................................................ 32

    Section 12.03    Systems Access; Inspection Rights ................................................... 33

    Section 12.04    Income Tax Status ........................................................................... 33

    Section 12.05    Tax Matters Representative ............................................................. 33

    Section 12.06    Tax Returns ..................................................................................... 34

    Section 12.07    Company Funds ............................................................................... 34

ARTICLE XIII DISSOLUTION AND LIQUIDATION ................................................................. 34

    Section 13.01    Events of Dissolution ...................................................................... 34

    Section 13.02    Effectiveness of Dissolution ............................................................ 35

    Section 13.03    Liquidation ..................................................................................... 35

    Section 13.04    Cancellation of Certificate .............................................................. 36

    Section 13.05    Survival of Rights, Duties and Obligations ...................................... 36

ARTICLE XIV MISCELLANEOUS ....................................................................................... 36

    Section 14.01    Expenses ......................................................................................... 36

    Section 14.02    Further Assurances ......................................................................... 36

    Section 14.03    Notices ........................................................................................... 36

    Section 14.04    Headings ........................................................................................ 36

    Section 14.05    Severability .................................................................................... 36

    Section 14.06    Entire Agreement ............................................................................ 37

DocuSign Envelope ID: 78F56210-71FF-4475-A383-B1AB537CC05D

Section 14.07   Successors and Assigns ............................................................... 37

Section 14.08   No Third-Party Beneficiaries ......................................................... 37

Section 14.09   Amendment .................................................................................. 37

Section 14.10   Waiver ........................................................................................ 37

Section 14.11   Governing Law ............................................................................ 37

Section 14.12   Submission to Jurisdiction ............................................................ 37

Section 14.13   WAIVER OF JURY TRIAL; ARBITRATION. ................................. 38

Section 14.14   Equitable Remedies ..................................................................... 41

Section 14.15   Attorneys' Fees ........................................................................... 41

Section 14.16   Remedies Cumulative .................................................................. 41

Section 14.17   Counterparts ............................................................................... 41

iv

LIMITED LIABILITY COMPANY AGREEMENT

This LIMITED LIABILITY COMPANY AGREEMENT of PURCHASECO80, LLC, a Delaware limited liability company (the "Company"), is entered into as of September 1, 2022 (the "Effective Date"), by and among the Company, OHP – LPG, LP, a Delaware limited partnership ("OHP"), LITIGATION PRACTICE GROUP PC, a California professional corporation ("LPG"), and MARIO AZEVEDO, an individual ("Azevedo").

R E C I T A L S:

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of Delaware (the "Secretary of State") on January 16, 2019 (the "Certificate of Formation"), for the purposes set forth in Section 2.05 of this Agreement; and

WHEREAS, the Members wish to enter into this Agreement setting forth the terms and conditions governing the operation and management of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01    Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"AAA" has the meaning given such term in Section 14.13(b)(ii).

"ACB Holdings Agreement" means that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement, dated as of September 29, 2020, by and between LPG and ACB Holdings, LP.

"Additional Capital Contributions" has the meaning set forth in Section 3.03.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)    debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Adjusted Taxable Income" of a Member for a Fiscal Year (or portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); *provided*, that such taxable income shall be computed (a) minus any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable

Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years; and (b) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings; *provided, however*, that the term "Affiliate" does not, when used with respect to a Member, include the Company.

"Agreement" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented, or restated from time to time, as provided herein.

"Ancillary Agreements" means the other agreements delivered by or among any of the Initial Members and the other parties signatory thereto in connection with this Agreement, including, without limitation, any Loan Agreement, that certain indemnification agreement attached as Exhibit F dated as of the Effective Date and entered into by Azevedo and LPG for the benefit of OHP and the Company, agreements between LPG or Azevedo and any of the LPG Receivable Affiliates attached as Exhibit G (the "LPG Receivable Affiliate Agreements"), and any agreement of a company owned by Tony Diab or his Affiliate, attached as Exhibit J.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Arbitration Agreement" has the meaning given to such term in Section 14.13(b)(i).

"Arbitration Rules" has the meaning given such term in Section 14.13(b)(ii).

"Arbitrator" and "Arbitrators" have the meanings given such terms in Section 14.13(b)(iii).

"Available Cash" means all cash or cash equivalents of the Company (a) that are not, and are not required to be, designated as "restricted" on the financial statements of the Company; (b) that are not contractually required, and have not been contractually committed by the Company, to be used for a specific purpose; (c) that are not subject to (i) any provision of law, statute, rule, or regulation; (ii) any provision of the organizational documents of the Company; or (iii) any order of any governmental authority; (d) in which no Person has a lien (other than liens held by OHP); and (e) that are held in a deposit account or securities account.

"Azevedo" has the meaning set forth in the preamble.

"Bankruptcy" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such

<center>2</center>

Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member bankrupt or appointing a trustee of such Member's assets.

"BBA" means the Bipartisan Budget Act of 2015.

"Book Depreciation" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by unanimous consent of the Members in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"Book Value" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)     the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values as of the following times:

(i)     the acquisition of an additional Membership Interest by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest; and

(iii)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

(d)     the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided*, that Book Values shall not be adjusted pursuant to this

3

paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"Budget" has the meaning set forth in Section 7.06(a).

"Business" has the meaning set forth in Section 2.05(a).

"Cancellation Rate" means, as of such date of determination, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Eligible Receivables purchased by the Company that have been cancelled or written off, or which are more than sixty (60) days past due, *divided by* (b) the total dollar amount of undiscounted received and expected future cash flows from all Eligible Receivables purchased by the Company.

"Capital Account" has the meaning set forth in Section 3.04.

"Capital Contribution" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"Certificate of Formation" has the meaning set forth in the Recitals.

"Change of Control" means any transaction or series of related transactions (whether as a result of a tender offer, merger, consolidation, reorganization, acquisition, sale or transfer of equity securities, proxy, power of attorney or otherwise) that results in, or that is in connection with (a) any independent third-party acquiring beneficial ownership, directly or indirectly, of a majority of the then issued and outstanding voting securities or combined voting rights of the applicable Person; or (b) the sale, lease, exchange, conveyance, transfer, or other disposition (whether for cash, shares of stock (or other equity interests) or securities or other consideration) of all or substantially all of the property and assets of such Person.

"Change of Control Notice" has the meaning set forth in Section 11.01.

"Class Action Waiver" has the meaning given such term in Section 14.13(b)(v).

"Code" means the Internal Revenue Code of 1986.

"Company" has the meaning set forth in the Preamble.

"Company Interest Rate" has the meaning set forth in Section 6.03(c).

"Company Minimum Gain" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"Covered Person" has the meaning set forth in Section 8.01(a).

"Delaware Act" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, *et seq*.

"Designated Individual" has the meaning set forth in Section 12.05(a).

"Disputes" has the meaning given such term in Section 14.13(b)(i).

"Dissolution" means, with respect to a Member, the occurrence of any of the following: (a) if such Member is a partnership or limited liability company, the dissolution and commencement of winding up of such partnership or limited liability company; or (b) if such Member is a corporation, the dissolution of the corporation or the revocation of its charter.

"Drag-Along Member" has the meaning set forth in Section 10.03(a).

"Drag-Along Notice" has the meaning set forth in Section 10.03(a).

"Drag-Along Sale" has the meaning set forth in Section 10.03(b).

"Effective Date" has the meaning set forth in the introductory paragraph.

"Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"Eligible Receivables" means any cash flow stream representing an interest in customer payments for debt validation services which meets the following criteria:

(a) such cash flow stream is to be purchased by the Company from LPG Receivable Affiliates;

(b) such cash flow represents the entire interest therein held by LPG Receivable Affiliates; and

(c) the purchase of such cash flow stream is approved by OHP in accordance with Section 3.02(c).

"Equity Investments" has the meaning set forth in Section 3.02(a).

"Estimated Tax Amount" of a Member for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Manager. In making such estimate, the Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"Event of Default" means any of the following:

(a)    LPG, Tony Diab, or Azevedo are in breach of any of their respective representations, warranties, or covenants contained in this Agreement or any of the Ancillary

5

Agreements and such breach remains uncured for a period of seven (7) days after written notice thereof by OHP or the Company, as applicable, to the breaching party(ies);

(b) the Company is in material default of any of its contractual obligations (whether or not resulting in acceleration), including, without limitation, obligations under any of the Ancillary Agreements;

(c) the Company, LPG, Tony Diab, or Azevedo consent to the appointment of a receiver, trustee, or liquidator of all or substantially all of their respective assets, file a voluntary petition in bankruptcy, make a general assignment for the benefit of creditors, or if any order, judgment or decree is entered by any court of competent jurisdiction on the application of a creditor or otherwise adjudicating such Person bankrupt or appointing a receiver, trustee, or liquidator of such Person or of all or a substantial part of its or his assets and such order, judgment, or decree continues unstayed and in effect for sixty (60) calendar days after its entry;

(d) Azevedo or Tony Diab is convicted of, or pleads guilty or no contest to, a felony or a crime of moral turpitude;

(e) the Company, LPG, or any of the LPG Limited Guarantors become subject to a civil judgment in an amount greater than fifty thousand dollars ($50,000.00); or

(f) the Company, LPG, or any of the LPG Limited Guarantors become subject to any disciplinary review, disciplinary action, or investigation by any Governmental Authority.

"Excess Amount" has the meaning set forth in Section 6.02(c).

"Exchange Act" means the Securities Exchange Act of 1934.

"Fair Market Value" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction, as reasonably determined by the Manager in good faith.

"Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"Funding Capital Request Period" has the meaning set forth in Section 3.02(c).

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization (for example, without limitation, state bar associations for attorneys or boards governing other licensed professionals) or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Indebtedness" of any Person means (without duplication) all (a) indebtedness of such Person for borrowed money; (b) obligations of such Person which are evidenced by notes, bonds, debentures or similar instruments; (c) obligations of such Person that have been, or should be, in accordance with

6

DocuSign Envelope ID: 78F66210-71FF-4475-A383-B1AB537CC25D

GAAP, recorded as capital leases; (d) obligations of such Person that have been, or should be, in accordance with GAAP, recorded as a sale-leaseback transaction or a leveraged lease; (e) obligations of such Person in respect of letters of credit or acceptances issued or created for the account of such Person; (f) liabilities for the deferred purchase price of property or services (other than current liabilities incurred in the ordinary course of business); and (g) direct or indirect guarantees (including "keep well" arrangements, support agreements and similar agreements) with respect to Indebtedness of any other Person.

"Initial Budget" has the meaning set forth in Section 7.06(a).

"Initial Capital Contribution" has the meaning set forth in Section 3.01(a).

"Initial Members" means OHP, LPG, and Azevedo.

"IRR" means internal rate of return, as determined by OHP in its sole and reasonable discretion.

"Joinder Agreement" means the joinder agreement in form and substance attached hereto as Exhibit A.

"Liquidator" has the meaning set forth in Section 13.03(a).

"Loan Agreement" means any loan agreement(s) entered into by and between LPG, as borrower, and OHP, as lender, on or after the Effective Date.

"Losses" has the meaning set forth in Section 8.02(a).

"LPG" has the meaning set forth in the preamble.

"LPG Accounts" has the meaning set forth in Section 7.02(e).

"LPG Company Guarantors" means LPG and each subsidiary of LPG now owned or hereafter acquired.

"LPG Customer Agreement" means the standard form of customer agreement entered into by LPG, attached as Exhibit I.

"LPG Limited Guarantors" means Azevedo, Tony Diab, Daniel March, each member of LPG's senior management team as of such date of determination, and each Person owning at least five percent (5%) of the issued and outstanding equity interests in LPG as of such date of determination.

"LPG Receivable Affiliates" means lead-generating and marketing companies from which cash flows are purchased.

"Manager" shall mean the Person appointed by OHP to serve as "Manager" of the Company as such term is defined in the Delaware Act and subject to rights and restrictions as set forth in this Agreement. The initial Manager shall be LPG.

"Material Adverse Change" means, with respect to any Person, any effect, change, event, occurrence, development, or state of facts that, individually or in the aggregate with all other such effects, changes, events, occurrences, developments, or states of fact, (a) has had, or would reasonably be expected to have, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise), or results of operations of such Person, whether alone or with such Person's Affiliates; or (b)

would, or would reasonably be expected to, prevent or materially impair the ability of such Person to observe or perform its obligations, liabilities, or agreements, whether under this Agreement, the Ancillary Agreements, or otherwise. Notwithstanding the forgoing, the following shall not be taken into account in determining whether there has been a "Material Adverse Change": (i) general business or economic conditions; (ii) national or international political or social conditions, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iii) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); or (iv) changes in GAAP.

"Member" means (a) each Initial Member; and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of a Membership Interest. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"Member Nonrecourse Debt" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deduction" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"Membership Interest" means an interest in the Company owned by a Member, including such Member's right to (a) its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) its distributive share of the assets of the Company; (c) vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) any and all other benefits to which such Member may be entitled as provided in this Agreement or the Delaware Act. The Membership Interest of each Member shall be expressed as a Percentage Interest.

"Minimum Cash Balance" means twenty-five thousand dollars ($25,000.00).

"Net Income" and "Net Loss" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

    (a)    any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

    (b)    any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)      any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)      any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)      if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)      to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"OHP" has the meaning set forth in the preamble.

"OHP Funding Capital" has the meaning set forth in Section 3.02(b).

"Percentage Interest" means, with respect to a Member at any time, the percentage set forth opposite such Member's name on Exhibit B hereto (such percentage being understood to be reflective of the economic interest in the Company represented by such Member's Membership Interest). The Percentage Interests shall at all times aggregate to one hundred percent (100%).

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"Quarterly Estimated Tax Amount" of a Member for any calendar quarter of a Fiscal Year means the excess, if any, of (a) the product of (i) a quarter ($\frac{1}{4}$) in the case of the first calendar quarter of the Fiscal Year, half ($\frac{1}{2}$) in the case of the second calendar quarter of the Fiscal Year, three-quarters ($\frac{3}{4}$) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"Regulatory Allocations" has the meaning set forth in Section 5.02(e).

"Related-Party Agreement" means any agreement, arrangement, transaction or understanding between the Company and any Member or Manager or any of his, her, or its Affiliates.

"Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Revised Partnership Audit Rules" has the meaning set forth in Section 12.05(a).

"Secretary of State" has the meaning set forth in the Recitals.

"Securities Act" means the Securities Act of 1933.

"Shortfall Amount" has the meaning set forth in Section 6.02(b).

"Tax Amount" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and; (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest.

"Tax Distribution" has the meaning set forth in Section 6.02(a).

"Tax Matters Representative" has the meaning set forth in Section 12.05(a).

"Tax Rate" of a Member, for any period, means the highest effective marginal rate of combined federal, state, and local tax rate imposed for such period based on (a) the highest general marginal rate of tax imposed on corporations under Section 11(b) of the Code; (b) the highest general combined marginal rate of state and city taxes imposed on corporations operating in New York, New York; and (c) assuming the deductibility of state and city income taxes for federal income tax purposes.

"Taxing Authority" has the meaning set forth in Section 6.03(b).

"Term" has the meaning set forth in Section 2.06.

"Transfer" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Membership Interest owned by a Person or any interest (including a beneficial interest or any direct or indirect economic or voting interest) in any Membership Interest owned by a Person. "Transfer" when used as a noun shall have a correlative meaning. "Transferor" and "Transferee" mean a Person who makes or receives a Transfer, respectively.

"Transferring Member" has the meaning set forth in Section 10.02.

"Treasury Regulations" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"Unpaid OHP Funding Capital" means the excess, if any, of (a) OHP Funding Capital paid as of the date of any such determination; over (b) the aggregate amount of all distributions made to OHP pursuant to or in accordance with Section 6.01(b)(i).

"Withholding Advances" has the meaning set forth in Section 6.03(b).

Section 1.02    Interpretation. For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any

10

pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (i) to Articles, Sections and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented or modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

ARTICLE II
ORGANIZATION

Section 2.01    Formation.

(a)    The Company was formed on August 3, 2022, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State.

(b)    This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

Section 2.02    Name. The name of the Company is "PurchaseCo80, LLC."

Section 2.03    Principal Office. The principal office of the Company is located at 17542 17th St., Suite 100, Tustin, CA 92780, or such other place as may from time to time be determined by the Manager. The Manager shall give prompt notice of any such change to each of the Members.

Section 2.04    Registered Office; Registered Agent.

(a)    The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)    The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

Section 2.05    Purpose; Powers.

(a)    The purposes of the Company are to engage in (i) the acquisition of cash flow streams representing interests in customer payments for debt validation services (the "Business"); and (ii) any and all lawful activities necessary or incidental thereto.

11

Exhibit "H"
Page 124

(b)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

Section 2.06      Term. The term of the Company ("Term") commenced on the date the Certificate of Formation was filed with the Secretary of State and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07      No State-Law Partnership. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member or Manager of the Company shall be a partner or joint venturer of any other Member or Manager of the Company, for any purposes other than as set forth in Section 12.04.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 3.01      Initial Capital Contributions; Updates to Membership Interests.

(a)      Contemporaneously with the execution of this Agreement, each Initial Member has made an initial Capital Contribution (each, an "Initial Capital Contribution") and is deemed to own a Membership Interest in the amount set forth opposite such Member's name on Exhibit B hereto.

(b)      The Manager shall update Exhibit B hereto upon the Transfer of any Membership Interest to any new or existing Member in accordance with this Agreement, to reflect any Additional Capital Contribution in accordance with Section 3.03, or as otherwise required by the terms hereof.

Section 3.02      Equity Investments and OHP Funding Capital.

(a)      In addition to their Initial Capital Contributions, contemporaneously with the execution of this Agreement, OHP shall advance twenty two thousand dollars ($22,000.00), Azevedo shall advance one thousand eight hundred dollars ($1,800.00), and LPG shall advance one thousand three hundred dollars ($1,300.00) to the balance sheet of the Company in order to fund its initial operation of the Business (the "Equity Investments"). The Equity Investments shall not increase the Capital Accounts of either OHP or LPG and shall not proportionally increase the Percentage Interests either of OHP or LPG; however, OHP and LPG shall each receive a priority return of their Equity Investments in accordance with Section 6.01(b)(ii) and Section 6.01(b)(iii).

(b)      In addition to its Initial Capital Contribution and Equity Investment, OHP may, but shall not be obligated to, make additional advances of up to ten million dollars ($10,000,000.00) in the aggregate to the balance sheet of the Company or Affiliate in order to fund its operation of the Business of the Company or any Affiliate (the "OHP Funding Capital"); provided, except as otherwise agreed in writing by OHP:

(i)      the maximum aggregate amount of OHP Funding Capital that can be requested during the period beginning on the Effective Date and ending on the six (6) month anniversary thereof shall be five million dollars ($5,000,000.00);

(ii)      OHP shall not be requested to make advances of OHP Funding Capital more frequently than once per calendar month, beginning on the first day of the first full calendar month immediately succeeding the Effective Date;

12

(iii) the maximum amount of OHP Funding Capital that can be requested per calendar month is two million dollars ($2,000,000.00);

(iv) each request for OHP Funding Capital shall be made in accordance with the procedures set forth in Section 3.02(c); and

(v) each of the LPG Company Guarantors and each of the LPG Limited Guarantors shall have signed and delivered to OHP a guaranty agreement substantially in the forms attached hereto as Exhibit C and Exhibit D, respectively.

(c) Each request for OHP Funding Capital shall be made by the Company in writing and delivered to OHP reasonably in advance of the date on which the Company expects to utilize such capital. Each OHP Funding Capital request shall be accompanied by a statement of historical and projected performance statistics of Eligible Receivables purchased, organized by LPG Receivable Affiliate. In addition to the foregoing, during the five (5) business days immediately following delivery of an OHP Funding Capital request (the "Funding Capital Request Period"), the Company, LPG, and Azevedo shall promptly provide, or cause to be provided, any supplementary documentation or information as reasonably requested by OHP or its representatives in connection with such Person's review of the OHP Funding Capital request. OHP shall review each request on a case-by-case basis and shall notify the Company and LPG of its decision prior to the expiration of the Funding Capital Request Period. Should OHP fail to respond prior to the expiration of the Funding Capital Request Period, the OHP Funding Capital request shall be deemed approved by OHP in all respects. Subject to the conditions set forth in Section 3.02(b) and the foregoing provisions of this Section 3.02(c), OHP shall make any approved OHP Funding Capital advance by wire transfer of immediately available funds within ten (10) business days after such approval. The OHP Funding Capital shall not increase the Capital Account of OHP and shall not proportionally increase the Percentage Interest of OHP; *however*, OHP shall receive a priority return of the OHP Funding Capital in accordance with Section 6.01(b)(i).

Section 3.03    Additional Capital Contributions.

(a) Should the Manager determine that the Company requires capital in excess of the amounts set forth in Section 3.01 and Section 3.02, but only after exhaustion of such amounts, the Manager may request (but not require) additional Capital Contributions from the Members ("Additional Capital Contributions"); *provided*, that such Additional Capital Contributions shall not exceed the corresponding amounts expressly provided for in the then-current Budget.

(b) Upon the Manager making a determination to call for Additional Capital Contributions, the Manager shall deliver to the Members a written notice of the Company's need for Additional Capital Contributions, which notice shall specify in reasonable detail (i) the purpose for such Additional Capital Contributions; (ii) the aggregate amount of such Additional Capital Contributions; (iii) each Member's pro rata share of such aggregate amount of Additional Capital Contributions (based upon such Member's Percentage Interest); and (iv) the date (which date shall not be less than fourteen (14) days following the date that such notice is given) on which such Additional Capital Contributions are due. Promptly after each collection of Additional Capital Contributions, the Manager shall update Exhibit B hereto to reflect changes in Membership Interests commensurate with the payment by, or failure or declination to pay by, the Members of any Additional Capital Contributions.

Exhibit "H"
Page 126

(c)      Except as set forth in <u>Section 3.02</u> or <u>Section 3.06</u>, no Member shall be required to make Additional Capital Contributions, advances, capital infusions, loans to the Company.

Section 3.04      <u>Maintenance of Capital Accounts</u>. The Company shall establish and maintain for each Member a separate capital account (a "<u>Capital Account</u>") on its books and records in accordance with this <u>Section 3.04</u>. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)      Each Member's Capital Account shall be increased by the amount of:

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution and any Additional Capital Contributions (other than the Equity Investments and OHP Funding Capital);

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to <u>ARTICLE V</u>; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property distributed to such Member pursuant to <u>ARTICLE VI</u> and <u>Section 13.03(c)</u>;

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to <u>ARTICLE V</u>; and

(iii)      the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

Section 3.05      <u>Succession Upon Transfer</u>. In the event that any Membership Interest is Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interest and, subject to <u>Section 5.04</u>, shall receive allocations and distributions pursuant to <u>ARTICLE V</u>, <u>ARTICLE VI</u>, and <u>ARTICLE XIII</u> in respect of such Membership Interest.

Section 3.06      <u>Negative Capital Accounts</u>. In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, including during the Term or upon dissolution or liquidation of the Company, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 3.07      <u>No Withdrawals from Capital Accounts</u>. No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement. No Member shall receive any interest, salary, management, or service fees, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement or any of the Ancillary Agreements. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the

14

Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

Section 3.08    Loans from Members. Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

Section 3.09    Modifications. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Manager, acting alone, may authorize such modifications.

ARTICLE IV
MEMBERS

Section 4.01    Admission of New Members.

(a)    A new Member may be admitted from time to time in connection with a Transfer of a Membership Interest in accordance with this Agreement, subject to compliance with the provisions of ARTICLE X, and following compliance with the provisions of Section 4.01(b).

(b)    In order for any Person not already a Member of the Company to be admitted as a Member, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the amendment of Exhibit B hereto by the Manager and the satisfaction of any other applicable conditions as may reasonably be deemed necessary by the Manager to effect such admission, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company. The Manager shall also adjust the Capital Accounts of the Members as necessary in accordance with Section 3.05.

Section 4.02    No Personal Liability. Except as otherwise provided in the Delaware Act, by Applicable Law, or expressly in this Agreement or any of the Ancillary Agreements, no Member will be obligated personally for any debt, obligation, or liability of the Company or the other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.03    No Withdrawal. So long as a Member continues to hold any Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Membership Interests, such Person shall no longer be a Member. A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act.

Section 4.04    No Interest in Company Property. Neither the Eligible Receivables purchased by the Company, nor any real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

Section 4.05    Certification of Membership Interests.

(a)    The Manager may, but shall not be required to, issue certificates representing the Membership Interests held by the Members.

(b)    If the Manager issues certificates representing Membership Interests in accordance with Section 4.05(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

ARTICLE V
ALLOCATIONS

Section 5.01    Allocation of Net Income and Net Loss. For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.02, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

Section 5.02    Regulatory and Special Allocations. Notwithstanding the provisions of Section 5.01:

(a)    If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 5.02 is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain

16

during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 5.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)     In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This Section 5.02(d) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     The allocations set forth in paragraphs (a), (b), (c) and (d) above (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

Section 5.03     Tax Allocations.

(a)     Subject to Section 5.03(b), Section 5.03(c), and Section 5.03(d), all income, gains, losses, and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.01 and Section 5.02, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.01 and Section 5.02.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method with curative allocations of Treasury Regulations Section 1.704-3(c), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value in Section 1.01, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset

17

for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)     Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager after taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     Allocations pursuant to this Section 5.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions or other items pursuant to any provisions of this Agreement.

Section 5.04     Allocations in Respect of Transferred Membership Interests. In the event of a Transfer of a Membership Interest during any Fiscal Year made in compliance with the provisions of ARTICLE IX, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Membership Interest for such Fiscal Year shall be determined using the interim closing of the books method.

ARTICLE VI
DISTRIBUTIONS AND PAYMENTS

Section 6.01     General.

(a)     Until such time as all principal and accrued interest under a Loan Agreement, if any is outstanding, is paid in full, any Available Cash, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, commitments to purchase Eligible Receivables, and such other reasonable reserves (including the Minimum Cash Balance) as OHP, acting in accordance with Section 7.02(h)(vi), may require, shall be distributed to the Members, on at least a quarterly basis, pro rata in accordance with their respective Percentage Interests; provided, however, that all distributions to LPG and Azevedo under this Section 6.01(a) shall be deemed distributed to such Members but paid directly to OHP, on behalf of such Members, and the balance due under a Loan Agreement, if outstanding, shall be correspondingly reduced.

(b)     After all principal and accrued interest under a Loan Agreement, if any is outstanding, is paid in full, any Available Cash, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, commitments to purchase Eligible Receivables, and such other reasonable reserves (including the Minimum Cash Balance) as OHP, acting in accordance with Section 7.02(h)(vi), may require, shall be distributed to the Members, when determined by OHP, in the following order and priority:

(i)     first, to OHP until such time as OHP has received a return of all OHP Funding Capital paid into the Company as of such date of determination, but which has not been repaid pursuant to Section 6.04;

(ii)     next, to OHP until such time as OHP has received a return of its Equity Investment;

(iii)     next, to LPG and Azevedo until such time as LPG and Azevedo have received a return of their Equity Investment;

18

DocuSign Envelope ID: 78F66210-71EE-4475-A383-B1AB537CC25D

(iv)   *next*, to OHP until such time as OHP receives distributions under this Section 6.01(b)(iv) equal to the greater of (x) eighty eight percent (88%) of the maximum OHP Funding Capital paid as of such date of determination, and (y) a twenty percent (20%) IRR on the total OHP Funding Capital paid as of such date of determination;

(v)   *next*, to LPG and Azevedo in an amount equal to thirteen and a half percent (13.5%) of the amount paid to OHP under Section 6.01(b)(iv); and

(vi)   *next*, to the Members in an amount equal to their respective Additional Capital Contributions, if any;

(vii)   *thereafter,* pro rata in accordance with their respective Percentage Interests.

(A)   Notwithstanding the foregoing, as a condition precedent to LPG and Azevedo receiving distributions under Section 6.01(b)(vii), OHP shall have received:

(i) all LPG Receivable Affiliate Agreements currently in effect; and

(ii) the LPG Customer Agreement, with written approval from OHP of any deviation of the terms therein.

(c)   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members if such distribution would violate § 18-607 of the Delaware Act or other Applicable Law.

Section 6.02   Tax Distributions.

(a)   Subject to Section 6.01(c), at least five (5) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "Tax Distribution").

(b)   If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Distributions to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "Shortfall Amount"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of such Member's Shortfall Amount. The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the seventy-fifth (75th) day of the next succeeding Fiscal Year; *provided*, that if the Company has made distributions in such next succeeding Fiscal Year other than pursuant to this Section 6.02, the Manager may apply such distributions to reduce any Shortfall Amount.

(c)   If the aggregate Tax Distributions made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "Excess Amount"), such Excess Amount shall reduce subsequent Tax Distributions that would be made to such Member pursuant to this Section 6.02.

DocuSign Envelope ID: 78F66210-71FF-4475-A383-B4AB537CC05D

(d)     Notwithstanding the foregoing provisions of this <u>Section 6.02</u>, if a Loan Agreement remains outstanding and any principal or accrued interest is unpaid to OHP under a Loan Agreement, all distributions payable to LPG and Azevedo under this <u>Section 6.02</u> shall be paid directly to OHP, on behalf of LPG, until LPG's debt under a Loan Agreement has been paid in full.

Section 6.03     <u>Tax Withholding; Withholding Advances</u>.

(a)     Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Manager to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)     The Company is hereby authorized at all times to make payments ("<u>Withholding Advances</u>") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Representative based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "<u>Taxing Authority</u>") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this <u>Section 6.03(b)</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

(c)     Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the *Wall Street Journal* on the date of payment plus two percent (2.0%) per annum (the "<u>Company Interest Rate</u>"):

(i)     be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)     with the consent of OHP, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount shall be deemed to have been distributed to the Member, but which shall not further reduce the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)     Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this <u>Section 6.03(d)</u> and the obligations of a Member pursuant to <u>Section 6.03(c)</u> shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interest. The Company may pursue and enforce all rights

20

and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e)     Neither the Company, nor the Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 6.04     Payments of Excess Funding Base. On a regular basis, but no less than prior to each request for an OHP Funding Capital payment, the Manager shall evaluate the difference between (a) the amount (i) paid by the Company to LPG Receivable Affiliates for Eligible Receivables; *plus* (ii) payable to LPG Receivable Affiliates for cash flows that met the criteria for Eligible Receivables within the current calendar month but have yet to be paid for by the Company; and *minus* (b) the amount of Unpaid OHP Funding Capital. Should this evaluation yield a positive number, the Company shall promptly pay OHP an amount in cash equal to such number.

Section 6.05     Distributions in Kind. No Member has the right to demand or receive property other than cash in payment for its share of any distribution made in accordance with this Agreement. Non-cash distributions are not permitted without the unanimous consent of the Members.

ARTICLE VII
MANAGEMENT AND COVENANTS REGARDING THE OPERATION OF THE COMPANY

Section 7.01     Management by Manager; No Authority of Members. Except for certain decisions and rights of OHP as set forth in this Agreement, the day-to-day business and affairs of the Company shall be managed, operated, and controlled by or under the direction of the Manager. The Manager shall have, and is hereby granted, the full, complete, and exclusive power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement. The Manager shall be appointed by OHP. Except as expressly provided herein or by Applicable Law, no Member, in its capacity as a Member, shall have any power or authority over the business and affairs of the Company or any power or authority to act for or on behalf of, or to bind, the Company.

Section 7.02     Operational Covenants; Certain Rights of OHP.

(a)     Presentment of Cash Flows; Right of First Offer. During the Term, LPG and Azevedo grant to the Company a right of first offer to purchase any cash flow stream representing an interest in customer payments for debt validation services. On no less than a monthly basis, LPG shall present OHP with a written list of cash flows for consideration to be Eligible Receivables, which shall be presented to OHP without price markups and on the same terms as originally presented to LPG by the applicable LPG Receivable Affiliate. OHP shall have five (5) days after receipt of such list to accept or decline such cash flows as Eligible Receivables. Should OHP fail to respond prior to the expiration of such five (5)-day period, the applicable cash flows shall be deemed approved by OHP and the Company in all respects. Should OHP decline any presented cash flow stream, it may be sold to third-parties for a period of thirty (30) days on identical economic terms as were presented to OHP. After the thirty (30)-day period or upon any change in economic terms of the offering, the Company's and OHP's rights under this Section 7.02(a) shall be renewed as to such cash flow. For so long as any of LPG or Azevedo hold any Membership Interest, directly or indirectly, LPG and Azevedo shall not (and shall cause each of the LPG Limited Guarantors to not) enter into side letters or agreements with any LPG

21

Exhibit "H"
Page 134

Receivable Affiliates or among each other which would result in price markups to the Company or additional payments to LPG as a result of any cash flow being acquired by the Company, or which would violate the Company's and OHP's rights in this Section 7.02(a) or elsewhere in this Agreement. Any commissions or similar payments received by LPG or Azevedo as a result of the Company's purchase of Eligible Receivables shall be promptly paid to the Company not as Additional Capital Contributions and without any corresponding increase in the Percentage Interest of such party.

(b) Maintenance of Minimum Cash Balance and Available Cash. At all times, the Manager shall cause the Available Cash to be no less than the Minimum Cash Balance. All Available Cash shall be kept in depository accounts to which OHP has direct access and joint control.

(c) Maintenance of Cancellation Rate. The Manager shall cause the Cancellation Rate to be equal to or less than forty percent (40%), calculated on a monthly basis as of the last business day of each calendar month, beginning on the first full calendar month immediately succeeding the Effective Date.

(d) Insurance Policies. Within thirty (30) days of the Effective Date, the Manager shall cause the Company to obtain and maintain throughout the Term insurance policies in amounts (but in no event less than the amount of Unpaid OHP Funding Capital) and through carriers reasonably acceptable to OHP. For so long as LPG is the Manager, such policies shall include, at a minimum, general liability insurance policies and key man life insurance policies on members of LPG's senior management team. From the Effective Date and thereafter, the Company shall pledge the life insurance policy insuring Tony Diab, as more particularly described in a Loan Agreement.

(e) Deposit Account Control Agreements; Phone Conference. Until the later of (i) LPG no longer being Manager, and (ii) LPG no longer holding, directly or indirectly, any Membership Interest, LPG shall grant and provide OHP access to all of LPG's depository accounts (the "LPG Accounts"), within fourteen (14) days of the Effective Date, through deposit account control agreements or similar instruments at the discretion of OHP. Such agreements or instruments shall include, without limitation, the right of OHP to take sole custody and control over the funds therein and to approve expenditures outside of the ordinary course of business. In addition to granting OHP access to the LPG Accounts, within seven (7) days of the Effective Date, LPG and OHP shall attend a phone conference for the purposes of discussing regulatory issues attended and facilitated by Tony Diab.

(f) Purchase of Eligible Receivables; Collections and Management.

(i) The Manager shall cause the Company to acquire Eligible Receivables first with Available Cash in excess of the Minimum Cash Balance, second with OHP Funding Capital, and third with Additional Capital Contributions.

(ii) Within seven (7) days of the Effective Date, OHP shall attach certain agreements to be assigned to the Company as Exhibit K (the "*Assigned Eligible Receivables*"). Upon attachment of the Assigned Eligible Receivables, OHP's rights in the Assigned Eligible Receivables will be assigned to the Company pursuant to an assignment agreement and deemed as approved Eligible Receivables acquired with OHP Funding Capital in the amount listed on Exhibit L.

22

(iii)     The Manager shall operate the Company at all times in compliance with all Applicable Law and shall promptly, within forty-eight (48) hours, notify OHP of the Manager's or the Company's receipt or becoming aware of any notices of defaults, claims, investigations, or actions of any kind against the Company, LPG (whether in its capacity as Manager or otherwise), any of the LPG Limited Guarantors, or any of the LPG Receivable Affiliates.

(iv)     From the Effective Date and thereafter, LPG shall continue operate in a manner consistent with its historical practices, including, without limitation, in its solicitation, relationships, and purchases with LPG Receivable Affiliates.

(v)     From the Effective Date and thereafter, LPG will operate its collections and management practices with LPG Receivable Affiliates consistent with the terms detailed in the ACB Holdings Agreement, listed on Exhibit H.

(g)     Commitment of LPG Limited Guarantors. For so long as LPG is Manager, the Manager shall cause all of the LPG Limited Guarantors to devote all, or substantially all, of such Person's professional time to the management and business of LPG and, indirectly, the management and business of the Company and the Business.

(h)     Major Decisions. The Company shall not, and shall not enter into any commitment to (and the Manager shall not authorize the Company to), do any of the following without the affirmative written consent of OHP:

(i)     amend, modify or waive the Certificate of Formation or this Agreement;

(ii)     make any material change to the nature of the business conducted by the Company or enter into any business other than the Business;

(iii)     issue, repurchase, or redeem any Membership Interest, admit additional Members (other than as provided in Section 10.02) or accept any Additional Capital Contribution other than as provided in Section 3.03;

(iv)     approve the Budget for any Fiscal Year or any amendment, modification or supplement thereto or authorize or incur expenses by an amount in excess of ten percent (10%) of the corresponding amounts set forth in the then-current Budget;

(v)     authorize any distribution other than as required by ARTICLE VI or Section 13.03(c);

(vi)     establish any reserve for expenses, indebtedness, obligations, or anticipated capital expenditures under Section 6.01(a);

(vii)     other than the OHP Funding Capital, Equity Investments, and as set forth in Section 8.03, incur any Indebtedness, pledge or grant liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person;

(viii)     make any loan, advance, capital contribution or other investment in or to any Person other than to the extent approved or authorized in the Budget then in effect;

23

(ix)     make any single capital expenditure not set forth in the Budget in excess of five thousand dollars ($5,000.00);

(x)     enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange or other acquisition (including by merger, consolidation, acquisition of stock or acquisition of assets) of any assets and/or equity interests of any Person, other than in the ordinary course of business;

(xi)     enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange or other disposition (including by merger, consolidation, sale of stock or sale of assets) of any assets other than in the ordinary course of business;

(xii)     approve any merger, consolidation, or combination with or into any other Person;

(xiii)     establish a subsidiary or enter into any joint venture or similar business arrangement;

(xiv)     settle any lawsuit, action, dispute or other proceeding or assume any liability;

(xv)     initiate or consummate an initial public offering or make a public offering and sale of any membership interests or any other securities of the Company or any successor entity;

(xvi)     appoint or remove the Company's auditors or make any changes in the accounting methods or policies of the Company (other than as required by GAAP);

(xvii)     except as expressly provided in this Agreement, enter into, amend, waive, supplement, or terminate (other than pursuant to its terms) any Related-Party Agreement; or

(xviii) initiate a bankruptcy proceeding (or consent to any involuntary bankruptcy proceeding).

Section 7.03     Removal; Resignation; Vacancies.

(a)     OHP shall have the right to remove the Manager appointed at any time with or without cause, effective upon written notice to such Manager.

(b)     OHP shall have the right to require the Company to hire, at the Company's expense and upon written notice to the Company and the Manager, one or more independent, third-party administrators or back-up servicers to assist or take over for the Manager in the collection and management of purchased Eligible Receivables, and any activities incidental thereto.

(c)     The Manager may resign at any time by delivering its, his, or her written resignation to OHP and the Company upon at least ninety (90) days' prior written notice. OHP's or the Company's acceptance of a resignation shall not be necessary to make it effective.

24

Section 7.04    Compensation; No Employment.

(a)    The Manager shall serve without compensation in its, his, or her capacity as such. The Manager shall be entitled to reimbursement from the Company for its, his, or her reasonable and necessary out-of-pocket expenses incurred in the performance of its, his, or her duties as a Manager, pursuant to such policies as may from time to time be established by OHP.

(b)    This Agreement does not, and is not intended to, confer upon the Manager any rights with respect to employment by the Company, and nothing herein shall be construed to have created any employment agreement or relationship with the Manager.

Section 7.05    No Personal Liability. Except as otherwise provided in the Delaware Act or by Applicable Law, the Manager shall not be obligated personally for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being the Manager.

Section 7.06    Budget.

(a)    The initial annual budget for the Company through the Fiscal Year ending December 31, 2022 (the "Initial Budget"), which has previously been approved by the Initial Members and the Manager, is attached hereto as Exhibit E. The Manager shall operate the Company in accordance with the Initial Budget, as it may be amended, modified, or replaced in accordance with Section 7.06(b) (the "Budget").

(b)    At least ninety (90) days before the beginning of each Fiscal Year, the Manager shall prepare and submit to OHP proposed revisions to the Budget for such upcoming Fiscal Year. The Company shall operate in accordance with the existing Budget until a revised Budget is approved in accordance with Section 7.02(h)(iv).

Section 7.07    Other Activities; Business Opportunities. Except as set forth in any Ancillary Agreements or in Section 7.02(a), Section 7.02(g), and Section 11.03: (i) nothing contained in this Agreement shall prevent any Member, the Manager, or any of their Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Business; and (ii) neither the Members, the Manager, nor any of their Affiliates shall be obligated to inform the Company or any Member of any business opportunity of any type or description.

ARTICLE VIII
EXCULPATION AND INDEMNIFICATION; SECURITY INTEREST

Section 8.01    Exculpation of Covered Persons.

(a)    As used herein, the term "Covered Person" shall mean each of the following, subject to the consent of OHP, which may be granted or withheld in OHP's sole discretion: (i) each Member; (ii) each officer, director, shareholder, partner, member, Affiliate, employee, agent, or representative of each Member; and (iii) each Manager, employee, agent, or representative of the Company.

(b)    Except as set forth in ARTICLE IX, no Covered Person shall be liable to the Company for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, whether or not such Person continues to be a Covered Person at the time such loss, damage, or claim is incurred or imposed, so long as such action or omission does not constitute fraud, gross negligence, willful

25

misconduct, or a breach by such Covered Person of any of such Covered Person's or his, her, or its Affiliates' agreements contained herein or in any of the Ancillary Agreements, as determined by OHP in its sole discretion.

(c)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) a Manager; (ii) one or more employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

Section 8.02     Indemnification.

(a)     To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted, or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person from and against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (other than in connection with any claims brought by (i) a Member or its Affiliate against another Member or its Affiliate or (ii) the Company) (collectively, "Losses") to which such Covered Person may become subject by reason of:

1.     any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company in connection with the Business of the Company; or

2.     such Covered Person being or acting in connection with the Business of the Company as a Member or a Manager or that such Covered Person is or was serving at the request of the Company as a member, manager, partner, director, officer, employee, or agent of any other Person;

*provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and within the scope of such Covered Person's authority conferred on him, her, or it by the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his, her, or its conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud, gross negligence, willful misconduct or a breach by such Covered Person of any of such Covered Person's or his, her or its Affiliates' agreements contained herein or in any of the Ancillary Agreements, in each case as determined by OHP in its sole discretion.

(b)     The indemnification provided by this Section 8.02 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled

26

under any agreement or otherwise. The provisions of this <u>Section 8.02</u> shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this <u>Section 8.02</u> and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(c)  Notwithstanding anything herein to the contrary, nothing in this <u>ARTICLE VIII</u> shall (or shall be construed to) (i) relieve any Member or other Person from any liability or obligation of such Person pursuant to any of the Ancillary Agreements, or to in any way impair the enforceability of any provision of the Ancillary Agreements against any party thereto; or (ii) require the Company to indemnify, hold harmless, defend, pay or reimburse any Covered Person with respect to any Loss to the extent a Member or its Affiliate is required to indemnify, hold harmless, defend, pay or reimburse such Covered Person with respect thereto.

(d)  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager and OHP may determine; *provided*, that (i) all Members and the Manager shall be treated equally under any such insurance policies; and (ii) the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this <u>Section 8.02</u> shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)  If this <u>Section 8.02</u> or any portion hereof shall be invalidated on any ground by any arbitrator or, as applicable, a court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this <u>Section 8.02</u> to the fullest extent permitted by any applicable portion of this <u>Section 8.02</u> that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)  The provisions of this <u>Section 8.02</u> shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Section 8.02</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification, or repeal of this <u>Section 8.02</u> that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 8.03  <u>Guarantees and Granting of Security Interest for OHP Funding Capital</u>. To secure the repayment of any OHP Funding Capital which may become due by the Company to OHP, and also to secure any other indebtedness or liability of the Company to OHP, direct or indirect, absolute or

contingent, due or to become due, now existing or hereafter arising, including all future advances or loans which may be made at the option of OHP to the Company, the Company and the LPG Company Guarantors hereby grant and convey to OHP a first priority security interest in all of their respective personal property wherever located, whether now owned or existing or hereafter acquired, created or arising, including the following: All goods, accounts, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts (including the LPG Accounts), fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all of the Company's and the LPG Company Guarantors' books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds (both cash and non-cash) and insurance proceeds of any or all of the foregoing.

Section 8.04    Survival. The provisions of this ARTICLE VIII shall survive the dissolution, liquidation, winding up, and termination of the Company.

ARTICLE IX
EVENTS OF DEFAULT

Section 9.01    Rights Upon Event of Default. Upon the occurrence of an Event of Default, OHP shall have the right, but not the obligation, to take, or cause the Company to take, any or all of the following actions:

(a)    withhold, without penalty, any approved OHP Funding Capital;

(b)    accelerate the repayment of any Unpaid OHP Funding Capital and declare such amount immediately due and owing;

(c)    freeze all of the Company's bank accounts and the LPG Accounts, and withdraw and disburse all or any portion of thereof as OHP deems necessary or reasonable to remedy such Event of Default;

(d)    remove the Manager and appoint a new Manager;

(e)    assume control over all management and operational authority over the Company as granted to LPG pursuant to Section 7.01; and

(f)    divert all distributions or sums otherwise payable to LPG, Azevedo, or the LPG Receivable Affiliates and cause such amounts to be instead payable solely to OHP until all amounts to be distributed to OHP pursuant to Section 6.01(b)(i), Section 6.01(b)(ii), Section 6.01(b)(iii), and Section 6.01(b)(iv) are paid in full.

Section 9.02    Power of Attorney. Effective only upon the occurrence of an Event of Default, LPG and Azevedo hereby irrevocably appoint, and shall cause the LPG Receivable Affiliates to irrevocably appoint, OHP as such Person's true and lawful attorney-in-fact to take, in such Person's name, place, and stead, all actions necessary or advisable to accomplish the remedies of OHP set forth in Section 9.01.

Section 9.03    Remedies Not Exclusive. No remedy herein conferred upon or reserved to OHP is intended to be exclusive of any other remedy, and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing, at law or in equity or by statute or otherwise.

<div align="center">

ARTICLE X
TRANSFER
</div>

Section 10.01    Restrictions on Transfer.

(a)    Except as otherwise provided in this ARTICLE X, no Member shall Transfer all or any portion of its Membership Interest without the written consent of OHP, which consent may be granted or withheld in the sole discretion of OHP. No Transfer of a Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with Section 4.01(b).

(b)    Notwithstanding any other provision of this Agreement (including Section 10.02), each Member agrees that it will not Transfer all or any portion of its Membership Interest, and the Company agrees that it shall not issue any Membership Interests:

(i)    except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)    if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b);

(iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv)    if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940; or

(vi)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)    Any Transfer or attempted Transfer of any Membership Interest in contravention of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books or otherwise recognized by the Company, and the purported Transferee in any such Transfer shall not be treated as the owner of such Membership Interest for any purposes of this Agreement or have any rights as a Member (and the purported Transferor shall continue to be treated as the owner of such Membership Interest and as a Member).

<div align="center">

29
</div>

(d)     For the avoidance of doubt, any Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, assignment or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest," unless otherwise explicitly agreed to by the parties to such Transfer.

Section 10.02     Permitted Transfers. The provisions of Section 10.01(a) shall not apply to any Transfer by a Member (a "Transferring Member") (a) of all of its Membership Interest in the event of a Change of Control of such Transferring Member, (b) to an Affiliate that is wholly-owned, directly or indirectly, by the Transferring Member or the ultimate parent of such Transferring Member, or (c) if the Transferring Member is OHP, of all of its Membership Interest to its Affiliate; *provided,* that in all foregoing circumstances such Transferring Member shall have guaranteed in a writing delivered to the Company and the other Member the performance by the Transferee of all of such Transferring Member's obligations under this Agreement and all of its and its Affiliates' obligations under any of the Ancillary Agreements to which such Transferring Member or its Affiliate is a party.

Section 10.03     Drag-Along Rights.

(a)     If at any time OHP receives a bona fide offer from an independent third-party to consummate, in one transaction or a series of related transactions, a Change of Control of the Company (a "Drag-Along Sale"), OHP shall have the right to require that each other Member (each, a "Drag-Along Member") participates in such sale in the manner set forth in this Section 10.03.

(b)     OHP shall exercise its rights pursuant to this Section 10.03 by delivering a written notice (the "Drag-Along Notice") to the Company and each Drag-Along Member no more than ten (10) after the execution and delivery by all of the parties thereto of a letter of intent or definitive agreement entered into with respect to the Drag-Along Sale and, in any event, no later than thirty (30) days prior to the closing date of such Drag-Along Sale. The Drag-Along Notice shall make reference to OHP's rights hereunder and shall describe in reasonable detail:

(i)     the name of the person or entity to whom such Membership Interests or assets are proposed to be sold;

(ii)     the proposed date, time, and location of the closing of the sale; and

(iii)     the percentage of Membership Interests to be sold by OHP, the proposed amount of consideration for the Drag-Along Sale, and the other material terms and conditions of the Drag-Along Sale.

(c)     If the Drag-Along Sale is structured as a sale of Membership Interests, each Drag-Along Member shall sell in the Drag-Along Sale the percentage of Membership Interests equal to the product obtained by multiplying (i) the percentage of Membership Interests held by such Drag-Along Member by (ii) a fraction (1) the numerator of which is equal to the percentage of Membership Interests OHP proposes to sell or transfer in the Drag-Along Sale and (2) the denominator of which is equal to the percentage of Membership Interests held by OHP at such time.

(d)     If the Drag-Along Sale is structured as a sale of all or substantially all of the assets of the Company or as a merger, consolidation, recapitalization, or reorganization of the

30

Company, then notwithstanding anything to the contrary in this Agreement, each Drag-Along Member shall vote in favor of the transaction and otherwise consent to and raise no objection to such transaction.

(e)     Each Member shall take all actions as may be reasonably necessary to consummate the Drag-Along Sale, including, without limitation, promptly entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by OHP.

## ARTICLE XI
## OTHER COVENANTS AND AGREEMENTS OF THE MEMBERS

Section 11.01    Change of Control Notice. In the event of a Change of Control of a Member, such Member shall promptly, but not later than thirty (30) days prior to such Change of Control, notify the other Members in writing thereof, setting forth the date and identity of the party or parties that will acquire control of such Member.

Section 11.02    Related-Party Agreements. Except as expressly provided in this Agreement, the Company shall not, directly or indirectly, enter into, enter into any commitment to enter into, extend, amend, waive, supplement, or terminate (other than pursuant to its terms) any Related-Party Agreement (including any of the Ancillary Agreements) other than (a) to the extent approved by OHP in accordance with Section 7.02(h)(xvii); or (b) as are reasonably required by the Company on terms that are no less favorable to the Company than those that would have been obtained in a comparable transaction entered into with an unaffiliated third party on an arm's-length basis.

Section 11.03    Non-Compete. For so long as either of LPG and Azevedo hold any Membership Interests, directly or indirectly, and for a period of two (2) years thereafter, LPG and its Affiliates, Tony Diab, and Azevedo shall neither, directly or indirectly, (a) in any manner whatsoever engage in any capacity with any business competitive with the Business, for such Person's own benefit or for the benefit of any Person other than the Company, nor (b) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, or otherwise in any business competitive with the Business; *provided*, *however*, that (i) LPG and Azevedo may hold, directly or indirectly, solely as an investment, not more than one percent (1%) of the outstanding securities of any person or entity which is listed on any national securities exchange or regularly traded in the over-the-counter market notwithstanding the fact that such person or entity is engaged in a business competitive with the Business, and (ii) the restrictions contained in this Section 11.03 shall not apply to LPG's or Azevedo's operation of LPG solely in compliance with the terms of this Agreement and solely during the time in which either of LPG and Azevedo hold any Membership Interests, directly or indirectly.

## ARTICLE XII
## ACCOUNTING; TAX MATTERS

Section 12.01    Company Financial Statements. The Company shall furnish to each Member the following reports, at the Company's expense:

(a)     As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year, audited consolidated balance sheets of the Company as at the end of each such Fiscal Year and audited consolidated statements of income, cash flows and Members' equity for such Fiscal Year, in each case setting forth in comparative form the figures for the previous Fiscal Year, accompanied by the certification of independent certified public

31

accountants of recognized national standing selected by OHP in accordance with Section 7.02(h)(xvi), certifying to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the Company as of the dates thereof and the results of their operations and changes in their cash flows and Members' equity for the periods covered thereby.

(b)      As soon as available, and in any event within forty-five (45) days after the end of each quarterly accounting period in each Fiscal Year (other than the last fiscal quarter of the Fiscal Year), unaudited consolidated balance sheets of the Company as at the end of each such fiscal quarter and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows and Members' equity for such fiscal quarter and for the current Fiscal Year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto), and certified by LPG.

(c)      As soon as available, and in any event within thirty (30) days after the end of each monthly accounting period in each fiscal quarter (other than the last month of the fiscal quarter), unaudited consolidated balance sheets of the Company as at the end of each such monthly period and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows and Members' equity for each such monthly period and for the current Fiscal Year to date, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto).

(d)      As soon as available, and in any event within thirty (30) days after the end of each monthly accounting period in each fiscal quarter, a statement of historical and projected performance statistics of Eligible Receivables purchased, organized by LPG Receivable Affiliate, together with projections for requests of OHP Funding Capital.

Section 12.02    LPG Financial Statements. LPG shall furnish to OHP the following reports at LPG's expense:

(a)      As soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year, audited consolidated balance sheets of LPG as at the end of each such fiscal year and audited consolidated statements of income and cash flows, in each case setting forth in comparative form the figures for the previous fiscal year, accompanied by the certification of independent certified public accountants of recognized national standing selected by OHP, certifying to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the LPG as of the dates thereof and the results of their operations and changes in their cash flows for the periods covered thereby.

(b)      As soon as available, and in any event within forty-five (45) days after the end of each quarterly accounting period in each fiscal year (other than the last fiscal quarter of the fiscal year), unaudited consolidated balance sheets of LPG as at the end of each such fiscal quarter and for the current fiscal year to date and unaudited consolidated statements of income and cash flows for such fiscal quarter and for the current fiscal year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to

32

normal year-end audit adjustments and the absence of notes thereto), and certified by an executive officer of LPG.

(c)     As soon as available, and in any event within thirty (30) days after the end of each monthly accounting period in each fiscal quarter (other than the last month of the fiscal quarter), unaudited consolidated balance sheets of LPG as at the end of each such monthly period and for the current fiscal year to date and unaudited consolidated statements of income and cash flows for each such monthly period and for the current fiscal year to date, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto).

Section 12.03    Systems Access; Inspection Rights.

(a)     At all times, LPG shall cause OHP and the Company to have and maintain access to LPG's debt management systems including, without limitation, DebtPayPro.

(b)     Upon reasonable notice from a Member and at such Member's expense, the Company shall afford such Member and its Representatives access during normal business hours to:

(i)     the Company's properties, offices, and other facilities; and

(ii)    the corporate, financial and similar records, reports and documents of the Company, including all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments and copies of any management letters and communications with Members (which right of access shall include the right to examine such documents and to make copies thereof or extracts therefrom);

Section 12.04    Income Tax Status. It is the intent of the Company and the Members that the Company shall be treated as a partnership for U.S., federal, state, and local income tax purposes. Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3.

Section 12.05    Tax Matters Representative.

(a)     The Members hereby appoint OHP as the "partnership representative" as provided in Code Section 6223(a) (the "Tax Matters Representative"). The Tax Matters Representative shall appoint an individual (the "Designated Individual") meeting the requirements of Treasury Regulation Section 301.6223-1(c)(3) as the sole person authorized to represent the Tax Matters Representative in audits and other proceedings governed by the partnership audit procedures set forth in Subchapter C of Chapter 63 of the Code as amended by the BBA (the "Revised Partnership Audit Rules"). The Tax Matters Representative shall resign if it is no longer a Member. In the event of the resignation of the Tax Matters Representative, the Members shall select a replacement. Any person appointed as the Designated Individual shall be subject to the requirements and obligations of the Tax Matters Representative for purposes of this Section 12.05.

(b)     The Tax Matters Representative is authorized and required to represent the Company in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for

33

DocuSign Envelope ID: 78F66210-71EF-4475-A383-B1AB537CC05D

professional services and costs associated therewith. The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon the receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.

(c)     To the extent permitted by applicable law and regulations, the Tax Matters Representative will cause the Company to annually elect out of the Revised Partnership Audit Rules pursuant to Code Section 6221(b). For any year in which applicable law and regulations do not permit the Company to elect out of the Revised Partnership Audit Rules, then within forty-five (45) days of any notice of final partnership adjustment, the Tax Matters Representative will cause the Company to elect the alternative procedure under Code Section 6226, and furnish to the Internal Revenue Service and each Member during the year or years to which the notice of final partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

(d)     Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any taxes imposed pursuant to Code Section 6226) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 6.03(d).

(e)     The Tax Matters Representative will make an election under Code Section 754, if requested in writing by a Member.

(f)     The provisions of this Section 12.05 and the obligations of a Member or former Member pursuant to Section 12.05 shall survive the termination, dissolution, liquidation, and winding up of the Company and the Transfer of a Member's Membership Interest.

Section 12.06    Tax Returns. At the expense of the Company, the Manager shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Manager will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.07    Company Funds. All funds of the Company shall be deposited in its name in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Manager. The funds of the Company shall not be commingled with the funds of any other Person and OHP shall have unrestricted, direct access to all such accounts.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

Section 13.01    Events of Dissolution. The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events:

34

(a)    The unanimous determination of the Manager and OHP to dissolve the Company; or

(b)    The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

Section 13.02    Effectiveness of Dissolution. Dissolution of the Company shall be effective on the day on which the event described in Section 13.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.03 and the Certificate of Formation shall have been cancelled as provided in Section 13.04.

Section 13.03    Liquidation. If the Company is dissolved pursuant to Section 13.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)    OHP shall act as liquidator to wind up the Company (the "Liquidator"). The Liquidator shall have full power and authority to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)    As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)    The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)    *first*, to the payment of all outstanding principal and interest under a Loan Agreement, if any remains outstanding;

(ii)    *second*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(iii)    *third*, to the establishment of and additions to reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iv)    *fourth*, to the Members in accordance with the order, priority, and provisions set forth in Section 6.01(b).

(d)    All documents and records of the Company, including financial records, shall be delivered to OHP upon dissolution of the Company. OHP shall retain such documents and records for a period of not less than seven (7) years and shall make such documents and records reasonably available during normal business hours to the other Members and their Representatives for inspection and copying; *provided* that such access shall not unduly interfere with the management and business of OHP or its Affiliates.

35

Section 13.04    Cancellation of Certificate. Upon completion of the distribution of the assets of the Company as provided in Section 13.03(c), the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

Section 13.05    Survival of Rights, Duties and Obligations. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 8.02.

ARTICLE XIV
MISCELLANEOUS

Section 14.01    Expenses. LPG shall promptly reimburse OHP for all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby.  Except as set forth in the immediately preceding sentence, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

Section 14.02    Further Assurances. In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 14.03    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications to the Members must be sent to the address set forth on their respective signature pages hereto. Such communications to the Company or the Manager must be sent to: 17542 17th St., Suite 100, Tustin, CA 92780. The parties may change their address for notice at any time, as shall be specified in a notice given in accordance with this Section 14.03.

Section 14.04    Headings. The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

Section 14.05    Severability. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in Section 8.02(f), upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties

36

hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 14.06   Entire Agreement. This Agreement, together with the Certificate of Formation, the Ancillary Agreements, and all Exhibits, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 14.07   Successors and Assigns. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns. This Agreement may not be assigned by any Member except as permitted by this Agreement and any assignment in violation of this Agreement shall be null and void.

Section 14.08   No Third-Party Beneficiaries. Except as provided in ARTICLE VIII, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and permitted assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 14.09   Amendment. No provision of this Agreement may be amended or modified except by an instrument in writing executed by all Members. Any such written amendment or modification will be binding upon the Company and each Member. Notwithstanding the foregoing, amendments to Exhibit B hereto that are necessary to reflect any Transfer of a Membership Interest in accordance with this Agreement may be made by the Manager without the consent of or execution by the Members.

Section 14.10   Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this Section 14.10 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 14.13 hereof.

Section 14.11   Governing Law. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

Section 14.12   Submission to Jurisdiction. To the extent a dispute is not resolved in arbitration as set forth in Section 14.13(b) (the "Arbitration Agreement"), the parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or

37

otherwise, shall be brought in the United States District Court for the Western District of Texas, Austin Division. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 14.03 shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 14.13 WAIVER OF JURY TRIAL; ARBITRATION.

(a) EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b) Binding Arbitration.

(i) This Section 14.13(b) shall be referred to as the "Arbitration Agreement." Upon demand of any party, whether made before or after institution of any judicial proceeding, any dispute, claim or controversy arising out of, connected with or relating to this Agreement, any Ancillary Agreements, and/or any Related-Party Agreements ("Disputes")[1], between or among the parties hereto and to any Ancillary Agreements, and/or any Related-Party Agreements, related third parties, and the parties' respective employees, agents, representatives, affiliates, beneficiaries, related entities and assigns, shall be resolved by binding arbitration as provided herein. Institution of a judicial proceeding by a party does not waive the right of that party to demand arbitration hereunder. This Arbitration Agreement is intended to be as broad as legally permissible. Disputes may include, but are not limited to, tort claims, counterclaims, claims arising from Ancillary Agreements or Related-Party Agreements executed in the future, disputes as to whether a matter is subject to arbitration, or claims concerning any aspect of the past, present or future relationships arising out of or connected with this Agreement, any Ancillary Agreements, and/or any Related-Party Agreement. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, scope, applicability, enforceability, or waiver of this Arbitration Agreement including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable. The obligation to arbitrate any Dispute will survive the satisfaction in full of all obligations under this Agreement and the termination of this Agreement, any Ancillary Agreements, and/or any Related-Party Agreement for any reason. The parties hereto do not waive any applicable federal or state substantive law except as provided herein. A judgment upon the award may be entered in any court having jurisdiction.

---

[1] The following is not covered under this Arbitration Agreement: disputes or any portion thereof that an applicable federal statute expressly states cannot be arbitrated or cannot be the subject of a pre-dispute arbitration agreement.

38

(ii)     This Arbitration Agreement is governed by the FAA (9 U.S.C. § 1 et seq.).   Unless otherwise agreed in writing by the parties, and notwithstanding any conflicting choice of law provision in any of the Ancillary Agreements and/or Related-Party Agreements between the parties, Delaware law shall control the interpretation, application, and enforcement of this Agreement; provided, however, the Federal Arbitration Act will be applied to the Arbitration Agreement.   In reaching any determination or award, the Arbitrator shall apply the substantive laws of the State of Delaware and the applicable laws of the United States of America, without giving effect to any principles of conflict of laws under the laws of the State of Delaware, to all Disputes covered by this Arbitration Agreement.   Any arbitration proceeding will be conducted by the American Arbitration Association (the "AAA"), or such other administrator as the parties shall mutually agree upon.   Any arbitration proceeding shall be conducted in accordance with the AAA Commercial Arbitration Rules, including the AAA Emergency Procedures for Protection,  unless the claim or counterclaim is at least one million dollars ($1,000,000) exclusive of claimed interest, arbitration fees and costs, in which case the AAA's optional procedures for large, complex commercial disputes shall also apply (the commercial dispute resolution procedures and the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "Arbitration Rules").   Any arbitration shall proceed in a location in Austin, Texas selected by the AAA.   The expedited procedures set forth in Sections E-1 through E-10, et seq. of the Arbitration Rules shall be applicable to claims of less than one million dollars ($1,000,000).   All applicable statutes of limitations shall apply to any Dispute. Either party may file dispositive motions, including without limitation a motion for summary judgment, and the Arbitrator(s) will apply the standards governing such motions under the Federal Rules of Civil Procedure. Each party may take the deposition of four individual fact witnesses and any expert witness designated by another party. Each party also may propound requests for production of documents and ten (10) interrogatory requests to the other party. And, each party shall have the right to subpoena witnesses and documents for discovery or the arbitration hearing, including testimony and documents relevant to the case from third parties, in accordance with any applicable state or federal law (including, without limitation, pursuant to California Code of Civil Procedure § 1283.05). Additional discovery may be conducted by mutual stipulation, and the Arbitrator(s) will have exclusive authority to entertain requests for additional discovery, and to grant or deny such requests, based on the Arbitrator(s)'s determination whether additional discovery is warranted by the circumstances of a particular case.  If there is any inconsistency between the terms hereof and the Arbitration Rules, the terms and procedures set forth herein shall control.  Subject to applicable law as determined by the Arbitrator(s), any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any Dispute.  Notwithstanding anything in the foregoing to the contrary, any arbitration proceeding demanded hereunder shall begin within ninety (90) days of the appointment of the Arbitrator(s) and shall be concluded within one hundred and twenty (120) days after such appointment, unless otherwise mutually agreed in writing by the parties.  These time limitations may not be extended unless a party hereto shows cause for extension and then such extension shall not exceed a total of sixty (60) days, unless otherwise mutually agreed in writing by the parties.

(iii)     Any arbitration proceeding in which the amount in controversy is five million dollars ($5,000,000) or less will be decided by a single arbitrator who shall not render an award of greater than five million dollars ($5,000,000) (the "Arbitrator").  Any

39

dispute in which the amount in controversy exceeds five million dollars ($5,000,000) shall be decided by majority vote of a panel of three arbitrators (the "Arbitrators").

The Arbitrator(s) must have at least ten (10) years of relevant legal experience as an attorney or a judge and be knowledgeable in the subject matter of the dispute. The parties shall select the Arbitrator(s) by mutual agreement. If the parties are unable to mutually select an arbitrator, the Arbitrator(s) shall be selected as follows:

To the extent the arbitration is conducted by a single arbitrator (as set forth above), AAA will give each party a list of nine (9) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each party will have ten (10) calendar days to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual will be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only one remains. If no common name remains on the lists of all parties, AAA will furnish an additional list of nine (9) arbitrators from which the parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until only one name remains. That person will be designated as the Arbitrator. If the individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

To the extent the arbitration is conducted by a panel of three arbitrators (as set forth above), AAA will give each party a list of twenty-seven (27) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each party will have ten (10) calendar days to strike all names on the list it deems unacceptable. Any common names remaining will be designated as the Arbitrators. To the extent more than three common names remains on the lists of all parties, the parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only three remain. If less than three common names remain on the lists of all parties, AAA will furnish an additional list of arbitrators (9 for each arbitrator that remains to be selected) from which the parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until the number of arbitrators needed to comprise the three-arbitrator panel remain. Those persons will be designated as the Arbitrators. If any individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(iv)     Notwithstanding the preceding binding arbitration provisions, the parties hereto and to any Ancillary Agreement and/or Related-Party Agreement preserve, without diminution, certain remedies that such Persons may employ or exercise freely, either alone, in conjunction with or during a Dispute. Each such Person shall have and hereby reserves the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable: (A) all rights to foreclose against any real or personal property or other security by exercising a power of sale granted in any agreement or under applicable law or by judicial foreclosure and sale, including a proceeding to confirm the sale, (B) all rights of self-help including peaceful occupation of property and collection of rents, set off, and peaceful possession of property, (C) obtaining provisional or ancillary remedies including injunctive relief, sequestration, garnishment, attachment, appointment of receiver and in filing an

40

involuntary bankruptcy proceeding, and (D) when applicable, a judgment by confession of judgment. Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies that may be requested by a party in a Dispute.

(v)     The parties agree there will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective and/or consolidated action (the "Class Action Waiver"). Nor shall any Arbitrator have the authority to hear or arbitrate any such dispute, regardless of any other language in this Arbitration Agreement, or any provision of any of the rules or procedures of the AAA that might otherwise apply including, without limitation, the AAA Supplemental Rules for Class Action Arbitration. Notwithstanding the broad delegation to the Arbitrator(s) to resolve arbitrability disputes, no Arbitrator shall have the right to interpret the extent, applicability and/or enforceability of this Class Action Waiver; rather, any issue or dispute as to whether this Agreement permits such class, collective and/or consolidated action arbitration shall be resolved and/or interpreted solely by a court of competent jurisdiction. This Class Action Waiver shall be severable from this Arbitration Agreement if there is a final judicial determination that the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances, the class or collective action must be litigated in court—not in arbitration.

(vi)     Other than as set forth in the Class Action Waiver, if any provision of this Arbitration Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Arbitration Agreement; all remaining provisions will remain in effect.

Section 14.14    Equitable Remedies. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from an arbitrator or, as applicable, a court of competent jurisdiction (without any requirement to post bond).

Section 14.15    Attorneys' Fees. In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and costs.

Section 14.16    Remedies Cumulative. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

Section 14.17    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Remainder of Page Intentionally Left Blank. Signature Pages to Follow.]

41

Exhibit "H"
Page 154

DocuSign Envelope ID: 78F56210-71FF-4475-A383-B4AB537CC25D

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

        **COMPANY:**

        PURCHASECO80, LLC,
        a Delaware limited liability company


        By:    Litigation Practice Group PC, its manager

        By: _____
        Name:  Daniel S March
        Title:   Managing Shareholder

LIMITED LIABILITY COMPANY AGREEMENT – Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**OHP:**

OHP – LPG, LP,
a Delaware limited partnership

By:     Old Hickory Fund I GP, LLC, its general partner

By:_____
       Adam C. Blum, Manager

DocuSign Envelope ID: 78F56210-71FE-4475-A383-B1AB537CC05D

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**LPG:**

LITIGATION PRACTICE GROUP PC,
a California professional corporation

By: _____Daniel S March_____

Name: Daniel S March

Title: Managing Shareholder

Address:

LIMITED LIABILITY COMPANY AGREEMENT – Signature Page

DocuSign Envelope ID: 78F66210-71FE-4475-A383-B1AB537CC05D

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**AZEVEDO:**

By: _____

Mario Azevedo

Address:

LIMITED LIABILITY COMPANY AGREEMENT – Signature Page

Exhibit "H"

Page 158

# EXHIBIT B

U230005834326



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: U230005834326

Date Filed: 1/25/2023

Submitter Information:

| | |
|---|---|
| Contact Name | BEE |
| Organization Name | CAPITOL SERVICES, INC. |
| Phone Number | 214-745-5400 |
| Email Address | barchaphorn@winstead.com |
| Address | PO BOX 1831<br>AUSTIN, TX 78767 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| THE LITIGATION PRACTICE GROUP, PC | 17542 E 17TH STREET, STE 100<br>TUSTIN, CA 92780 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| OHP – LPG, LP | 303 COLORADO STREET, SUITE 2550<br>AUSTIN, TX 78701 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All assets of the Debtor, whether now owned or hereafter acquired, wherever located.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
62697-25 - CA - STATE

B1439-9197 01/25/2023 8:33 AM Received by California Secretary of State

Exhibit "H"

Page 1 of 1

# EXHIBIT C

<div align="center">GUARANTY</div>

THIS GUARANTY (this "<u>Guaranty</u>") is entered into as of September 1, 2022, by and among each of the signatories party hereto and each other Person who becomes a party hereto pursuant to <u>Section 22</u> (including any permitted successors and assigns, collectively, the "<u>Guarantors</u>" and each individually, a "<u>Guarantor</u>") for the benefit of OHP - LPG, LP, a Delaware limited partnership ("<u>OHP</u>"), and its Affiliates (OHP and its Affiliates, together with their successors and assigns, herein sometimes collectively called "<u>Beneficiaries</u>").  Unless otherwise defined herein, all capitalized terms have the meanings given to such terms in the LLC Agreement (as defined herein).

<div align="center">BACKGROUND</div>

The Guarantors, the other parties thereto, and OHP have entered into that certain Limited Liability Company Agreement of the Company dated as of the date hereof (as it may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>LLC Agreement</u>").

It is a condition precedent to effectiveness of the LLC Agreement that Guarantors shall have executed and delivered this Guaranty, and each Guarantor is entering into this Guaranty in order to, among other things, induce OHP to extend OHP Funding Capital (as defined in the LLC Agreement) to Company under the LLC Agreement.

Each Guarantor is a member of an Affiliate of a member in the Company, and the extension of credit to Company is a substantial and direct benefit to each Guarantor.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Guarantor hereby guarantees to Beneficiaries the prompt payment and performance of the Guaranteed Obligations, this Guaranty being upon the following terms and conditions:

1.      <u>Definitions</u>.  Capitalized terms used herein and not otherwise defined herein have the meanings given such terms in the LLC Agreement.  As used in this Guaranty, the following terms have the following meanings:

"<u>Company</u>" means PURCHASECO80, LLC, a Delaware limited liability company, and without limitation, Company's successors and assigns (regardless of whether such successor or assign is formed by or results from any merger, consolidation, conversion, sale or transfer of assets, reorganization, or otherwise) including Company as a debtor-in-possession, and any receiver, trustee, liquidator, conservator, custodian, or similar party hereafter appointed for Company or all or substantially all of its assets pursuant to any Debtor Relief Laws from time to time in effect.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"<u>Guaranteed Obligations</u>" means, as of any date, all OHP Funding Capital which has been paid into the Company as of such date of determination, but which has not been repaid, and the Guaranteed Performance Obligations.

GUARANTY AGREEMENT – Page 1
4859-5495-4543v.1 62697-25

"Guaranteed Performance Obligations" means all of the obligations of Company and each Guarantor under the LLC Agreement and the Ancillary Agreements, other than an obligation to pay money.

"Release Date" means the date upon which both of the following have occurred: (a) the Guaranteed Obligations are paid and performed in full and (b) the ability of the Company to request OHP Funding Capital has expired or terminated.

2.    Payment.   Each Guarantor hereby unconditionally and irrevocably guarantees to Beneficiaries the punctual payment when due, whether by lapse of time, by acceleration of maturity, or otherwise, and at all times thereafter, of the Guaranteed Obligations.  This Guaranty covers the Guaranteed Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by any Beneficiary in stages or installments.  The guaranty of the Guarantors as set forth in this Section 2 is a continuing guaranty of payment and not a guaranty of collection.  Each Guarantor acknowledges and agrees that such Guarantor may be required to pay and perform the Guaranteed Obligations in full without assistance or support from Company, any other Guarantor, or any other party. Each Guarantor agrees that if all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether on the scheduled payment date, by lapse of time, by acceleration of maturity or otherwise, such Guarantor shall, immediately upon demand by a Beneficiary, pay the amount due on the Guaranteed Obligations to such Beneficiary at Beneficiary's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be made, given and received in accordance with the notice provisions hereof.

3.    Performance. Each Guarantor hereby unconditionally and irrevocably guarantees to Beneficiaries the timely performance of the Guaranteed Performance Obligations.  If any of the Guaranteed Performance Obligations are not satisfied or complied with in any respect whatsoever, and without the necessity of any notice from a Beneficiary to any Guarantor, each Guarantor agrees to indemnify and hold Beneficiaries harmless from any and all loss, cost, liability or expense that Beneficiaries may suffer by any reason of any such non-performance or non-compliance.  The obligations and liability of the Guarantors under this Section 3 shall not be limited or restricted by the existence of, or any terms of, the guaranty of payment under Section 2 of this Guaranty.

4.    Primary Liability of the Guarantors.

(a)    This Guaranty is an absolute, irrevocable and unconditional guaranty of payment and performance.  Each Guarantor is and shall be jointly and severally liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guaranty, as a primary obligor.

(b)    In the event of default in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations become due (including as a result of an Event of Default under the LLC Agreement), whether by its terms, by acceleration, or otherwise, each Guarantor shall promptly pay the amount due thereon to Beneficiaries without notice or demand, of any kind or nature, in lawful money of the United States of America or perform the obligations to be performed hereunder, and it shall not be necessary for any Beneficiary in order to enforce such payment and performance by any Guarantor first, or contemporaneously, to institute suit or exhaust remedies against Company or others liable on the Guaranteed Obligations, including any other Guarantor, or to enforce any rights, remedies, powers, privileges or benefits of any Beneficiary against any security or collateral which shall ever have been given to secure the Guaranteed Obligations.

GUARANTY AGREEMENT – Page 2

(c)     Suit may be brought or demand may be made against all parties who have signed this Guaranty or any other guaranty in favor of Beneficiaries covering all or any part of the Guaranteed Obligations, or against any one or more of them, separately or together, without impairing the rights of any Beneficiary against any party hereto.  Any time that a Beneficiary is entitled to exercise its rights or remedies hereunder, such Beneficiary may in its discretion elect to demand payment and/or performance.  If a Beneficiary elects to demand performance, it shall at all times thereafter have the right to demand payment until all of the Guaranteed Obligations have been paid and performed in full.  If a Beneficiary elects to demand payment, it shall at all times thereafter have the right to demand performance until all of the Guaranteed Obligations have been paid and performed in full.

5.     Other Guaranteed Debt.  If any Guarantor becomes liable for any indebtedness owing by Company to Beneficiaries, or any or some of them, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights and remedies hereunder shall be cumulative of any and all other rights and remedies that Beneficiaries may ever have against the Guarantors.  The exercise by Beneficiary of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy by such Beneficiary or any other Beneficiary.

6.     Subrogation.  Until the Release Date has occurred, each Guarantor hereby covenants and agrees that it shall not assert, enforce, or otherwise exercise (a) any right of subrogation to any of the rights, remedies or liens of Beneficiaries or any other beneficiary against Company or its Affiliates or any other guarantor of the Guaranteed Obligations or any collateral or other security, or (b) unless such rights are expressly made subordinate to the Guaranteed Obligations (in form and upon terms acceptable to OHP) and the rights or remedies of Beneficiaries under this Guaranty and the other Ancillary Agreements, any right of recourse, reimbursement, contribution, indemnification, or similar right against Company or its Affiliates or any other guarantor of all or any part of the Guaranteed Obligations.

7.     Subordinated Debt.  All principal of and interest on all indebtedness, liabilities, and obligations of Company or its Affiliates to any Guarantor (the "Subordinated Debt") now or hereafter existing, due or to become due to any Guarantor, or held or to be held by any Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by written instrument or not, shall be expressly subordinated to the Guaranteed Obligations.  Until the Release Date, each Guarantor agrees not to receive or accept any payment from Company with respect to the Subordinated Debt; and, in the event any Guarantor receives any payment on the Subordinated Debt in violation of the foregoing, such Guarantor will hold any such payment in trust for Beneficiaries and forthwith turn it over to Beneficiaries in the form received, to be applied to the Guaranteed Obligations.

8.     Obligations Not to be Diminished.  Each Guarantor hereby agrees that its obligations under this Guaranty shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event, including, without limitation, one or more of the following events, whether or not with notice to or the consent of such Guarantor:  (a) the taking or accepting of collateral as security for any or all of the Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any partial release of the liability of Company or any other Guarantor or the full or partial release of any other guarantor or obligor from liability for any or all of the Guaranteed Obligations; (c) the death, disability, dissolution, insolvency, or bankruptcy of Company, any other Guarantor, or any other party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by any

GUARANTY AGREEMENT – Page 3

Beneficiary to Company, any other Guarantor, or any other party ever liable for any or all of the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of any Beneficiary to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by Company or any other party to any Beneficiary is held to constitute a preference under applicable Debtor Relief Laws or if for any other reason any Beneficiary is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any portion of the Guaranteed Obligations; (j) the non-perfection of any security interest or lien securing any or all of the Guaranteed Obligations; (k) any impairment of any collateral securing any or all of the Guaranteed Obligations; (l) the failure of any Beneficiary to sell any collateral securing any or all of the Guaranteed Obligations in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate existence, structure, or ownership of Company or any other Guarantor; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, Company, any Guarantor, or any other obligor, other than payment.

9. <u>Waivers</u>. Each Guarantor waives (a) any right to revoke this Guaranty with respect to future indebtedness; (b) any right to require any Beneficiary to do any of the following before such Guarantor is obligated to pay the Guaranteed Obligations or before any Beneficiary may proceed against such Guarantor: (i) sue or exhaust remedies against Company, the Guarantors, and other guarantors or obligors, (ii) sue on an accrued right of action in respect of any of the Guaranteed Obligations or bring any other action, exercise any other right, or exhaust all other remedies, or (iii) enforce rights against Company's assets or the collateral pledged by Company or any other Person to secure the Guaranteed Obligations; (c) any right relating to the timing, manner, or conduct of such Beneficiary's enforcement of rights against Company's assets or the collateral pledged by Company or any other Person to secure the Guaranteed Obligations; (d) if any Guarantor and Company (or a third-party) have each pledged assets to secure the Guaranteed Obligations, any right to require any Beneficiary to proceed first against the other collateral before proceeding against collateral pledged by any Guarantor; (e) except as expressly required by any applicable law, promptness, diligence, notice of any default under the Guaranteed Obligations, notice of acceleration or intent to accelerate, demand for payment, notice of acceptance of this Guaranty, presentment, notice of protest, notice of dishonor, notice of the incurring by Company of additional indebtedness, notice of any suit or other action by any Beneficiary against Company or any other Person, any notice to any party liable for the obligation which is the subject of the suit or action, and all other notices and demands with respect to the Guaranteed Obligations and this Guaranty; (f) each of the foregoing rights or defenses regardless whether they arise under (i) Chapter 43 et seq. of the Texas Civil Practice and Remedies Code, as amended, (ii) Section 17.001 of the Texas Civil Practice and Remedies Code, as amended, (iii) Rule 31 of the Texas Rules of Civil Procedure, as amended, (iv) common law, in equity, under contract, by statute, or otherwise; and (g) any and all rights under Sections 51.003, 51.004 and 51.005 of the Texas Property Code, as amended.

10. <u>Insolvency</u>. Should any Guarantor become insolvent, or fail to pay such Guarantor's debts generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law, or become a party to (or be made the subject of) any proceeding provided for by any Debtor Relief Law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights and remedies of Beneficiaries granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between such Guarantor and Beneficiaries, a fully matured, due, and payable obligation of such Guarantor to Beneficiaries (without regard to whether Company is then in default under the LLC Agreement or whether the Guaranteed Obligations, or any part thereof is then due and owing by Company to Beneficiaries), payable in full by such Guarantor to Beneficiaries upon demand, which shall be the estimated amount owing in respect of the contingent claim created hereunder.

GUARANTY AGREEMENT – Page 4

11.     Termination.  Each Guarantor's obligations hereunder shall remain in full force and effect until the Release Date.  If at any time any payment of the OHP Funding Capital or any other amount payable by Company under the LLC Agreement or the Ancillary Agreements is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of Company or otherwise, each Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

12.     Representations and Warranties.  Each Guarantor represents and warrants as follows:

(a)     If such Guarantor is not a natural Person, such Guarantor (i) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of the jurisdiction of its incorporation or organization; (ii) has all requisite power and authority, and all requisite governmental licenses, authorizations, consents and approvals, to own or lease its assets and carry on its business; and (iii) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Change.

(b)     Such Guarantor has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to execute, deliver, and perform its obligations under this Guaranty and the other Ancillary Agreements to which it is a party.

(c)     The execution, delivery and performance by such Guarantor of this Guaranty have been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) if such Guarantor is not a natural Person, contravene the terms of its organizational documents, (ii) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (A) any material agreement or instrument to which such Guarantor is a party or by which it or any of its property is bound or subject, or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Guarantor or its property is subject or (iii) violate any law in any material respect.

(d)     There are no actions, suits, proceedings, claims, disputes or investigations pending or, to the knowledge of such Guarantor, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against such Guarantor or against any of its properties or revenues that (i) could reasonably be expected to be adversely determined, and, if so determined, either individually or in the aggregate could reasonably be expected to have a Material Adverse Change or (ii) purport to affect or pertain to this Guaranty or any of the transactions contemplated hereby.

(e)     This Guaranty has been duly executed and delivered by such Guarantor.  This Guaranty constitutes a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as limited by Debtor Relief Laws and general principles of equity.

(f)     No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, such Guarantor of this Guaranty, except for such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect.

(g)     Such Guarantor has, independently and without reliance upon any Beneficiary and based upon such documents and information as such Guarantor has deemed appropriate, made its

GUARANTY AGREEMENT – Page 5

own analysis and decision to enter into this Guaranty, and such Guarantor has adequate means to obtain from Company on a continuing basis information concerning the financial condition and assets of Company, and such Guarantor is not relying upon any Beneficiary to provide (and no Beneficiary shall have duty to provide) any such information to such Guarantor either now or in the future.

(h)     The value of the consideration received and to be received by each Guarantor is reasonably worth at least as much as the liability and obligation of such Guarantor hereunder, and such liability and obligation may reasonably be expected to benefit such Guarantor directly or indirectly.

13.     <u>Covenants</u>.  To the extent not already required by the LLC Agreement, so long as this Guaranty remains in full force and effect, each Guarantor shall, unless Beneficiaries shall otherwise consent in writing:

(a)     furnish to Beneficiaries written notice of the occurrence of any Event of Default promptly upon obtaining knowledge thereof;

(b)     furnish to Beneficiaries such additional information concerning such Guarantor, Company or any other Person under the control of such Guarantor as Beneficiaries may reasonably request;

(c)     obtain at any time and from time to time all authorizations, licenses, consents or approvals as shall now or hereafter be necessary under all applicable laws or regulations or otherwise in connection with the execution, delivery and performance of this Guaranty and will promptly furnish copies thereof to Beneficiaries; and

(d)     comply with ARTICLE VII of the LLC Agreement.

In addition to the foregoing, each Guarantor agrees to comply with any requirements in the LLC Agreement applicable to such Guarantor.

14.     <u>No Fraudulent Transfer</u>.  It is the intention of each Guarantor and Beneficiaries that the amount of the Guaranteed Obligations guaranteed by such Guarantor by this Guaranty shall be in, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar laws applicable to such Guarantor.  Accordingly, notwithstanding anything to the contrary contained in this Guaranty or any other agreement or instrument executed in connection with the payment of any of the Guaranteed Obligations, the amount of the Guaranteed Obligations guaranteed by each Guarantor by this Guaranty shall be limited to that amount which after giving effect thereto would not (a) render such Guarantor insolvent, (b) result in the fair saleable value of the assets of such Guarantor being less than the amount required to pay its debts and other liabilities (including contingent liabilities) as they mature, or (c) leave such Guarantor with unreasonably small capital to carry out its business as now conducted and as proposed to be conducted, including its capital needs, as such concepts described in clauses (a), (b) and (c) of this <u>Section 14</u>, are determined under applicable law, if the obligations of such Guarantor hereunder would otherwise be set aside, terminated, annulled or avoided for such reason by a court of competent jurisdiction in a proceeding actually pending before such court.

15.     <u>Successors and Assigns</u>.  This Guaranty is for the benefit of Beneficiaries and their successors and assigns, and, in the event of an assignment of the Guaranteed Obligations in accordance with the provisions of the LLC Agreement, or any part thereof, the rights and remedies hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness.  This

GUARANTY AGREEMENT – Page 6

Guaranty is binding on each Guarantor, and its heirs, administrators, personal representatives, successors and permitted assigns; provided that, no Guarantor may assign its obligations under this Guaranty without obtaining the prior written consent of OHP, and any assignment purported to be made without the prior written consent of OHP shall be null and void.

16.    LLC Agreement. The LLC Agreement, and all of the terms thereof, are incorporated herein by reference, the same as if stated verbatim herein, and each Guarantor agrees that Beneficiaries may exercise any and all rights granted to it under the LLC Agreement and the Ancillary Agreements without affecting the validity or enforceability of this Guaranty.

17.    Amendments. No amendment or waiver of any provision herein nor consent to any departure therefrom by any Guarantor shall be effective unless the same shall be in writing and signed by OHP, and then, such amendment, waiver, or consent shall be effective only in the specific instance and for the specific purpose for which given.

18.    Setoff Rights. If an Event of Default has occurred and is continuing, Beneficiaries shall have the right to set off and apply against this Guaranty or the Guaranteed Obligations or both, at any time and without notice to any Guarantor, any and all sums at any time credited by or owing from any Beneficiary to any Guarantor whether or not the Guaranteed Obligations are then due and irrespective of whether or not such Beneficiary shall have made any demand under this Guaranty. As security for this Guaranty and the Guaranteed Obligations, each Guarantor hereby grants Beneficiaries a security interest in all money, instruments, certificates of deposit, and other property of such Guarantor now or hereafter held by Beneficiaries, including, without limitation, property held in safekeeping. In addition to Beneficiaries' right of setoff and as further security for this Guaranty and the Guaranteed Obligations, each Guarantor hereby grants Beneficiaries a security interest in all deposits (general or special, time or demand, provisional or final) and all other accounts of such Guarantor now or hereafter on deposit with or held by Beneficiaries or any or some of them and all other sums at any time credited by or owing from each Beneficiary to such Guarantor. The rights and remedies of Beneficiaries hereunder are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Beneficiaries may have.

19.    Time of Essence. Time shall be of the essence in this Guaranty with respect to all of each Guarantor's obligations hereunder.

20.    Governing Law; Venue; Service of Process. This Guaranty shall be governed by and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America. To the extent a dispute is not resolved in arbitration as set forth in Section 24(b) (the "Arbitration Agreement"), each Guarantor hereby agrees that any such action or proceeding against such Guarantor under or in connection with this Guaranty may be brought in any state or federal court in Austin, Texas. For any such action or proceeding that is not resolved in arbitration pursuant to the Arbitration Agreement, each Guarantor hereby irrevocably (a) submits to the nonexclusive jurisdiction of such courts, and (b) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any such court or that any such court is an inconvenient forum. Each Guarantor agrees that service of process upon it may be made by certified or registered mail, return receipt requested, at its address specified or determined in accordance with the provisions of Section 26. Nothing herein shall affect the right of Beneficiaries to serve process in any other manner permitted by law. Other than as set forth in the Arbitration Agreement, nothing herein shall limit the right of Beneficiaries to bring any action or proceeding against any Guarantor or with respect to any of its property in courts in other jurisdictions. Other than as set forth in the Arbitration Agreement, any action or proceeding by any Guarantor against OHP or any Beneficiary shall be brought only in a court located in Austin, Texas.

GUARANTY AGREEMENT – Page 7

21.     Counterparts.  This Guaranty may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Guaranty by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Guaranty.

22.     Additional Guarantors.  Any Person who was not a "Guarantor" under this Guaranty at the time of initial execution hereof shall become a "Guarantor" hereunder if required pursuant to the terms of the LLC Agreement by executing and delivering to OHP a Guaranty Supplement in substantially the form of Exhibit A (each, a "Guaranty Supplement").  Any such Person shall thereafter be deemed a "Guarantor" for all purposes under this Guaranty.

23.     Death of a Guarantor.  Should any Guarantor that is a natural Person die or become legally incapacitated, or should any Guarantor become insolvent, or fail to pay such Guarantor's debts generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law or become a party to (or be made the subject of) any proceeding provided for by any Debtor Relief Law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights of the OHP granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between such Guarantor and Beneficiaries, a fully matured, due, payable and performable obligation of such Guarantor to Beneficiaries (without regard to whether there is an Event of Default under the LLC Agreement or whether the Guaranteed Obligations, or any part thereof, are then due and owing or unperformed by the Company), payable and/or performable in full by such Guarantor upon demand of OHP, which shall be the estimated amount owing in respect of the contingent claim created hereunder.

24.     WAIVER OF RIGHT TO TRIAL BY JURY; BINDING ARBITRATION.

(a)     Waiver of Jury Trial.  EACH PARTY HERETO (INCLUDING OHP) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  IF AND TO THE EXTENT THAT THE FOREGOING WAIVER OF THE RIGHT TO A JURY TRIAL IS UNENFORCEABLE FOR ANY REASON IN SUCH FORUM, EACH OF THE PARTIES HERETO (INCLUDING OHP) HEREBY CONSENTS TO THE ADJUDICATION OF ALL CLAIMS PURSUANT TO JUDICIAL REFERENCE AS PROVIDED IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638, AND THE JUDICIAL REFEREE SHALL BE EMPOWERED TO HEAR AND DETERMINE ALL ISSUES IN SUCH REFERENCE, WHETHER FACT OR LAW. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND CONSENT AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(b)     Binding Arbitration.

(i)     Upon demand of any party, whether made before or after institution of any judicial proceeding, any dispute, claim or controversy arising out of, connected with or

GUARANTY AGREEMENT – Page 8

relating to this Guaranty ("Disputes")[1], between or among the parties hereto, shall be resolved by binding arbitration as provided herein. Institution of a judicial proceeding by a party does not waive the right of that party to demand arbitration hereunder. This Arbitration Agreement is intended to be as broad as legally permissible. Disputes may include, but are not limited to, tort claims, counterclaims, claims arising from documents executed in connection with this Guaranty in the future, disputes as to whether a matter is subject to arbitration, or claims concerning any aspect of the past, present or future relationships arising out of or connected with this Guaranty. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, scope, applicability, enforceability, or waiver of this Arbitration Agreement including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable. The obligation to arbitrate any Dispute will survive the repayment in full of all Guaranteed Obligations, the occurrence of the Release Date, and the termination of this Guaranty for any reason. The parties hereto do not waive any applicable federal or state substantive law except as provided herein. A judgment upon the award may be entered in any court having jurisdiction.

(ii) This Arbitration Agreement is governed by the FAA (9 U.S.C. § 1 et seq.). Unless otherwise agreed in writing by the parties, and notwithstanding any conflicting choice of law provision in this Guaranty between the parties, New York law shall control the interpretation, application, and enforcement of this Guaranty; provided, however, the Federal Arbitration Act will be applied to the Arbitration Agreement. In reaching any determination or award, the arbitrator shall apply the substantive laws of the State of New York and the applicable laws of the United States of America, without giving effect to any principles of conflict of laws under the laws of the State of New York, to all Disputes covered by this Arbitration Agreement. Any arbitration proceeding will be conducted by the American Arbitration Association (the "AAA"), or such other administrator as the parties shall mutually agree upon. Any arbitration proceeding shall be conducted in accordance with the AAA Commercial Arbitration Rules, unless the claim or counterclaim is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs, in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "Arbitration Rules"). Any arbitration shall proceed in a location in New York, New York or Austin, Texas selected by the AAA. The expedited procedures set forth in Sections E-1 through E-10, et seq. of the Arbitration Rules shall be applicable to claims of less than $1,000,000. All applicable statutes of limitations shall apply to any Dispute. If there is any inconsistency between the terms hereof and the Arbitration Rules, the terms and procedures set forth herein shall control. Subject to applicable law as determined by the arbitrator, any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any Dispute. Notwithstanding anything in the foregoing to the contrary, any arbitration proceeding demanded hereunder shall begin within 90 days after such demand thereof and shall be concluded within 120 days after such demand, unless otherwise mutually agreed in writing by the parties. These time limitations may not be extended

---

[1] The following is not covered under this Arbitration Agreement: disputes or any portion thereof that an applicable federal statute expressly states cannot be arbitrated or cannot be the subject of a pre-dispute arbitration agreement.

GUARANTY AGREEMENT – Page 9

unless a party hereto shows cause for extension and then such extension shall not exceed a total of 60 days, unless otherwise mutually agreed in writing by the parties.

(i)      Any arbitration proceeding in which the amount in controversy is $5,000,000 or less will be decided by a single arbitrator selected according to the Arbitration Rules, and who shall not render an award of greater than $5,000,000. Any dispute in which the amount in controversy exceeds $5,000,000 shall be decided by majority vote of a panel of three arbitrators.

(ii)     Notwithstanding the preceding binding arbitration provisions, the parties hereto preserve, without diminution, certain remedies that such Persons may employ or exercise freely, either alone, in conjunction with or during a Dispute. Each such Person shall have and hereby reserves the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable: (A) all rights to foreclose against any real or personal property or other security by exercising a power of sale granted in connection with the LLC Agreement or under applicable law or by judicial foreclosure and sale, including a proceeding to confirm the sale, (B) all rights of self-help including peaceful occupation of property and collection of rents, set off, and peaceful possession of property, (C) obtaining provisional or ancillary remedies including injunctive relief, sequestration, garnishment, attachment, appointment of receiver and in filing an involuntary bankruptcy proceeding, and (D) when applicable, a judgment by confession of judgment. Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies that may be requested by a party in a Dispute.

(iii)    The parties agree there will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective and/or consolidated action (the "Class Action Waiver"). Nor shall any arbitrator have the authority to hear or arbitrate any such dispute, regardless of any other language in this Arbitration Agreement, or any provision of any of the rules or procedures of the AAA that might otherwise apply including, without limitation, the AAA Supplemental Rules for Class Action Arbitration. Notwithstanding the broad delegation to the arbitrator to resolve arbitrability disputes, no arbitrator shall have the right to interpret the extent, applicability and/or enforceability of this Class Action Waiver; rather, any issue or dispute as to whether this Guaranty permits such class, collective and/or consolidated action arbitration shall be resolved and/or interpreted solely by a court of competent jurisdiction. This Class Action Waiver shall be severable from this Arbitration Agreement if there is a final judicial determination that the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances, the class or collective action must be litigated in court – not in arbitration.

(iv)     Other than as set forth in the Class Action Waiver, if any provision of this Arbitration Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Arbitration Agreement; all remaining provisions will remain in effect.

25.      OHP Acts for Beneficiaries. OHP shall (absent written notification by a Beneficiary to the contrary) act for all Beneficiaries for the purposes of making demands hereunder, obtaining information, amending or waiving provisions hereof and otherwise taking action on behalf of the Beneficiaries, and (absent written notice to the contrary) each Guarantor shall be entitled to rely on the authority of OHP to act for all Beneficiaries without further investigation.

GUARANTY AGREEMENT – Page 10

26.     <u>Notices and Deliveries</u>.  All notices and other communications to any Guarantor shall be made to such Guarantor's address specified on its signature page hereto.  All notices and other communications provided for herein shall be effectuated in the manner provided for in Section 14.03 of the LLC Agreement.

27.     <u>Electronic Signatures and Electronic Records</u>.  Each Guarantor consents to the use of electronic and/or digital signatures by any Guarantor or OHP, or any one or more of them.  This Guaranty and any other Ancillary Agreement may be signed electronically or digitally in a manner specified solely by OHP.  Each Guarantor agrees not to deny the legal effect or enforceability of this Guaranty or any other Ancillary Agreement solely because (a) this Guaranty or such other Ancillary Agreement is entirely in electronic or digital form, including any use of electronically or digitally generated signatures, (b) an electronic or digital record was used in the formation of this Guaranty or such other Ancillary Agreement, or (c) this Guaranty or such other Ancillary Agreement was subsequently converted to an electronic or digital record by any Guarantor or OHP, or any one or more of them.  Each Guarantor agrees not to object to the admissibility of this Guaranty or any other Ancillary Agreement in the form of an electronic or digital record, or a paper copy of an electronic or digital document, or a paper copy of a document bearing an electronic or digital signature, on the grounds that the record or signature is not in its original form or is not the original of this Guaranty or such other Ancillary Agreement.

28.     <u>NO ORAL AGREEMENTS</u>.  THIS GUARANTY, THE LLC AGREEMENT AND THE OTHER ANCILLARY AGREEMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*[Remainder of Page Intentionally Left Blank.  Signature Pages to Follow.]*

GUARANTY AGREEMENT – Page 11

EXECUTED as of the first date herein set forth.

**GUARANTORS:**

ADDRESS:

17542 17th St., Suite 100
Tustin, CA 92780

Attention: _____

**LITIGATION PRACTICE GROUP PC**, *a*
*California professional corporation*

By: _____
    Name: Daniel S. March
    Title:   Managing Shareholder

GUARANTY AGREEMENT – Signature Page

# EXHIBIT I

# PURCHASECO80, LLC
17542 17th St., Suite 100
Tustin, CA 92780

September 1, 2022 (the "*Effective Date*")

This letter agreement (this "***Side Letter***") memorializes certain terms, rights and obligations that modify the Members' distribution rights in the Company with regard to the Eligible Receivables attached as <u>Exhibit A</u> (the "***100% Eligible Receivables***").  PurchaseCo80, LLC, a Delaware limited liability company (the "***Company***") and the Company's members as signatories to this Side Letter (the "***Members***"), hereby amends the distribution rights different than those described in the Company's Limited Liability Company Agreement (as further amended from time to time, the "***Company Agreement***"), dated September 1, 2022.  Capitalized terms not defined herein shall have the meaning given to such terms in the Company Agreement.

For the avoidance of doubt, from the Effective Date until the termination of this Side Letter in accordance with <u>Section 4</u>, this Side Letter shall amend only the sections of the Company Agreement with respect to the 100% Eligible Receivables. All other terms of the Company Agreement not amended in this Side Letter shall remain in full force and effect with respect to the 100% Eligible Receivables.

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      <u>Amendment to Section 6.01(b)</u>.  <u>Section 6.01(b)</u> of the Company Agreement is hereby amended and restated to read in its entirety as set forth below (solely for the 100% Eligible Receivables):

*(b)      After all principal and accrued interest under a Loan Agreement, if any is outstanding, is paid in full, any Available Cash attributable to the 100% Eligible Receivables, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, commitments to purchase Eligible Receivables, and such other reasonable reserves (including the Minimum Cash Balance) as OHP, acting in accordance with Section 7.02(h)(vi), may require, shall be distributed to the Members, when determined by OHP, in the following order and priority:*

*1.  One hundred percent (100%) to OHP.*

2.      <u>Miscellaneous</u>.  This Side Letter and the Company Agreement contain the entire agreement of the parties with respect to the subject matter hereof.  Subject to applicable law, in the event of a conflict between the provisions of this Side Letter, on the one hand, and the Company Agreement, on the other hand, the provisions of this Side Letter shall control.  This Side Letter may be executed in counterparts, each of which shall be deemed to be an original and all of which together will constitute one and the same agreement.  Signatures to this Side Letter may be provided by fax, .PDF or other electronic format, each of which shall be deemed an original and fully effective as though it was an original signed copy of this Side Letter.  This Side Letter may not be amended, modified or otherwise changed without the prior written consent of the Members.

1

4810-8048-2018v.6 60901-18

DocuSign Envelope ID: F22D5B1F-DBB8-49DE-89A0-9F6A0E6FD532

3.      <u>Further Assurances</u>.  Each party hereto will at any time, and from time to time after the execution of this Side Letter, upon reasonable request of any other party, execute, acknowledge and deliver such other agreements, instruments, documents, or other writings as may be reasonably requested or required to carry out the intent of this Side Letter.

4.      <u>Termination</u>.  This Side Letter may be terminated by mutual written agreement of all Members.

5.      <u>Governing Law</u>.  The internal law of Delaware will govern this Side Letter. However, nothing in this Side Letter will be construed contrary to any applicable state or federal law.

[SIGNATURE PAGE FOLLOWS]

2

**MEMBERS:**

*OHP:*

**OHP – LPG, LP**

By:    Old Hickory Fund I GP, LLC, its general partner

By:    _Adam C. Blum_

Adam C. Blum, *Manager*

*LPG:*

**LITIGATION PRACTICE GROUP PC**

By:    _Daniel S. March_

Name:    Daniel S. March

Title:    Managing Shareholder

*AZEVEDO:*

By:    _Mario Azevedo_

Mario Azevedo

SIGNATURE PAGE
SIDE LETTER

# **EXHIBIT A**

<u>100% Eligible Receivables</u>

*[See Attached.]*

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of September 1, 2022  (the "**Agreement Date**"), by and between PurchaseCo80, LLC (the "**Buyer**"), and  Litigation Practice Group, PC (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**).

**RECITALS**

WHEREAS, in the regular course of business, the Seller currently owns account receivables;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

Whereas, Purchaser desires to purchase, and Seller desires to sell to Purchaser, all right, title and interest to the payments owing to Seller from the client files of the Consumers listed on Addendum A (the "**Client Files**").

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $3,569.58 (the "**Purchase Price**") by wire transfer in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire  Instructions**") in exchange for the receivable on the 4 files identified on the attached spreadsheet.

Exhibit **"I"**
Page 179

## ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Affiliate shall compy with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, and (b) its obligations under this Agreement and any other agreement associated herewith, including communicating with consumers and/or potential consumers regarding LPG or any of its or LPG's programs.

Section 3.3    LPG shall comply with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, (b) its obligations under the Agreement, and (c) the legal services agreement entered into between LPG and consumers and Affiliates.

Section 3.4    Each of LPG and Affiliate are in compliance in all material respects with any federal, state, local or foreign law (including common law), statute, code ordinance, rule, regulation or other requirement ("**Law**") applicable to its business or operations.  Neither LPG nor Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of LPG and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of LPG and Affiliate, there are no facts or circumstances which could form the basis for any such violation. LPG and Affiliate currently have all material approvals, authorizations, consents, licenses, permits or certificates which are required for the operation of the business as presently conducted ("**Permits**"). Neither LPG nor Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the LPG and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

Section 3.5    Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement

Exhibit "I"

Page 180

of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.6    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.7    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.8    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.9    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.10    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.11    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.12    Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**."

The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) Affiliate's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.5    <u>Indemnification by LPG</u>. Subject to the limitations set forth in this <u>Article 6</u>, LPG agrees to indemnify and hold harmless the **Buyer Indemnified Parties** against all **Losses** paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of LPG in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the LPG pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) LPG's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.6    <u>Indemnification by the Buyer</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.7    <u>Indemnification Procedures</u>.

(a)  <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)  No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)  If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this <u>Section 6.6(c)</u>.  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this <u>Article 6</u> or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this <u>Article 6</u>, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. This Agreement and any rights or obligations of a Party hereunder may be assigned by a Party or an Affiliate of such Party without consent of the other Parties. This Agreement will be binding upon any assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses. In the event of a breach,

Exhibit "I"

Page 185

the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

Section 7.7   Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles

Section 7.10   Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction

Section 7.11   Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.12    Non Disparagement - Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any Party to this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

PurchaseCo80, LLC
By: Litigation Practice Group, PC, its manager

By: _____
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**  LITIGATION PRACTICE GROUP, PC

By: _____
Name: Daniel S. March
Title: Managing Shareholder

Exhibit "I"
Page 186

## EXHIBIT A

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c) "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d) "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f) "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g) "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h) "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i) "**Client Files**" shall have the meaning set forth in the Recitals.

(i) "**Closing**" shall have the meaning set forth in Section 6.1.

(j) "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k) "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l) "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m) "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n) "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall have the meaning set forth in Article 3.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permits**" shall have the meaning set forth in Article 3.

(aa)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(bb)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit "I"

Page 188

(cc)    "**Purchase Price**" shall have the meaning set forth in Section 2.3.

(dd)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(ee)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ff)    "**Seller Indemnified Parties**" shall have the meaning set forth in Section 6.5.

(gg)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(hh)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ii)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(jj)    "**Third-party Claim**" shall have the meaning set forth in Section 6.6(a).

(kk)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(ll)    "**Upfront Cash Payment**" shall have the meaning set forth in Section 2.3.

(mm)    "**Wire Instructions**" shall have the meaning set forth in Section 2.3.

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between OHP – LPG, LP (the "**Buyer**"), and Litigation Practice Group, PC (the "**Seller**").  Each of the Seller and the Buyer are  sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

PurchaseCo80, LLC
By: Litigation Practice Group PC, its manager

By: _____
    *Daniel S. March*
    9D494DB1993341F
    Name:  Daniel S. March
    Title:  Managing Shareholder

**SELLER:**  Litigation Practice Group, PC

By: _____
    *Daniel S. March*
    9D494DB1993341F
    Name: Daniel S. March
    Title: Managing Shareholder

Accounts Receivable Purchase Agreement

# EXHIBIT J

## OMNIBUS ASSIGNMENT AND ASSUMPTION
## OF
## ACCOUNTS RECEIVABLE PURCHASE AGREEMENTS

THIS OMNIBUS ASSIGNMENT AND ASSUMPTION OF ACCOUNTS RECEIVABLE PURCHASE AGREEMENTS (this "*Assignment*") is made and entered into as of the 8th day of September, 2022, by and among OHP – LPG, LP, a Delaware limited partnership ("*Assignor*"), and PurchaseCo80, LLC, a Delaware limited liability company ("*Assignee*").

**W I T N E S S E T H:**

WHEREAS, Assignor entered into numerous accounts receivable purchase agreements attached in Exhibit A (the "*A/R Purchase Agreements*") in which Assignor purchased accounts receivable obligations from various sellers, as more particularly described in the A/R Purchase Agreements;

WHEREAS, Assignor desires to assign its interest in the A/R Purchase Agreements to Assignee pursuant to Section 7.4 of the A/R Purchase Agreements; and

WHEREAS, Assignor paid a total amount of Ten Million Two Hundred Forty Thousand Three Hundred Forty Eight and 40/100 Dollars ($10,240,348.40) (the "*OHP Payments*") pursuant to the terms of the A/R Purchase Agreements and such OHP Payments shall be deemed as OHP Funding Capital (as is defined in the Limited Liability Company Agreement of Assignee dated as of September 1, 2022); and

NOW, THEREFORE, in consideration of premises contained herein, and intending to be legally bound hereby, Assignor and Assignee hereby agree as follows:

1. **Assignment/Assumption of Interest in A/R Purchase Agreements.** Pursuant to Section 7.4 of the A/R Purchase Agreements, Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in and to the A/R Purchase Agreements described in Exhibit A, and Assignee hereby accepts such assignment and assumes all rights of Assignor under the A/R Purchase Agreements.

2. **Other Provisions Unaffected**. Except as specifically modified herein, the A/R Purchase Agreements shall remain in full force and effect.

3. **Assignor Indemnification**. Assignor shall indemnify, defend and hold harmless Assignee from and against any and all claims, demands, causes of action, liabilities, losses, judgments, costs and expenses (including reasonable legal fees incurred in investigating or defending against any such claims, demands, causes of action, liabilities or judgments) arising out of any act or omission or alleged act or omission performed or omitted to be performed on behalf of Assignor, in connection with this Assignment or the A/R Purchase Agreements.

OMNIBUS ASSIGNMENT AND ASSUMPTION OF ACCOUNTS RECEIVABLE PURCHASE AGREEMENTS – PAGE 1

DocuSign Envelope ID: 252A2SB7-70FC-4GBC-9F71-716A8BC42F87

4. **Counterparts.** This Assignment may be executed in any number of counterparts, each of which shall be effective upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Assignment may be detached from any counterpart of this Assignment without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Assignment identical in form hereto but having attached to it one or more additional signature pages.

[*Signature Page Follows*]

OMNIBUS ASSIGNMENT AND ASSUMPTION OF ACCOUNTS RECEIVABLE PURCHASE AGREEMENTS – PAGE 2

**COUNTERPART SIGNATURE PAGE TO OMNIBUS ASSIGNMENT AND ASSUMPTION OF ACCOUNTS RECEIVABLE PURCHASE AGREEMENTS**

 

 

      **IN WITNESS WHEREOF,** the parties have caused this Assignment to be executed as of the date first written above.

                                        <u>**ASSIGNOR**</u>**:**

                                        **OHP – LPG, LP**, a Delaware limited partnership

                                        By: Old Hickory Fund I GP, LLC, its general partner

                                        By: _____

                                            Adam C. Blum, *Manager*

DocuSign Envelope ID: 252A2CB7-70FC-4CBC-9F71-716A8BC42F87

**COUNTERPART SIGNATURE PAGE TO OMNIBUS ASSIGNMENT AND ASSUMPTION OF ACCOUNTS RECEIVABLE PURCHASE AGREEMENTS**

      **IN WITNESS WHEREOF,** the parties have caused this Assignment to be executed as of the date first written above.

<div align="center">

**ASSIGNEE:**

**PURCHASECO80, LLC**,
a Delaware limited liability company

By: Litigation Practice Group, PC, its manager

</div>

By: _____
           Daniel S. March, *Managing Shareholder*

OMNIBUS ASSIGNMENT AND ASSUMPTION OF ACCOUNTS RECEIVABLE PURCHASE AGREEMENTS - SIGNATURE PAGE 2

DocuSign Envelope ID: 252A2SB7-70FC-4CBC-9F71-716A8BC42F87

**EXHIBIT A**

**A/R Purchase Agreements**

*[See attached.]*

# Individual Attached Agreements Omitted

# EXHIBIT K

## BLOCKED ACCOUNT CONTROL AGREEMENT
## SHIFTING CONTROL

**V1.7_08_24_21**

BLOCKED ACCOUNT CONTROL AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**") dated as of November 18, 2022, by and among THE LITIGATION PRACTICE GROUP PC ("**Company**"), OHP- LPG, LP (together with its permitted successors and assigns, "**Secured Party**") and JPMorgan Chase Bank, N.A. ("**Bank**" and together with Company and Secured Party, "**Parties**" and each of the Parties in its individual capacity, **"Party"**).

The Parties refer to the following account(s) in the name of Company maintained at Bank (the "**Account**") and hereby agree as follows:

| Account Number(s): |
| --- |
| 735863158 |
| 735863133 |

**1.** (a) Company and Secured Party notify Bank that by separate agreement Company has granted Secured Party a security interest in the Account and all funds on deposit from time to time therein.  Bank acknowledges being so notified.

(b)  Bank hereby confirms that the Account is a demand deposit account maintained by Company with Bank in Bank's ordinary course of business and that Bank is a national banking association.  Each party confirms that it intends that this Agreement constitute an "authenticated record" as defined in Article 9 of the Uniform Commercial Code as in effect in the State of New York from time to time ("**UCC**").  As of the effective date of this Agreement, Bank confirms that except for this Agreement and the applicable Account Documentation, (i) Bank is not currently entered into any agreement with any person or entity pursuant to which Bank is obligated to comply with instructions as to the disposition of funds from the Account and (ii) for the duration of the Agreement Bank shall not, without the prior written consent of Secured Party, enter into any agreement with any other person or entity pursuant to which Bank is obligated to comply with instructions as to the disposition of funds from the Account.

**2.** (a)  It is the intent of the Parties that Secured Party has control over the Account within the meaning of Section 9-104 of the UCC.  Bank agrees that it shall follow the Instructions (as defined below) of Secured Party concerning the Account without further consent of Company.  Secured Party hereby instructs Bank that prior to the Effective Time (as defined below) Bank shall honor all withdrawal, payment, transfer or other fund disposition or other instructions (collectively, "**Instructions**") which Company is entitled to give under the Account Documentation (as defined below) received from Company (but not those from Secured Party) concerning the Account.  On and after the Effective Time (and without Company's consent), Bank shall honor all written Instructions received from Secured Party (but not those from Company) concerning the Account and Company shall have no right to issue Instructions or any other right or ability to access or withdraw or transfer funds from the Account.

(b)  The "**Effective Time**" shall be the opening of business on the second Business Day following the Business Day on which a notice purporting to be signed by Secured Party in substantially the same form as Exhibit A, with a copy of this Agreement attached to such notice (a "**Shifting Control Notice**"), is actually received by the unit of Bank to whom the notice is required to be addressed; provided, however, that if any such notice is so received after 12:00 noon, Eastern time, on any Business Day, the Effective Time shall be the opening of business on the third Business Day following the Business Day on which such receipt occurs.  A "**Business Day**" is any day other than a Saturday, Sunday or other day on which Bank is or is authorized or required by law to be closed.

(c)  Notwithstanding the foregoing: (i) all transactions involving or resulting in a transaction involving the Account duly commenced by Bank or any affiliate prior to the Effective Time and consummated or processed thereafter shall be deemed not to constitute a violation of this Agreement and (ii) Bank and/or any affiliate may (at its discretion and without any obligation to do so) (x) cease honoring Company's Instructions and/or commence honoring solely Secured Party's Instructions concerning the Account at any time or from time to time after it becomes aware that Secured Party has sent to it a Shifting Control Notice but prior to the Effective Time (including without limitation halting, reversing or redirecting any transaction referred to in clause (i) above) or (y) deem a Shifting Control Notice to be received by it, for purposes of the foregoing paragraph, prior to the specified unit's actual receipt if otherwise actually received by Bank (or if such Shifting Control Notice does not substantially comply with the form attached as Exhibit A or does not attach an appropriate copy of this Agreement), with no liability whatsoever to Company for doing so.

**3.** This Agreement supplements, rather than replaces, Bank's deposit account agreement, terms and conditions and other standard documentation in effect from time to time with respect to the Account or services provided in connection with the Account (the "**Account Documentation**"), which Account Documentation will continue to apply to the Account and such services, and the respective rights, powers, duties, obligations, liabilities and responsibilities of the parties to such Account Documentation and this Agreement, to the extent not expressly conflicting with the provisions of this Agreement (however, in the event of any such conflict, the provisions of this Agreement shall control).  Prior to issuing any Instructions on or after the Effective Time, Secured Party shall provide Bank with such documentation as Bank may reasonably request to establish the identity and authority of the individuals issuing Instructions on behalf of Secured Party.  Secured Party may request Bank to provide other services (such as automatic daily transfers) with respect to the Account on or after the Effective Time; however, if such services are not authorized or otherwise covered under the Account Documentation, Bank's decision to provide any such services shall be made in its sole discretion (including without limitation being subject to Company and/or Secured Party executing such Account Documentation or other documentation as Bank may require).

**4.** Bank agrees not to exercise or claim any right of offset, banker's lien or other like right against the Account for so long as this Agreement is in effect except with respect to (i) returned or charged-back items, reversals or cancellations of payment orders and other electronic fund transfers or other corrections or adjustments to the Account or transactions therein, (ii) overdrafts in the Account or (iii) Bank's customary charges, fees and documented expenses with respect to the Account or the services provided hereunder.

**5.** Notwithstanding anything to the contrary in this Agreement: (i) Bank shall have only the duties and responsibilities with respect to the matters set forth in writing in this Agreement and shall not be deemed to be an agent, bailee or fiduciary for any Party, (ii) Bank shall be fully protected in acting or refraining from acting in good faith without investigation on any notice (including without limitation a Shifting Control Notice), Instruction or request purportedly furnished to it by Company or Secured Party in accordance with the terms of this Agreement, in which case the Parties agree that Bank has no duty to make any further inquiry whatsoever, (iii) it is hereby acknowledged and agreed that Bank has no knowledge of (and is not required to know) the terms and provisions of the separate agreement referred to in Section 1(a) above or any other related documentation or whether any actions by Secured Party (including without limitation the sending of a Shifting Control Notice), Company or any other person or entity are permitted under, constitutes a breach of, or is consistent or inconsistent with such separate agreement, (iv) Bank shall not be liable to Company or Secured Party or any other person for any action or failure to act under or in connection with this Agreement or the Account, except to the extent such conduct constitutes its own willful misconduct or gross negligence (and to the maximum extent permitted by law, shall under no circumstances be liable for any incidental, indirect, special, consequential or punitive damages) and (v) Bank shall not be liable for losses or delays caused by force majeure, interruption or malfunction of computer, transmission or communications facilities, labor difficulties, court order or decree, the commencement of bankruptcy or other similar proceedings or other matters beyond Bank's reasonable control.

**6.** (a)  Company agrees to indemnify, defend and save harmless Bank against any loss, liability or expense (including reasonable fees and disbursements of outside counsel) (collectively, "**Covered Items**") incurred (i) in connection with this Agreement or the Account (except to the extent due to Bank's willful misconduct or gross negligence) or any related interpleader proceeding or (ii) as a result of following Company's direction or Instructions.

(b)  To the extent Bank is not indemnified by Company pursuant to the preceding sentence, Secured Party agrees to indemnify, defend and save harmless Bank against any Covered Items incurred (i) on or after the Effective Time in connection with this Agreement or the Account (except to the extent due to Bank's willful misconduct or gross negligence) or any related interpleader proceeding, (ii) as a result of following Secured Party's direction or Instructions (including without limitation Bank's honoring of a Shifting Control Notice) or (iii) due to any claim by Secured Party of an interest in the Account or the funds on deposit therein.

**7.** (a)  Bank may terminate this Agreement (i) in its discretion upon the sending of at least thirty (30) calendar days advance written notice to Company and Secured Party or (ii) because of a material breach by Company or Secured Party of any of the terms of this Agreement or the Account Documentation, upon the sending of at least five (5) Business Days advance written notice to Company and Secured Party.

(b)  Secured Party may terminate this Agreement in its discretion upon the sending of at least three (3) Business Days advance written notice ("**Termination Delivery Requirement**") in substantially the same form as Exhibit B, with a copy of the Agreement attached thereto (a "**Secured Party Termination Notice**") to Bank and Company, provided that Bank may shorten or waive the Termination Delivery Requirement and any such shortening or waiver shall be binding on the Parties.

(c)  Any other termination, any amendment or waiver of this Agreement shall be effected solely by an instrument in writing executed by all the Parties. The provisions of Sections 5 and 6 above shall survive any termination of this Agreement.

**8.** Company shall compensate Bank for the opening and administration of the Account and services provided hereunder in accordance with Bank's customary fee schedules from time to time in effect.  Payment will be effected by a direct debit to the Account or as otherwise agreed to between Company and Bank; however, Bank retains the right to debit the Account for any fees that are not paid when due.

**9.** (a)  No Party may assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of the other Parties; provided, however, that no consent will be required if the assignment or transfer takes place as part of a merger, acquisition or corporate reorganization affecting Bank; and provided further that only Bank's prior written consent is required for an assignment by Secured Party. A failure to comply with the assignment requirements referenced under this section shall result in such assignment being null and void.

(b)  Notwithstanding the foregoing, Secured Party may transfer its rights and obligations under this Agreement (i) to an assignee to which, by contract or operation of law, Secured Party transfers substantially all of its rights and obligations under the financing arrangement with Company or (ii) to a successor representative, if Secured Party is acting as a representative in whose favor a security interest is provided for or created; provided as between Bank and Secured Party, Secured Party will not be released from its obligations under this Agreement unless and until an Assignment Notice is actually received by the unit of Bank to whom notice is required to be addressed. An "**Assignment Notice**" is a notice purporting to be signed by Secured Party and assignee in which assignee agrees to assume all of Secured Party's obligations under this Agreement substantially in the same form as Exhibit C, with a copy of this Agreement to be attached to the notice.

**10.** Upon Secured Party's request and at Company's sole expense, Bank will provide Bank's standard bank statements covering deposits to and withdrawals from the Account.  Bank may disclose to Secured Party such other information concerning the Account as Secured Party may from time to time reasonably request.

**11.** This Agreement: (i) may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument, (ii) shall become effective when counterparts have been signed and delivered by the Parties and (iii) may be executed using Electronic Signatures, which the Parties agree are intended to authenticate this writing and to have the same force and effect as manual signatures. "**Electronic Signature**" means any electronic sound, symbol, or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or email electronic signatures. Each Party represents and warrants on a continuous basis that (i) any Electronic Signature on this Agreement constitutes valid execution of this Agreement by a duly authorized signer in accordance with applicable law and, as applicable, its constitutional documents and (ii) this Agreement constitutes its valid, legal, enforceable and binding obligation. Each Party confirms that the others have relied on the foregoing representations and warranties when accepting an Electronic Signature on this Agreement. Each Party confirms that this Agreement constitutes an electronic record established and maintained in the ordinary course of business and an original written record when printed from electronic files.  Such printed copies will be treated to the same extent and under the same conditions as other original business records created and maintained in documentary form.  All notices under this

Exhibit "K"

Page 200

Agreement shall be in writing and sent (including via emailed pdf or similar file or facsimile transmission) to the Parties at their respective addresses, email addresses or fax numbers set forth below (or to such other address, email address or fax number as any such Party shall designate in writing to the other Parties from time to time).

**12.** This Agreement and all claims, disputes or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, will be governed by, and enforced in accordance with, the internal laws of the State of New York without regard to conflict of law principles.  Regardless of any provision in any other separate agreement, the State of New York shall be deemed to be Bank's "jurisdiction" for purposes of Section 9-304 of the UCC.  The Parties intend that New York's periods of limitations govern the aforementioned causes of action irrespective of any otherwise applicable statute.  **All Parties hereby waive all rights to a trial by jury in any action or proceeding relating to the Account or this Agreement.**

[Signatures on following page]

Page 3 of 7

Exhibit "K"

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

| THE LITIGATION PRACTICE GROUP PC | | |
| --- | --- | --- |
| **By:** | *Daniel S. March* | **Date:** 11/18/2022 |
| **Name:** | Daniel S. March | |
| **Title:** | President | |
| **Address for Notices:** | 17542 17TH ST STE 100 TUSTIN, CA, 927801981, USA | |
| **Fax:** | | |
| **Email Address:** | dan@litigationpracticegroup.com | |

| OHP- LPG, LP | | |
| --- | --- | --- |
| **By:** | | **Date:** |
| **Name:** | | |
| **Title:** | | |
| **Address for Notices:** | | |
| **Fax:** | | |
| **Email Address:** | | |

| JPMorgan Chase Bank, N.A. | | |
| --- | --- | --- |
| **By:** | | **Date:** |
| **Name:** | | |
| **Title:** | | |
| **Address for Instructions and other Notices:** | JPMorgan Chase Bank, N.A. Attn: Sarita Villa 8181 Communications Pkwy Bldg B, Floor 02 Plano, TX, 75024-0239, United States Email: sarita.villa@chase.com Fax: | |
| **Address for Assignment, Shifting Control Notice and Termination Notices:** | JPMorgan Chase Bank, N.A. Attn: Blocked Account Contracts Team Email: blocked.account.contracts@jpmchase.com | |

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

| THE LITIGATION PRACTICE GROUP PC | | |
|---|---|---|
| By: | [signature] | Date: 11-17-22 |
| Name: | DANIEL S MARCUS | |
| Title: | MANAGING SHAREHOLDER | |
| Address for Notices: | 17542 E. 17th St. TUSTIN, CA 92780 | |
| Fax: | | |
| Email Address: | dan@lpglaw.com | |

| OHP- LPG, LP | | |
|---|---|---|
| By: | [signature] | Date: November 16, 2022 |
| Name: | Adam Blum | |
| Title: | Manager of the General Partner | |
| Address for Notices: | OHP-LPG, LP c/o Old Hickory Partners 303 Colorado St., Ste. 2550 Austin, TX 78701 | |
| Fax: | 817-334-0078 | |
| Email Address: | AdamBlum@aol.com | |

| JPMorgan Chase Bank, N.A. | | |
|---|---|---|
| By: | | Date: |
| Name: | | |
| Title: | | |
| Address for Instructions and other Notices: | JPMorgan Chase Bank, N.A. Attn: Sarita Villa 8181 Communications Pkwy Bldg B, Floor 02 Plano, TX, 75024-0239, United States Email: sarita.villa@chase.com Fax: | |
| Address for Assignment, Shifting Control Notice and Termination Notices: | JPMorgan Chase Bank, N.A. Attn: Blocked Account Contracts Team Email: blocked.account.contracts@jpmchase.com | |

Page 4 of 4

Exhibit "K"
Page 203

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

| THE LITIGATION PRACTICE GROUP PC | | |
|---|---|---|
| **By:** | | **Date:** |
| **Name:** | Daniel S. March | |
| **Title:** | President | |
| **Address for Notices:** | 17542 17TH ST STE 100 <br> TUSTIN, CA, 927801981, USA | |
| **Fax:** | | |
| **Email Address:** | dan@litigationpracticegroup.com | |

| OHP- LPG, LP | | |
|---|---|---|
| **By:** | | **Date:** |
| **Name:** | | |
| **Title:** | | |
| **Address for Notices:** | | |
| **Fax:** | | |
| **Email Address:** | | |

| JPMorgan Chase Bank, N.A. | | |
|---|---|---|
| **By:** | | **Date:** November 18, 2022 |
| **Name:** | Robert Heffernan | |
| **Title:** | VP | |
| **Address for Instructions and other Notices:** | JPMorgan Chase Bank, N.A. <br> Attn: Sarita Villa <br> 8181 Communications Pkwy Bldg B, Floor 02 <br> Plano, TX, 75024-0239, United States <br> Email: sarita.villa@chase.com <br> Fax: | |
| **Address for Assignment, Shifting Control Notice and Termination Notices**: | JPMorgan Chase Bank, N.A. <br> Attn:  Blocked Account Contracts Team <br> Email:  blocked.account.contracts@jpmchase.com | |

## Exhibit A ⏐ Shifting Control Notice

**Date:**  _____

**JPMorgan Chase Bank, N.A.**
**Attention:** Blocked Account Contracts Team
**Email :**  blocked.account.contracts@jpmchase.com

Re:  Blocked Account Control Agreement dated as of November 18, 2022, by and among THE LITIGATION PRACTICE GROUP PC ("**Company**"), OHP- LPG, LP ("**Secured Party**") and JPMorgan Chase Bank, N.A. ("**Bank**") relating to account number(s) 735863158 and 735863133 (the "**Agreement**").

Ladies and Gentlemen:

This constitutes a Shifting Control Notice as referred to in Section 2 of the Agreement, a copy of which is attached hereto.

| OHP- LPG, LP | | |
|---|---|---|
| **By:** | | **Date:** |
| **Name:** | | |
| **Title:** | | |

ATTACHMENT: Blocked Account Control Agreement

## Exhibit B ╎ Secured Party Termination Notice

**Date:** _____

**JPMorgan Chase Bank, N.A.**
**Attention:** Blocked Account Contracts Team
**Email :** blocked.account.contracts@jpmchase.com

**THE LITIGATION PRACTICE GROUP PC**

**Address:** _____
                        _____
**Attention:** _____

Re:  Blocked Account Control Agreement dated as of November 18, 2022, by and among THE LITIGATION PRACTICE GROUP PC ("**Company**"), OHP- LPG, LP ("**Secured Party**") and JPMorgan Chase Bank, N.A. ("**Bank**") relating to account number(s) 735863158 and 735863133 (the "**Agreement**").

Ladies and Gentlemen:

This constitutes a Secured Party Termination Notice as referred to in Section 7(b) of the Agreement, a copy of which is attached hereto.

| OHP- LPG, LP | | |
|---|---|---|
| **By:** | | **Date:** |
| **Name:** | | |
| **Title:** | | |

ATTACHMENT: Blocked Account Control Agreement

## Exhibit C ∣ Assignment Notice

**Date:** _____

**JPMorgan Chase Bank, N.A.**
**Attention:** Blocked Account Contracts Team
**Email :** blocked.account.contracts@jpmchase.com

Re:  Blocked Account Control Agreement dated as of November 18, 2022, by and among THE LITIGATION PRACTICE GROUP PC ("**Company**"), OHP- LPG, LP ("**Secured Party**") and JPMorgan Chase Bank, N.A. ("**Bank**") relating to account number(s) 735863158 and 735863133 (the "**Agreement**").

Ladies and Gentlemen:

This constitutes an Assignment Notice as referred to in Section 9 of the Agreement, a copy of which is attached hereto.

[NAME OF ASSIGNEE] ("**Assignee**") agrees to assume all of Secured Party's obligations under the Agreement.

Please select the appropriate response below indicating if Assignee is an existing client of Bank.

_____   Assignee is an existing client of Bank

_____   Assignee is not a client of Bank

*(Note: Additional documentation may be required by Bank in order to satisfy its know your customer policies and its due diligence requirements to qualify the assignee as a customer)*

The Assignee's address for notices is as follows.

     **Address:** _____
                  _____
       **Attention:** _____

     **Email:** _____
     **Fax No.:** _____

| OHP- LPG, LP | | |
|---|---|---|
| **By:** | | **Date:** |
| **Name:** | | |
| **Title:** | | |

| Assignee | | |
|---|---|---|
| **By:** | | **Date:** |
| **Name:** | | |
| **Title:** | | |

ATTACHMENT: Blocked Account Control Agreement

# EXHIBIT L

Case 8:25-ap-05005-SC Doc 44 Filed 03/24/26 Entered 03/24/26 Document 81 Page 209 of 217
Main Document 81Page 209 of 217

U230005834326



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: U230005834326

Date Filed: 1/25/2023

Submitter Information:

| | |
|---|---|
| Contact Name | BEE |
| Organization Name | CAPITOL SERVICES, INC. |
| Phone Number | 214-745-5400 |
| Email Address | barchaphorn@winstead.com |
| Address | PO BOX 1831<br>AUSTIN, TX 78767 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| THE LITIGATION PRACTICE GROUP, PC | 17542 E 17TH STREET, STE 100<br>TUSTIN, CA 92780 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| OHP – LPG, LP | 303 COLORADO STREET, SUITE 2550<br>AUSTIN, TX 78701 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All assets of the Debtor, whether now owned or hereafter acquired, wherever located.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
62697-25 - CA - STATE

Exhibit "L"
Page 209

Page 1 of 1

B1439-9197 01/25/2023 8:33 AM Received by California Secretary of State

# EXHIBIT M

Message

| | |
|---|---|
| **From:** | Adam Blum [adamblum@aol.com] |
| on behalf of | Adam Blum <adamblum@aol.com>[adamblum@aol.com] |
| **Sent:** | 2/10/2023 3:30:30 AM |
| **To:** | Marvin Blum [mblum@theblumfirm.com] |
| **Subject:** | Mental exercise |

As detailed in past Fund updates, we made a small investment (-7% of total Fund exposure presently outstanding) to purchase receivables in partnership with LPG last year. While the transaction was structured like a secured loan in many facets, this investment took the form of a receivables purchase in part because the range of outcomes from the distressed nature of the opportunity required a much larger potential return than is the norm for a standard (if there is such a thing) OHP investment.

We shared in our last Fund letter that we have been playing a very hands-on role at LPG given the unstable situation at the company that is largely derived from poor management at some key leadership positions, conditions that afforded the Fund the very advantageous purchase terms in the first instance. Earlier this year, we determined that things hadn't improved to a degree that was suitable to us on our desired timeframe. As is commonplace with distressed opportunities, the situation was exacerbated by various legacy matters from years in the past that continually arose, causing distractions and costing LPG real dollars even as the revenue generated from client files performed as underwritten. Therefore, in consultation with counsel, we decided to take further proactive measures in partnership with a handful of trusted individuals from LPG to initiate the transfer our receivables to a different servicing platform, and although we have several options, the path forward is not crystal clear.  While never ideal, sometimes pulling the ripcord is necessary in our industry.

There is a lot left to play out before we can forecast an expected outcome, but shifting our receivables to a new servicer was advisable and in the best interest of the Fund, despite the uncertainty that lies ahead.  In past investor communications, we presented our rationale for owning the client receivables directly as opposed to being a general balance sheet lender to LPG. An additional advantage to the structure of our investment is that because the cash flows from these client files are owned directly by a subsidiary of the Fund and not by LPG, we, not LPG, have the legal right to work with the underlying consumers to move their files over to a new firm, and we are taking steps to do so.  OHP's predecessor entities have been in similar positions to this one in past transactions, and we are well-prepared. We will not shy away from taking any actions necessary, not matter how unpopular.

While we are and will forever be relentless in the pursuit of maximizing the performance of the LPG investment, protecting our interests and vigorously enforcing our rights, even if the ultimate outcome does not meet our expectations, our work with LPG has been a launchpad for various larger joint venture opportunities in the consumer debt relief industry that are accretive to the Fund. We viewed the LPG investment as a conduit to greater opportunities for the Fund in the consumer debt relief sector, a niche that we have highly prioritized. As a result of the time and work OHP has put forth at and around LPG, we have forged several key relationships with the industry's top regulatory and corporate attorneys as well as with many business leaders and other key players throughout the consumer debt relief ecosystem. These relationships, coupled with the specialized niche sector knowledge we have gleaned and the priority access we have been granted, have already been and will continue to be of tremendous benefit to the Fund, as we seek broad exposure to the consumer debt relief space, focusing on providing capital to finance customer acquisition at firms like LPG to enable consumers to get back on their feet.

The Fund's partnership with Level Lending, along with at least five other near-term opportunities in our pipeline, all emerged through our work with LPG.  Consumer debt relief continues to be an attractive area of emphasis in light of the macroeconomic conditions of today and those expected to linger into the future. As inflation persists and the consumer credit crisis deepens, life is getting increasingly unaffordable for the average consumer, so

Highly Confidential

OHPLPG00095737
Exhibit 10
AZEVEDO 029433
Page 211

credit card usage has proliferated to record levels with no signs of slowing. As a result, the consumer debt relief industry is expected to grow in order to serve the many new clients who need its services to address their credit obligations.  On the regulatory front, recent legislation and the general political climate have repeatedly favored the consumer and placed renewed emphasis on helping consumer debtors get back on their feet, giving the debtor the benefit of the doubt over the creditor or the collection agency at nearly every turn. We are pleased to be positioned as a partner of choice to numerous businesses in the consumer debt relief sector that primarily exist to help the consumer.

As the largest investors in the Fund and with our personal Fund commitments made on identical terms as all other Fund limited partners, we at Old Hickory remain very excited about our collective $12.8 million Fund commitment (amounting to more than 10% of total Fund commitments). This figure represents our team's hard-dollar commitment and does not reflect even further Fund exposure for us that will result from our having waived a large portion of management fees into the Fund as a profits interest each quarter.  Given the macroeconomic story unfolding before us over the next few years, even if the LPG investment ends up a loser, no one at our firm regrets having increased our team's Fund commitment by the additional $3 million that we subscribed into the Fund this past December; in fact, we relish the opportunity to have the extra Fund exposure. Manifesting an aligned culture where our team has everything on the line and eats the Fund's cooking is sacrosanct to our firm.  It's the only way we know how to operate.

In reaction to the news that our team subscribed in another $3 million of our own capital combined with their own views about the investment landscape, several existing Fund limited partners have registered interest with us about increasing their Fund commitments and have also asked if they can introduce us to folks they know who seek unique investment opportunities in this time of economic confusion. We have not determined if or when the Fund will reopen, but we will keep you apprised with ample advance notice. We remain focused above all else on building and managing a sound business that promotes operational integrity and neither compromises the quality of our investment strategy nor erodes the philosophical and economic alignment we have with our partners.

Highly Confidential

**HIGHLY CONFIDENTIAL**

OHPLPG00095738
EXHIBIT G00
AZEVEDO 029434
Page 212

# EXHIBIT N

From:    Dan Young <dan.young@oldhickorypartners.com>
Sent:    Tue 2/14/2023 8:10 AM (GMT-08:00)
To:      Tony Diab <tony@coastprocessing.com>
Cc:
Bcc:
Subject: RE: Docs


Can you call me?

Thanks.

Dan Young, CLU, ChFC

*COO and General Counsel | Old Hickory Partners*
*dan.young@oldhickorypartners.com*

This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Old Hickory Partners Management, LP  and its subsidiaries. This email may also contain information that is confidential, legally privileged and/or otherwise protected from disclosure by contract or law. Any unauthorized use, copying, disclosure, or distribution of this email and/or its attachments is prohibited. If you are not the intended recipient, please let us know by replying to this email and then destroying all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be a solicitation for investment "or an offer to sell securities. Such an offer may only be made to qualified investors by means of delivery of a confidential private placement memorandum.  This email is not legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.  Per IRS Circular 230 Disclosure, any tax advice contained herein is not intended or written to be used and cannot be used by you or any other persons for the purpose of avoiding any penalties that may be imposed by the IRS.

---

**From:** Tony Diab <tony@coastprocessing.com>
**Sent:** Tuesday, February 14, 2023 2:29 AM
**To:** Dan Young <dan.young@oldhickorypartners.com>
**Cc:** adamblum@aol.com
**Subject:** Re: Docs

Hi Dan -

My thoughts in response to your questions/suggestions:

-Oakstone and any successor/assignee/affiliate added as a party to the agreement and as a guarantor and co-obligor and becomes subject to same reporting and compliance requirements as LPG (audits, reporting, bank account controls, expense reimbursement of PurchaseCo and OHP)
>>> Would it be sufficient to add as a guarantor only?  And as part of the guaranty include audits, reporting, etc.?

-LPG needs to assign its ownership stake to another party [maybe a new entity that you and Dan March own?].  It also might be good for Oakstone to own some small fraction of LPG's ownership stake in PurchaseCo.
>>>I will create an entity to own this, and Dan and I will split the shares.  Parting gift....

-OHP should replace the manager of PurchaseCo and change the address of notice from LPG to OHP.
>>>Agreed.

-LPG and Oakstone and all parties acknowledge that PurchaseCo owns all its files free and clear, that there is no other party or claimant who has rights to the cash flows generated by these files, and that even though PurchaseCo has not been paid what it is owed on its files, there are no other agreements in place of any sort that allow for these payments to be made to any other party; PurchaseCo acknowledges that LPG is moving its files to Oakstone, and that while this commenced without PurcaseCo's consent, LPG and Oakstone acknowledge that PurchaseCo has the right to move its files to any servicer of its choosing at any time with the full cooperation of all parties to the agreement >>>This part is complicated.  The right PurchaseCo has is to receivables, and not the receivables of the clients but rather the law firm.  Meaning the client file at issue does not owe money to PurchaseCo, LPG does.  As such, Oakstone would have to take on an obligation if OHP is to have an enforceable right.  The ideal provision would say OHP is entitled to the revenue generated from the files regardless of where they are serviced, but the servicing company is the one that must take on the obligation otherwise OHP has no obligor.  So, the question is how does OHP maintain a collection right despite transfer?  And would the type of transfer (assignment, sale, satisfaction of an obligation, etc.) impact those rights?  I believe an assignment restriction is already in place, but that merely creates a cause of action against the transferor and potentially an action to set aside the transfer; it would not create right to collect from the transferee.  Maybe a call with Quinn would be a good idea to iron this out. Easy answer might be a new receivable purchase agreement, but OHP (I assume) wants the ability to collect past due amounts from the new servicer, so a new PA is not enough....

- PurchaseCo getting irrevocable authorized user/signer-level access to all systems and accounts and PurchaseCo can unilaterally dictate the banking and processing relationships?
>>>Unilaterally dictate banking and processing relationships?  Kind of aggressive, but I think I know what you mean.  I am fine with these terms provided we continue to agree not to share any information with anyone outside of OHP and me.

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Richard A. Marshack<br>**Trustee of the LPG Liquidation Trust** | DEFENDANTS OHP-CDR, LP, (fka OHP-LPG, LP), a<br>Delaware Limited Partnership; Old Hickory Fund I GP, LLC, a<br>Delaware Limited Liability Company; **Old Hickory Fund I GP, LP, a Delaware Limited Partnership**; PurchaseCo80, LLC, a Delaware limited liability Company, Adam Blum, an individual, Daniel Young, an individual |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Christopher Celentino, Yosina M. Lissebeck, Christopher B. Ghio,<br>Siqin Carol Wang<br>Dinsmore & Shohl LLP<br>(619) 400-0500 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>□ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>☒ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    ☒ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
*(1) Declaratory Judgment – Invalidation of Contracts Entered into for Illegal Purposes 11 U.S.C. § 105, and/or FRBP 7001(i); (2) Aiding and Abetting Breach of Fiduciary Duty;(3) Aiding and Abetting Conversion; (4) Conversion (FRBP 7001(g)); (5) Deepening Insolvency; and  (6) Aiding and Abetting Deepening Insolvency*

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ [2] 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ [4] 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☒ [1] 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☒ [3] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $   amount to be proven at trial |

Other Relief Sought
Declaratory Judgment that agreements entered into for illegal purposes are void and unenforceable, compensatory damage, punitive damage restitution, disgorgement, injunctive relief, costs of suit, pre and post-judgment interest, and any further relief as the Court deems just and proper.

**B1040 (FORM 1040) (12/24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group, P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>**Hon. Scott C. Clarkson** |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Christopher Celentino | |
|---|---|
| DATE<br><br>1/12/2026 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Christopher Celentino |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.